# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

Plaintiff and Respondent,

v.

JOHN ANTHONY BERTSCH and JEFFERY LEE HRONIS,

Defendants and Appellants.

S093944

Sacramento County Superior Court
94F07295

April 20, 2026

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Groban, Evans, and Viramontes[*] concurred.

---

[*]    Associate Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. BERTSCH and HRONIS

S093944


Opinion of the Court by Guerrero, C. J.


Defendants John Anthony Bertsch and Jeffery Lee Hronis were tried together and convicted by separate juries of the murder, rape, and kidnapping of Linda Canady. (Pen. Code, §§ 187, subd. (a), 264.1; *id.*, former § 209, subd. (b).)[1] The juries also found true kidnapping-murder, robbery-murder, and rape-murder special-circumstance allegations. (§ 190.2, subd. (a)(17).) Bertsch's jury convicted him of sodomy and found true a sodomy-murder special-circumstance allegation. (§§ 286, subd. (d), 190.2, subd. (a)(17).)

Bertsch and Hronis were tried separately before two penalty phase juries. Each jury returned a death verdict. The trial court denied motions for new trials and to modify the judgments, and it sentenced Bertsch and Hronis to death. The court also sentenced Bertsch and Hronis to various terms of imprisonment and stayed execution of the prison sentences. Specifically, it sentenced Hronis to life imprisonment on the kidnapping charge and nine years imprisonment on the rape in concert charge, and it likewise sentenced Bertsch to life imprisonment on the kidnapping charge, nine years imprisonment on the rape in concert charge, and nine years imprisonment on the sodomy in concert charge. The court also ordered Bertsch and Hronis to each pay a restitution fine under

_____

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

1

Government Code former section 13967 (subsequently replaced by Pen. Code, § 1202.4) in the amount of $10,000.

In this automatic appeal (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b)), we affirm the convictions of both Bertsch and Hronis and affirm the judgment of death against Bertsch. However, based on subsequent changes in the law governing a defendant's competency to represent himself at trial, we reverse Hronis's sentence, including the death judgment. In addition, any balance of restitution fines issued under section 1202.4 as to both Bertsch and Hronis are vacated pursuant to section 1465.9, subdivision (d).

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Guilt Phase

1. *Prosecution evidence*

a. *Overview*

The prosecution presented evidence that in late December 1985, Bertsch and Hronis were being pursued by law enforcement for a string of robberies in the Sacramento area. The duo planned to evade law enforcement by leaving town. They told friends of their plan to prowl a parking lot, find someone they could overpower, and take her vehicle. On December 22, 1985, they followed through on their plan. They kidnapped Canady from a shopping center parking lot, drove hundreds of miles south to a remote area, and raped and sodomized Canady before crushing her to death and discarding her body in an irrigation canal.

b. *Sacramento convenience store robberies and investigation*

In December 1985, several convenience stores in the Sacramento area were robbed. On December 2, a man robbed a

Food and Liquor store in Sacramento at gunpoint. The store clerk activated a surveillance camera, which took photographs of the perpetrator. The clerk later identified Hronis in a lineup as the possible perpetrator.

On December 3, the same individual robbed the Short Step Market at gunpoint. The store owner later identified Hronis in a lineup as the person who had robbed her store.

On December 5, the same man robbed a Circle K store on Kiefer Boulevard. The individual pointed a gun at the clerk and ordered him to hand over all the money in the register. The clerk activated the store camera, which took pictures of the perpetrator. The clerk later picked out Hronis from a lineup as possibly the person who had robbed his store. On December 12, an armed robbery took place at another Circle K store in Sacramento.

Detective Darrell Edwards was assigned to investigate the string of robberies. He provided the media with photographs obtained from the December 2, 5, and 12 robberies and information about the robberies and robbery suspects.

On December 15, another armed robbery took place at a Circle K store in Rancho Cordova. The store manager recognized the individual as the same man who had committed recent prior robberies, as his picture was hanging in front of the register. The manager gave police officers a description of the robber and the car involved, which was a white sedan. The manager later identified Hronis as the man who had robbed the store.

A nearby motorist was listening to a radio scanner tuned to a Sheriff's Department frequency. He heard information about the armed robbery that had just occurred at Circle K and

a description of the vehicle involved. The motorist noticed a vehicle fitting this description and followed it for a time before pulling over and calling the police. The motorist told police officers he saw at least two occupants in the car.

Later that afternoon, a White male robbed a 7-Eleven store at gunpoint. A bicyclist saw a man jump over the fence behind the store and get into a white car with another occupant. The car drove off quickly. The bicyclist told responding officers that the last three letters of the car's license plate were MTH.

On December 18, a local television station broadcasted information about the string of robberies. The next day, Detective Edwards visited the Plaza Motel and Apartments in West Sacramento after receiving a tip that the robbery suspects were staying there. The manager recognized a photograph of the robbery suspect as one of his tenants. He had recorded the tenant's license plate number as 089MTH. He told Detective Edwards that the tenant had rented the room under the name "John H. Brooks" until December 21 and that the tenant was sharing the room with another man with a beard and a woman.

Detective Edwards returned to the Plaza Motel and Apartments on December 21 and examined the room previously rented by "John H. Brooks." He saw a copy of the Sacramento Bee lying open on the bed. It was turned to an article about the robberies, which included the robbery suspect's photograph.

Around this time, Bertsch and Hronis confided to their friend, Martha R., that they had robbed several convenience stores. Bertsch told Martha R. that they would have to "ditch" his car, a white AMC Rebel bearing the license plate 089MTH, because someone was looking for it. Soon after their conversation, Bertsch and Hronis parked the Rebel in front of

Martha R.'s house in the middle of the night and emptied everything out of the car and onto her yard.

In another conversation, Bertsch told Martha R. they were "hot" and had to leave town quickly. Martha R. advised them to go to Buckeye, Arizona, which was about 10 and a half hours away. With Hronis present, Bertsch told Martha R. they had a plan to stake out a shopping center, find somebody they could overpower, and take that person's car. The last time Martha R. saw Bertsch and Hronis was a few days before Christmas.

Jerry B., another friend of Bertsch's and Hronis's, recalled a similar conversation that took place the day before Bertch and Hronis left Sacramento. Bertsch and Hronis told Jerry B. they needed to leave Sacramento because they had recently committed a string of armed robberies in the area and the media had started covering it.[2] They planned to get a car out of a parking lot and go to Arizona.

On January 3, 1986, police officers located the vehicle associated with the robberies, a white AMC Rebel with the license plate 089MTH. It had been abandoned on Fairgrounds Drive and Broadway in Sacramento.

c. *Murder of Canady*

In December 1985, Canady was living in a condominium in Sacramento and working at a clothing store. Canady owned a bronze-colored 1978 Pontiac Sunbird. She saw her parents approximately three to four times per week and spoke with them on the phone almost every day.

---

[2]   In 1987, Hronis pleaded guilty to the robberies committed on December 2, 3, 5, 12, and 15. The reporter's transcript of Hronis's plea to these offenses was read to Hronis's jury only.

On December 21, Canady and her parents visited Canady's grandfather in Manteca, and the trio later went out to dinner in Sacramento. They returned to Canady's condominium around 7:30 p.m. She told her parents she planned to buy groceries the next morning at a grocery store located in a nearby shopping center. She needed the groceries for a dinner that she was going to prepare for her family on Christmas Eve. Canady also planned further preparations, including cleaning her house. Canady's parents left her condominium around 9:00 p.m. It was the last time they saw their daughter alive.

The next day at approximately 9:30 a.m., Canady's neighbor saw Canady take out her trash and return to her condominium. Canady's father called Canady at home around noon, but she did not answer her phone.

The following evening, on December 23, one of Canady's coworkers phoned Canady's father. The employee asked about Canady because she had not shown up or called in for her scheduled shift. Canady's father immediately became very concerned because this was out of character for Canady. He called Canady's home phone but there was no answer again.

Canady's parents drove to Canady's condominium complex and noticed her car was not there. They also noticed the December 23 morning paper was still on the front porch. Inside the condominium, it appeared that Canady had started cleaning but had not finished. Canady's father looked inside the refrigerator and observed Canady had not been grocery shopping as planned. A grocery checker who was familiar with Canady confirmed she had not seen Canady in the store on December 22.

Canady's father called the Sacramento Sheriff's Department to report his daughter missing.

On December 22, 1985, at 12:14 p.m. and 12:17 p.m., one of Canady's credit cards was used to purchase gasoline in Modesto.  A clerk recalled that a man had come into the store with the credit card.  The clerk saw another male and a female sitting in the front seat of the man's car.  The man signed both credit card receipts "Bob Canady."

A few minutes later, Canady's credit card was used to purchase beer and Marlboro cigarettes at another gas station in Modesto.  According to the clerk who handled the transaction, the man using the card was scruffy-looking and very nervous.  Later that afternoon, a different credit card of Canady's was used to purchase gasoline and miscellaneous items in Bakersfield.

At 9:12 p.m., still on December 22, one of Canady's credit cards was used to purchase gasoline and other items in Corona.  The station clerk remembered two men in a light beige sedan.  One of the men entered the store, told the clerk he was in a hurry, and purchased beer and sandwiches.  The other man then entered the store and told his companion to "hurry up" before also grabbing a second case of beer.  At 11:05 p.m., Canady's credit card was used to purchase gasoline in Leucadia.

On December 23, one of Canady's credit cards was used to purchase gasoline in Tucson, Arizona.

At trial, a handwriting expert compared the signatures on the receipts for several of these purchases with known handwriting samples from Hronis.  He concluded Hronis had written the name "Jeff" on some of the receipts.  He was unable to conclude whether Bertsch had signed "Bob Canady" on other

7

receipts because he did not have enough known handwriting samples from Bertsch.

Early in the morning of December 24, an employee with the Imperial Irrigation District in Imperial County was driving along the East Highline Canal when he noticed an object on the east bank of the canal. Using binoculars, he saw a woman's body lying on the canal bank. The woman was later identified as Canady. Her wrists had been bound behind her back with duct tape, and she had duct tape wrapped around her ankles, eyes, and mouth. Her bra was undone and out of place. Canady had 33 different contusions (bruises) and abrasions (scrapes or bleeding) scattered throughout her body and a laceration over her lip. She had bruising on top of her head, over her right eye, right side of her chin, and finger-like markings on her neck. Her nose was broken. She also had bruising on her ankles, shins, and knees. Her ribs had been fractured, she had suffered hemorrhages in her chest, and her lungs were lacerated and collapsed. The forensic pathologist who performed Canady's autopsy determined the cause of death was a massive crush type injury to her back and chest, which was consistent with having been beaten to death.

The pathologist also examined Canady's body for signs of sexual assault. He found a slight hemorrhage in the lining of the uterus and a small amount of blood in the vaginal vault but no tear or laceration. He opined that a sexual assault would not produce noticeable injuries to this area if Canady were rendered unconscious or did not physically resist.

Several days after Bertsch and Hronis left Sacramento, Hronis called Jerry B. and told him they had killed a girl.

Jerry B. overheard Bertsch angrily tell Hronis, "Don't tell nobody that."

On January 10, 1986, Canady's car was found submerged in an Arizona canal. There were beer cans and cigarette butts inside the car. Canady was a nonsmoker; Hronis smoked Marlboro cigarettes.

### d. *DNA evidence and incriminating statements*

During the autopsy, swabs were taken from Canady's vagina, mouth, and anus. A high volume of spermatozoa was found on the vaginal and anal slides. The vaginal swab results and sperm fraction extracted from Canady's underwear indicated the presence of two sperm donors.

Law enforcement eventually came to suspect that Bertsch and Hronis were involved in Canady's murder. In 1988, law enforcement collected blood and saliva samples from Hronis while he was in jail after pleading guilty to the Sacramento convenience store robberies. Blood and saliva samples were also taken from Bertsch while he was in jail in Georgia for an unrelated offense.

A Department of Justice (DOJ) criminalist conducted serology testing and compared the Canady samples with the Bertsch and Hronis samples. She concluded that Hronis could be included as a possible semen donor while the results for Bertsch were inconclusive. The DOJ criminalist then sent the samples to the FBI for additional testing.

While the investigation was pending, DNA forensic testing became available. After reading a newspaper article in jail about the admissibility of DNA evidence in court, Bertsch asked for a private conversation with Detective Edwards and District Attorney Steve White. When Bertsch was asked why he wanted

a private meeting with them, he responded, "Because of the article and I know they have DNA evidence against me that was found on the victim."

In February 1990, Bertsch and Hronis were charged with Canady's murder.

In 1989 and 1992, the FBI DNA analysis unit chief, Lawrence Presley, supervised testing of the DOJ samples using restriction fragment length polymorphism (RFLP) analysis.[3]

---

[3]    RFLP analysis "compar[es] the DNA in a known sample (e.g., blood from a suspect) with the DNA in a questioned sample (e.g., blood or semen taken from a crime scene)." (*People v. Soto* (1999) 21 Cal.4th 512, 514–515 (*Soto*).)  RFLP analysis involves (1) processing DNA from the suspect(s) and the crime scene to produce X-ray films that indicate the lengths of the polymorphic base pairs (e.g., the sequence of base pairs that vary from person to person); (2) examining the X-ray films to determine whether any sets of polymorphic fragments match; and (3) if there is a match, determining the match's statistical significance. (*Id*. at pp. 520–521.)

"Unless a nonmatch between any band of the suspect's DNA and the corresponding band of the questioned sample conclusively eliminates the suspect as the source of that sample, a match of one or more of the suspect's bands with those of the sample places the suspect within a class of persons from whom the sample could have originated.  The fact finder's determination of guilt may then turn on the degree of probability that the suspect was indeed the source of the sample. That probability, however, will usually depend, not on the DNA findings alone, but on a combination of those findings together with other, non-DNA incriminating evidence. [Citation.]  [¶] The question properly addressed by the DNA analysis is therefore this:  Given that the suspect's known sample has satisfied the 'match criteria,' what is the probability that a person chosen at random from the relevant population would likewise have a DNA profile matching that of the evidentiary

The FBI's RFLP testing compared the known DNA profiles from Bertsch's and Hronis's blood samples to the two unknown DNA profiles identified in the semen collected on Canady's vaginal swab. At all four polymorphic DNA locations (loci) examined in the RFLP testing, Bertsch and Hronis could not be excluded as potential contributors. Using the four loci analyzed, Presley conducted a statistical frequency analysis to arrive at a statistical probability for a random match. For Hronis, the probability of an unrelated individual in the Caucasian population randomly contributing was one in eight million. For Bertsch, the probability of an unrelated individual in the Caucasian population randomly contributing was one in 12 million.

Presley later reevaluated his statistical analysis. This reevaluation, based on a change in FBI RFLP procedure as well as a newly approved "ceiling principle" analysis, resulted in a much greater probability that a random person unrelated to Bertsch or Hronis could have been a contributor to the sample being tested. As a result, the district attorney moved to dismiss the case against Bertsch and Hronis without prejudice in order to "seek independent testing, analysis, and assessment of

---

sample? That probability is usually expressed as a fraction — i.e., the probability that one out of a stated number of persons in the population (e.g., 1 out of 100,000) would match the DNA profile of the evidentiary sample in question. A greater probability, that is to say, a fraction with a smaller denominator (e.g., 1 out of 10,000), would tend to favor the suspect by increasing the probability that one or more other persons has a DNA profile matching the evidentiary sample." (*Soto, supra*, 21 Cal.4th at p. 523, fn. omitted.)

scientific issues." The court granted the motion and released Bertsch and Hronis from custody.[4]

While Hronis was out of custody, he spoke with his friend Loren G. about why he had been arrested for murder. Hronis claimed that another friend had stolen a woman's purse and given Hronis the woman's credit card. Hronis told Loren G. he had been arrested for murder because he had used the woman's credit card at least four times and the woman had been murdered soon after. He admitted to Loren G. that his friend might have murdered the woman.

In 1994, Cellmark Diagnostics laboratory conducted additional DNA testing using polymerase chain reaction (PCR) analysis. Dr. Robin Cotton oversaw and reviewed Cellmark's testing, which used both DQ-Alpha and Polymarker techniques.[5] The results of both tests showed that neither

---

[4]     The district attorney refiled charges against Bertsch and Hronis in April 1995.

[5]     "PCR is 'a molecular biology technical procedure for exploiting genetic differences in DNA,' whereby small pieces of DNA are copied or amplified. The technique is employed when the DNA sample available is too small and/or degraded to perform a more common type of DNA analysis known as RFLP." (*People v. Morganti* (1996) 43 Cal.App.4th 643, 662 (*Morganti*).) PCR analysis may be used "to amplify a specific gene known as the DQ alpha. The DQ alpha gene codes for proteins found on the surface of the white blood cell and is known to have alternate genetic forms, i.e., the gene does not look the same in all people. Six variations (or alleles) have been identified and labeled as 1.1, 1.2, 1.3, 2, 3 and 4. Because alleles are inherited in pairs, one from each parent, there are twenty-one possible combinations which are referred to as genotypes." (*Ibid.*)

Bertsch nor Hronis could be excluded as contributors to the DNA samples found in sperm extracted from Canady's vaginal swab and anal swab.

Genetic statistics expert George Sensabaugh conducted a random match calculation using the FBI and Cellmark test results. For the FBI's RFLP results, he calculated that 99.6 percent of the Caucasian population, 99.99 percent of the African American population, and 99.92 percent of the Hispanic population could be excluded as contributors of the semen collected on Canady's vaginal swab. For Cellmark's DQ-Alpha and Polymarker results, Sensabaugh calculated that 99.75 percent of the Caucasian population could be excluded from possible contributors.

In March 1998, DOJ criminalist Renee Montgomery conducted a second round of DQ-Alpha testing on the samples. She first retested the reference samples, concluding that Bertsch's genotype at the DQ-Alpha locus was a 2, 2, Hronis's genotype was a 1.2, 1.2, and Canady's genotype was a 4.1, 4.1. Montgomery then retested the anal swab sperm fraction,

---

"In the forensic setting, PCR analysis of DQ alpha involves three general steps. First, DNA is extracted from the nucleus of cells present in an unknown bloodstain. Second, the DQ Alpha is replicated or amplified by a process which involves combining the DNA with a commercially available solution or 'cocktail' and then subjecting the solution to a series of controlled temperature cycles. Finally, the amplified gene is typed in order to identify the alleles present in the amplified DNA." (*Morganti*, *supra*, 43 Cal.App.4th at p. 662, fn. omitted.)

A Polymarker analysis is a different kind of PCR test that "compare[s] five different genes rather than the single gene used in the DQ-Alpha test." (*People v. Jones* (2013) 57 Cal.4th 899, 935 (*Jones*).)

confirming the presence of more than one source of DNA in the sample. The major donor genotype matched Bertsch's genotype of 2, 2. Montgomery determined the minor genotype was a 1, but she was unable to conclude whether the subtype was a 1.2 or 1.1 based on the intensity of the dots. Montgomery determined an individual with a 1.2 genotype, such as Hronis, could not be excluded as a contributor of the second source of DNA.

DOJ criminalist Steven Myers performed further DNA testing using Short Tandem Repeat (STR) analysis in combination with PCR testing.[6] The subject DNA included additional DNA extracted from Canady's underwear. Myers compared the measurements of alleles at nine different STR loci. The allele readings observed in the sperm fraction extracted from Canady's anal swab were identical to the allele readings in Bertsch's reference sample at all nine loci. Myers calculated that this profile occurred randomly in the Caucasian population at a rate of one in 2.4 trillion individuals. Additional allele

---

[6] "STR's are sets of four nucleotide units of base pairs on the DNA strand." (*People v. Cordova* (2015) 62 Cal.4th 104, 128 (*Cordova*).) PCR testing using STR (also called PCR-STR) looks at different STR "that are on specific identified areas of different chromosomes." (*Id.* at pp. 127–128.) " 'PCR-STR testing has many advantages over RFLP testing. It can test a far smaller sample than RFLP testing requires. It is less susceptible to sample degradation. It is simpler and less time consuming. Additionally, . . . "[w]ith the ability to compare numerous loci, the discrimination power of PCR-STR testing is extremely high." ' [Citation.] As the high court has summarized, since 'the mid-1980's, there have been several major advances in DNA technology, culminating in STR technology.' " (*Id.* at p. 127, quoting *District Attorney's Office for Third Judicial Dist. v. Osborne* (2009) 557 U.S. 52, 62.)

readings observed in the sperm fraction extracted from Canady's underwear were also identical to the allele readings in Bertsch's reference sample at all nine loci, resulting in the same random match probability. The allele readings from Canady's underwear matched the allele readings in Hronis's reference sample at seven of nine loci. For the second donor profile matching Hronis's profile, Myers calculated this pattern of matching would also occur randomly in the Caucasian population at a rate of one in 2.4 trillion individuals.

2. *Defense evidence*

Hronis did not testify or offer evidence at the guilt phase of trial.

Bertsch's defense focused on handwriting evidence, the timing of another store robbery in Sacramento, the timing of the discovery of Bertsch's vehicle in Sacramento, and disputing the prosecution's DNA evidence with his own experts. Bertsch also testified in his defense.

A DOJ handwriting expert testified that Bertsch probably did not write the signatures on six of the credit card receipts. A forensic document examiner testified that Bertsch very probably did not sign the credit card receipts.

Two clerks who worked at a Sacramento clothing store on December 23, 1985, testified that a man came into the store and robbed them at gunpoint. One of the clerks participated in a lineup and indicated that Hronis looked like the person who had robbed the store.

On January 3, 1986, Roseville Police Officer Michael Jones noticed Bertsch's abandoned AMC Rebel while on an afternoon jog. At the time, he jogged past the same location nearly every day. When Jones contacted law enforcement, he

mentioned he had not observed the vehicle before January 3. Jones testified he had no independent recollection of having seen the car there prior to January 3, but that January 3 was probably the day he first made the connection.

Dr. Laurence Mueller and Dr. Kenneth Berger testified regarding what they perceived to be flaws in the DNA testing and analysis presented in this case. Mueller provided alternative methods of calculating random matches and opined the chances of random matches were much higher than Sensabaugh's or Cotton's calculations. He opined that there was an inherent problem with using population databases and the product rule to calculate probabilities for the loci included in the STR testing. However, he did not redo any of Myers's calculations based on the STR testing, and he conceded that a random match would be extremely rare. Berger also did not offer any new calculations under the STR testing but instead testified that the troubleshooting of the machine used in the DOJ's STR testing signaled that this particular type of STR testing was still in the development stage, which undermined the results of the tests. He also opined that the DOJ should have conducted additional validation testing.

Bertsch testified in the presence of both juries. He maintained that he did not kidnap, rape, or murder Canady. He admitted to participating in four or five convenience store robberies with Hronis in December 1985. He said that Hronis and Jerry B. had also committed separate robberies on their own. Bertsch claimed that a woman owned the white AMC Rebel, and that Hronis and Jerry B. drove it.

Bertsch also confirmed he and Hronis moved out of the Plaza Motel on December 19 after the local news ran a story

about the robberies. Bertsch claimed he intended to cut ties with Hronis and Jerry B. because of the law enforcement pursuit and that he dropped off Hronis and Jerry B. at Jerry B.'s mother's home. Bertsch parked the Rebel next to other abandoned cars in an open field near a motel but later moved it to Old Fairgrounds Drive.

Bertsch testified that he stayed in Sacramento until March 1986, when he traveled by bus to Denver. He ultimately settled in Atlanta. In 1987, he was convicted of manslaughter and aggravated assault and spent three years in a Georgia state prison. In 1990, he was extradited to California and charged with Canady's murder.

### B. Penalty Phase

#### 1. *Bertsch*

The prosecution's case in aggravation against Bertsch included details of Bertsch's criminal history and victim impact testimony. Bertsch's half sisters testified about numerous times Bertsch sexually and physically abused them growing up. Witness testimony from Bertsch's 1987 trial for voluntary manslaughter and aggravated assault was read into the record. The testimony revealed that Bertsch had stabbed two people, one of whom died from her wounds. Jerry B. also testified about two other occasions on which he saw Bertsch stab people.

Canady's parents testified about how their daughter's murder devastated them and otherwise impacted their family.

Bertsch's evidence in mitigation included testimony from individuals who knew Bertsch through school or church and described his disposition favorably. Three mental health professionals also testified. A retired corrections psychologist opined that Bertsch would make an adequate adjustment to life

in prison. A clinical neuropsychologist testified that Bertsch had significant neuropsychological deficits in his cognitive functioning, which made him more impulsive. A forensic psychologist testified that Bertsch suffered from antisocial personality disorder and substance abuse disorder, but he was "not a completely bad person."

2. *Hronis*

The prosecution's case in aggravation against Hronis included victim impact testimony from one of the robbery victims and from Canady's sister. Canady's parents testified about the devastating impact of her murder on them and their family. In addition, the prosecution presented evidence that Hronis had been convicted of second degree burglary in 1977.

Hronis represented himself at the penalty phase. He did not offer evidence in his own defense, testify, or give a closing argument.

## II. DISCUSSION

### A. Pretrial and Guilt Phase Issues

1. *Hronis's competency proceedings*

Hronis asserts various claims of error relating to his mental competence to stand trial. He contends the trial court's initial competency determination did not satisfy federal constitutional requirements and, alternatively, the proceedings were too superficial to support the court's finding that he was competent. He also claims the court should have appointed the Director of the Regional Center for Developmental Facilities as an additional competency expert. He further maintains the court abused its discretion when it declined to reinstitute competency proceedings based on new evidence. We conclude Hronis's arguments lack merit.

### a. *Factual and procedural background*

After Hronis was arrested for Canady's murder, he claimed to have a religious revelation where God spoke to him and told him he would be delivered, i.e., be found not guilty or otherwise escape the charges against him. He relayed this experience to his attorneys and the trial court on numerous occasions. Hronis's faith in the veracity of his religious revelation and his refusal to cooperate with his attorneys to prepare for a possible penalty phase defense provided the basis for his attorneys' expressions of doubt regarding Hronis's competence.

### i. *Initial competency proceedings (January– March 1995)*

In January 1995, Hronis's attorneys filed an expression of doubt as to Hronis's mental competence. Defense counsel's accompanying declarations stated that Hronis had attended classes for the educationally handicapped and his IQ level was once tested at 69. Defense counsel noted that Hronis refused to allow a mental health professional to evaluate him, but that two psychologists who had either met with Hronis or learned of his mental rigidity believed Hronis was not competent.

The trial court suspended criminal proceedings to allow for a formal evaluation and determination of Hronis's mental competence to stand trial. It appointed Dr. Shawn Johnston and Dr. Ted Kobashigawa to examine Hronis and file reports with the court. After each doctor administered a clinical interview of Hronis and reviewed relevant background documents, both determined Hronis was competent to stand trial.

Johnston's and Kobashigawa's reports described Hronis's ability to understand the legal proceedings and to assist counsel. As reflected in their reports, both experts considered Hronis's belief that God would deliver him from this case in evaluating whether he was competent to stand trial.

Regarding Hronis's intellectual functioning, Johnston found that Hronis "appear[ed] to be functioning in the borderline to low average" range. To this end, after administering the Bender-Gestalt Test to Hronis, Johnston believed the test results suggested Hronis may suffer from psychoneurological deficits and/or learning disabilities. However, Johnston concluded that there was no indication that Hronis was suffering from any significant cognitive deficit.[7]

Johnston characterized Hronis's professed religious revelation as "a clear demonstration of Mr. Hronis's narcissism and grandiosity" and "not . . . connected with any mental illness whatever but, rather, is part and parcel of the Antisocial Personality Disorder from which he obviously suffers." Johnston pointed to the isolated nature of Hronis's purported communication with God and the selective manner in which he utilized it. Johnston noted that Hronis used the revelation to explain his rejection of his attorneys' advice to accept a plea bargain offer, yet at the same time followed his attorneys' advice not to speak with Johnston about the circumstances of the case. He added that Hronis's religiosity was "remarkably common

---

[7] Johnston's conclusion as to Hronis's intellectual functioning was echoed by Dr. Janice Nakagawa, a court appointed psychologist, who later opined that there was "no evidence that [Hronis] suffers from any significant cognitive or developmental problems or delays."

among sociopaths in trouble who are attempting to distance themselves from the potential consequences of their antisocial behavior" and that "he understands exactly what he is doing" but "may not always be candid with regard to his true motives or intentions."

Kobashigawa's report likewise considered Hronis's "significantly religious" views and his belief he would be found innocent by divine intervention. Kobashigawa observed that, despite these views, Hronis "seemed to acknowledge that what may happen in the future may not be predictable or exactly what he may want" and exhibited "significant flexibility" concerning his religious views. Kobashigawa determined Hronis's extreme religiosity did not approach delusional status and concluded he was able to understand the nature of the criminal proceedings against him and probably able to assist counsel in the conduct of a defense in a rational manner.

Concerning Hronis's intellectual ability, Kobashigawa found Hronis's intelligence "to be in the average range" and did not believe that he was "of low intelligence."

In March 1995, following the submission of Johnston's and Kobashigawa's reports, Hronis waived his right to a jury trial on the issue of competence and agreed to submit the matter on the experts' reports. Based on the reports, the trial court determined Hronis was competent to stand trial. It found that Hronis "understands the nature of the proceedings, and if he wishes to do so, he can assist counsel in the defense of this case." The court then reinstated criminal proceedings.

### ii. *Subsequent* Marsden *hearings and discussions regarding competence*

Over the next few years, a dispute arose between Hronis and his attorneys regarding access to various documents. At *Marsden*[8] hearings in 1997 and 1999, Hronis complained that he was denied access to various witness statements and could not assist in his defense without them. Defense counsel acknowledged they were using the documents as leverage to get Hronis to assist with the penalty phase, since Hronis believed he would be delivered and did not need to talk about any possible penalty. Hronis complained about defense counsel's tying his ability to review guilt phase evidence to him speaking with a doctor, and he claimed defense counsel had confided that the competency proceeding was "a stall tactic." The trial court denied Hronis's *Marsden* motions.

In January 2000, the guilt phase of trial began. One month later, the court held another *Marsden* hearing to address Hronis's concern that the jury would notice his dirty appearance during trial and connect it to the evidence being presented. In response, defense counsel worried that Hronis only appeared concerned about looking good and was apparently not bothered by the incriminating testimony because of his religious revelation. Hronis replied that he was concerned about the testimony, and his *Marsden* request was not related to the revelation.

Defense counsel asked the court to suspend proceedings and declare a doubt of mental competency based on the record. The court denied the *Marsden* motion because the relationship

---

[8]     *People v. Marsden* (1970) 2 Cal.3d 118.

between counsel and Hronis had not fundamentally broken down. It asked defense counsel to confirm whether he was requesting the court to express a doubt regarding Hronis's competency. Defense counsel responded, "I think we have to. Well, yes, I just don't know that I can say anything else about that." The court stated it would reflect on that with counsel and adjourned for the day.

The following week, the court held an in camera hearing to address defense counsel's "oblique references on the record that arose from the expression of doubt stated not by the Court but by the counsel in the context of Mr. Hronis' most recent *Marsden* motion." Counsel represented that they had attempted to contact Dr. John Podboy, a psychologist who had spent some time with Hronis, but they were unable to do so and therefore could not secure any kind of psychological evaluation to supplement the record from the prior competency hearing. Counsel recounted that Podboy had relayed to them that Hronis's competence could begin to deteriorate if his religious revelation did not come to fruition. Counsel wanted to develop additional support, so they asked the court to delay ruling on the ultimate question of whether to appoint doctors to assess Hronis's competence. The court found it did not currently have a basis to express a doubt, and therefore did not appoint any experts, but it gave defense counsel continuing leave to revisit the issue.

Later that day, Hronis made another *Marsden* request based on his view that his counsel was attempting to have him declared incompetent. Hronis again complained that his attorneys were using competency claims as a stall tactic and a tool against him, stating, "If I get out of line, or he don't like the way what I am doing, he'll throw this at me and uses it as a tool

against me." The court again found the issues Hronis complained of were properly within the discretion of defense counsel and denied the *Marsden* motion.

In March 2000, after Loren G. had testified about Hronis's confession to using Canady's credit cards, Hronis again requested a *Marsden* hearing. He complained that his counsel had not adequately investigated or cross-examined Loren G., even though Hronis had been complaining for years about access to documents relating to investigation of church members (including Loren G.). Defense counsel replied that they had investigated Loren G. and listened to Hronis's proposal, but they had exercised their judgment and rejected it. The court denied Hronis's *Marsden* request, finding that the focus of Loren G.'s cross-examination was well within the discretion of counsel.

On April 12, 2000, outside the prosecution's presence, Hronis's counsel expressed a doubt regarding Hronis's competency to stand trial. They cited Hronis's consistent refusal to participate in a mental health evaluation or accept a plea bargain offer, based on his asserted religious revelation and message from God that he would not be convicted.

Counsel shared that they had retained Podboy to assess the presence of certain mitigating factors relating to penalty, namely, whether Hronis acted under extreme duress or substantial domination of Bertsch, whether Hronis was able to appreciate the criminality of his conduct due to mental disease or intoxication, and whether there were any other extenuating circumstances related to the crime. They represented that Podboy had interacted with Hronis beginning in April or May 1999 in a casual manner, not as a clinician, to gain Hronis's

trust. Podboy met with Hronis approximately 15 or 16 times over a period of six or seven months. In counsel's view, Podboy was making progress on establishing a basis for Hronis to be persuaded to participate in mental health testing in the event of an adverse verdict in the guilt phase of trial. The last visit occurred four months before, on December 20, 1999. By that point, however, the prosecution had become aware of Podboy's visits, which it disclosed in open court during jury selection. Hronis accused Podboy of attempting to produce evidence that could be used at the guilt phase and ended the relationship.

To support their expression of doubt regarding Hronis's competence, defense counsel called Podboy to testify under oath regarding the extent of his communications with Hronis. He briefly described his "positive" visits with Hronis between May and December 1999. He confirmed that these visits came to an end on December 20, when Hronis was very upset about the recent court hearing in which the prosecution represented that Podboy may offer evidence at the guilt phase. Although Podboy assured Hronis that he had not spoken to his attorneys about participating in the guilt phase, Hronis made clear that "he wanted nothing more to do with" Podboy.

Defense counsel then summarized a subsequent meeting between counsel and Podboy. Podboy conveyed that "although he has at least some preliminary impressions that would be founded on forensic issues, . . . he would not come to court to testify about them for a variety of reasons, not the least of which is that he does not have available data that he feels would be necessary to reach the level of reasonable medical or psychological" meetings or interviews necessary to form an opinion. Counsel proposed to keep Podboy apprised of developments in the case due to concerns relating to Hronis's

mental competency, noting they had sent him copies of prior *Marsden* hearings and shared certain communications between Hronis and his attorneys. Podboy opined to counsel that as time went on, Hronis "would become more and more fixed in his delusion, more likely to deteriorate; that his cooperation with [them] would, as a result of his delusional thinking process, reach the point where he very likely would decompensate and be unable to cooperate in any way." Defense counsel recalled Podboy suggesting that the "revelation is going to come in such serious conflict with the reality of the evidence and an ultimate guilt verdict, that you are going to end up with a psychotic client and that he will explode, psychically explode."

The court asked Podboy whether he believed Hronis was competent to proceed with trial. Podboy responded that, based on his review of Hronis's statements during the *Marsden* hearings and his conversations with counsel, he was "certainly of the opinion that this individual is incompetent." He explained that Hronis's sole focus was on what he would do after his release from jail and that he "is delusional to the extent that he is convinced that there is no way that he could possibly be found guilty and held to answer on these charges." Defense counsel reiterated their position that Hronis's refusal to cooperate was not by choice but was based on his religious delusion. They viewed Hronis as having "a peculiar kind of disability" that interfered with his ability to cooperate with counsel but not his ability to understand the proceedings. Counsel described Hronis's thinking as "delusional" and "crazy," adding: "And I don't care what you want to call it; he won't do what's in his best interest to save his life."

Hronis then made a *Marsden* motion so he could speak to the court regarding his competency. He repeated his belief that

God would deliver him, analogizing his case to a biblical story in which God had intervened to prevent the execution of a man who had committed adultery. He reiterated that counsel had tricked him into participating in the earlier competency hearing by misrepresenting it was just a stall tactic.

Hronis disputed telling counsel that the revelation prevented him from participating in the penalty phase, and he asserted defense counsel had misrepresented his position on this point. He contemplated the possibility of conviction, and he stated that if he were to be convicted, then he had misunderstood God. He added, if he were convicted, "I am not going to deteriorate, not going to break down." He also acknowledged that the pressure of this case at times had caused his emotions "to spill out," which he deemed reasonable in light of the stakes at play. Hronis repeated his complaint about his attorneys' failure to properly impeach Loren G. or present evidence he viewed as exculpatory.

The court denied the *Marsden* motion. Again, it found that most of the tactical decisions Hronis complained of fell within his counsel's discretion. It declined to make a competency finding at the time and allowed defense counsel the opportunity to submit additional evidence.

On April 19, 2000, defense counsel again formally expressed a doubt as to Hronis's competence and stated they would present evidence on the issue. Counsel indicated they would provide a declaration from a licensed and qualified psychologist opining that Hronis was currently mentally incompetent. Informally, based on the current record, the court stated it had no doubt as to Hronis's competence, but it recognized that defense counsel could submit supplemental

information to show a substantial change of circumstances since the last hearing. At a subsequent *Marsden* hearing the following month, defense counsel represented they would file additional pleadings regarding Hronis's competence.

On June 5, 2000, with trial proceeding apace and defense counsel still not having submitted additional evidence regarding Hronis's competency, the trial court decided to articulate on the record why it had no doubt as to Hronis's competence. The court first observed that because a prior competency determination had been made, there must be a substantial change of circumstances or new evidence casting doubt on the original competency determination. The court also noted that it could consider its personal observations of Hronis, and that it had done so.

The court acknowledged Podboy's opinion that Hronis was incompetent but found the basis for the opinion to be "fairly thin." The court also found Hronis's statements regarding his revelation were fundamentally the same as in the original competency proceeding. In fact, the court noted, Hronis's statements "were more open in some respects" because Hronis indicated that he may have misunderstood what he believed God's communication to be. Noting that the psychological reports submitted in connection with the prior competency proceeding had considered the same sort of statements that Hronis had more recently made, the court gave their findings regarding Hronis's competency substantial weight. The court emphasized that although Hronis was extremely religious and professed to have had a revelation, he also articulated some very strong and specific opinions about the way the case should be handled, which suggested he had the ability to rationally assist counsel.

### iii. *Renewed competency proceedings*

On August 23, 2000, Hronis was found guilty of first degree special circumstance murder. On August 28, Hronis made another *Marsden* request. He complained that his attorneys wanted to put on a defense at the penalty phase, while he would prefer to send the jury home, save the state some money, be first in line to receive the death penalty, and "be with Jesus" rather than "rotting" in prison waiting for an appeal. He repeated: "If I can't be free on the streets, I want to be free with Jesus. That's exactly how I feel." He added, "I'm not out of my mind, not speaking . . . irrationally. I'm being perfectly honest with you, Judge. [¶] Let's just save the state the money, send the jury back home. Let them go back in their lives. Shut this whole process down." The court noted for the record that Hronis was "soft spoken, deliberate, and composed."

In response, defense counsel stated that they had just filed a formal motion expressing a doubt as to Hronis's mental competency (Motion 820), which was supported by declarations from defense counsel and Podboy. Defense counsel made clear that unless they were removed as counsel, they would present a penalty phase defense "contrary to [Hronis's] wishes and desires as expressed," which presented a "very real conflict." They added that Hronis's *Marsden* motion sounded more like a *Faretta* motion.[9]

The court denied the *Marsden* motion, noting that counsel had discretion to present a penalty defense against a

---

[9] *Faretta v. California* (1975) 422 U.S. 806 at pp. 832–835 (*Faretta*) held that a defendant has a constitutional right to proceed without counsel when the defendant voluntarily and intelligently elects to do so.

defendant's wishes. It stated nothing in the hearing had raised a doubt in the court's mind regarding Hronis's mental competency, but it would carefully review Motion 820. It ended in camera proceedings to allow Hronis to make a *Faretta* motion in open court.

In Motion 820, defense counsel alleged new competency proceedings were required because there had been a substantial change of circumstances and new evidence cast serious doubt on the validity of the court's previous competency finding. The alleged change of circumstances or new evidence was that Hronis, since the last competency hearing in 1995, had conveyed certain information to counsel that could be considered mitigating at the penalty phase and counsel believed it was irrational for Hronis not to allow the information to be used as mitigation.

Attached to Motion 820 were declarations from defense counsel and an unsworn report from Podboy, which was addressed to defense counsel. In his report, Podboy opined that Hronis suffered from a delusional disorder based on his asserted special relationship with God. The report described Podboy's observations of Hronis on August 19 and 20, when Podboy visited him in jail during jury deliberations. Podboy believed Hronis's cognitive and emotional function at that point was deteriorating. He cited Hronis's comparison of himself to King David, his recent 21-day fast to communicate with God, and his steadfast belief during jury deliberations that he would be released from prison.

Podboy's report also described his personal observations of Hronis's mental state after the jury found him guilty. Podboy wrote, "Hronis presented as completely psychotic, irrational,

and unable to respond to even the . . . simplest form of questions which, in many cases, were put to him repeatedly and in a variety of forms." Podboy opined that this sort of decompensation was typically seen with individuals suffering from a paranoid type of schizophrenia. He added, "While opinions may differ to some extent about the exact diagnosis in regard to Mr. Hronis, which is made far more difficult by the absence of a psychometric database, there would appear to be no doubt whatsoever that Mr. Hronis is actively psychotic. He is unable to interact with his attorneys in a rational and meaningful manner about any topic whatsoever."

The court held an in camera hearing to allow defense counsel to explain the basis for their continued belief that Hronis was mentally incompetent. Defense counsel requested the court unseal Motion 820, which, as noted, included Podboy's report and counsel's declarations, and which referenced the mitigating information Hronis had conveyed to counsel. After confirming with Hronis that he wanted his statements to counsel to remain confidential, the court determined the statements came within the attorney-client privilege. The court ordered Motion 820 to remain sealed, but it said it would apprise the prosecution of the subject matter of the motion. The court also said it would give the prosecution Podboy's report, with two redactions to remove references to Hronis's statements.

The court then allowed the prosecution into the courtroom. It announced that defense counsel had filed a motion to express a doubt regarding Hronis's competency, which the court had ordered sealed from the public because of potential prejudice. It would, however, provide the prosecution with a partially redacted version of Podboy's report. The court also indicated its intent to seek an advisory opinion from a court-approved

31

medical expert, although it was specifically not expressing a doubt at that time.

On September 1, 2000, the court appointed Dr. Janice Nakagawa to render an advisory opinion on Hronis's mental competence. The court provided her with copies of the previous psychological reports from Johnston, Kobashigawa, and Podboy (with the same two redactions). Nakagawa conducted a clinical interview with Hronis on September 7 and submitted her advisory report the following week.

In her report, Nakagawa stated that she had reviewed the prior medical reports and personally observed Hronis. She described Hronis as alert, oriented, and cooperative. She noted that he seemed to become a little agitated when discussing religious convictions, and it was evident Hronis exhibited a quality of religious fervor. However, Nakagawa observed, "this did not appear to manifest in any frankly delusional symptomatology." She stated his speech was "relevant, goal-oriented, and coherent, with no evidence of any underlying psychotic symptoms." Nakagawa detected "some evidence of grandiosity and narcissism, as well as a clear antisocial dynamic," but she determined "these appeared to be directly related to underlying personality disorder dynamics rather than any signs of mental illness."

Nakagawa recommended Hronis be declared mentally competent. She described Hronis as possessing "very rigid, fundamentalist religious beliefs," but opined "this religious fervor is not atypical of a fairly large segment of the general population." She added, "While he may be an individual who is not very well integrated psychologically, he does not evidence any frankly delusional or psychotic symptomatology. There is

no evidence that he suffers from any significant cognitive or developmental problems or delays. Additionally, despite his rigidly fundamentalist religious perspectives, there is no evidence to suggest that he would not be able to make reasoned decisions regarding all matters pertaining to his case or assist counsel in conducting a defense in a rational manner."

On September 13, 2000, the court formally denied defense counsel's motion to declare a doubt as to Hronis's competency. The court stated that it had reviewed the lengthy evidentiary record regarding Hronis's competency and it had considered its own personal observations in making its ruling.

First, the court noted that every medical report had described Hronis's religious language and statements consistently, and the court had observed Hronis use the same language on occasion. Regarding Podboy's report to defense counsel, the court stated that it found certain aspects of the report "troubling." For example, the court viewed the report's skepticism of Hronis's fasting based on his religious beliefs as "reflect[ing] bias or pre-orientation." It described Podboy's reliance on Hronis's fasting as "extraordinarily weak," noting that "[i]t's common knowledge . . . that the bulk of the religions in the world have fasting periods," including new sects of Christianity that encourage and promote fasting for extended periods of time "as one of the tools to help gain insight and spiritual enlightenment." The court also noted the "thinness" of Podboy's opinion as expressed during the prior hearing. The court noted the "remarkable similarity and continuity" among the reports from Johnston, Kobashigawa, and Nakagawa, the last of whom met with Hronis following the jury's guilty verdict.

The court also described its personal observations of Hronis throughout the proceedings. It found that Hronis was "occasionally difficult" and "highly religious," but that he seemed to understand what was going on, even after the jury rendered its guilty verdict. The court explained it had decided to request an additional advisory opinion from Nakagawa because the court's personal observations "were so strongly, firmly, diametrically opposed to Dr. Podboy." The court posited that perhaps one of the reasons that Podboy's report was "so extraordinarily different" from the other reports, and from the court's own observations, was that Podboy had interviewed Hronis just two days after he was convicted of first degree murder with special circumstances, which in the court's view would have a substantial impact on anyone.

The court reasoned, "People who are competent . . . can make what the Court thinks are not rational decisions. [¶] I don't think it's a rational decision for a person to go Pro Per in a penalty phase, but people can make those decisions under the law. Decisions that the trial judge and the counsel may think are improper decisions. [¶] Decisions which are, from our perspective, not correct, [can] still be competent under the law. And that's I believe exactly what we have here."

Defense counsel objected to the trial court's ruling as improperly making findings and conducting a truncated competency trial in violation of Hronis's due process rights. The court noted the objection and ended the in camera hearing.

As discussed in more detail below (see pt. II.B.1.a., *post*), the court subsequently granted Hronis's request to represent himself at the penalty phase and ordered his attorneys to serve as standby counsel and attend all further proceedings. Hronis's

penalty phase trial began on September 18, 2000. As noted, Hronis did not offer evidence in his own defense, testify, or give a closing argument.

### b. *Analysis*

#### i. *Constitutionality of California's statutory competency scheme*

Hronis first contends that California's standard of competence as set forth in section 1367 is insufficiently protective, and therefore unconstitutional, because it requires a showing of a mental disorder or disability while the federal Constitution requires only a present inability to assist counsel. We disagree.

The due process clause of the federal Constitution prohibits the criminal trial of an incompetent defendant. (*Cooper v. Oklahoma* (1996) 517 U.S. 348, 354; U.S. Const., 14th Amend.) In *Dusky v. United States* (1960) 362 U.S. 402 (*Dusky*), the United States Supreme Court described the test of a defendant's competence to stand trial as "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him." (*Id.* at p. 402.)

California law likewise prohibits the state from trying or convicting a criminal defendant who is mentally incompetent. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 464 (*Sattiewhite*); § 1367, subd. (a).) Section 1367 provides that a defendant is mentally incompetent "if, as a result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."

(§ 1367, subd. (a).) " ' "Both federal due process and state law require a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial." ' " (*Sattiewhite*, at p. 464.)

We have repeatedly rejected the argument that section 1367 is insufficiently protective. In *People v. Stanley* (1995) 10 Cal.4th 764 (*Stanley*), we held that the high court's competency standard and section 1367 are identical " '[t]o anyone but a hairsplitting semanticist.' " (*Stanley*, at p. 816; see *People v. Lightsey* (2012) 54 Cal.4th 668, 691 ["The applicable state statutes essentially parallel the state and federal constitutional directives"].) More recently, we considered a similar constitutional attack on section 1367's definition of mental incompetence because it refers to a mental disorder or developmental disability. (*People v. Buenrostro* (2018) 6 Cal.5th 367, 387 (*Buenrostro*).) Construing this argument as a facial attack on the statute, we held that "defendant has failed to demonstrate that section 1367, subdivision (a), is facially invalid; indeed, she has failed to identify any case (including her own) in which section 1367's mental disorder or developmental disability requirement results in the violation of due process. Contrary to her argument, the due process right not to be tried while incompetent has long been understood in terms of the causal relationship between the defendant's mental condition and his or her trial-related functional abilities." (*Id.* at p. 388, fns. omitted.) Indeed, as we noted in *Buenrostro*, the high court has upheld the competency statutes of other states that contain similar language. (*Buenrostro*, at p. 389, citing *Drope v.*

36

*Missouri* (1975) 420 U.S. 162, 173.) Thus, consistent with our reasoning in *Stanley* and *Buenrostro*, we conclude Hronis's facial challenge to section 1367 is unpersuasive.

For similar reasons, we disagree that section 1367 is unconstitutional as applied to Hronis. Hronis argues that there exists in some individuals a "religious fervor" that is "so extreme that an accused has irrational beliefs so pervasive they render the individual unable to rationally cooperate with counsel in the preparation of a defense." He then contends that he is such a person and his extreme religious beliefs would render him incompetent under the federal standard. Yet, as discussed, section 1367 is consistent with the federal standard. (*Buenrostro, supra,* 6 Cal.5th at p. 389.) Hronis has not identified any constitutional infirmity in its application here. Indeed, although the federal standard does not explicitly require a mental disorder or disability, some form of disorder or disability is essentially implied. A person's *inability* to consult with counsel, as opposed to mere *unwillingness*, is necessarily associated with a mental disorder or disability, whether or not attributed to a specific medical diagnosis. (See *ibid.* [mental incompetency standard "does not require a specific medical diagnosis drawn from the current version of the Diagnostic and Statistical Manual of Mental Disorders"].) However, "[a]n uncooperative defendant is not tantamount to an incompetent one." (*People v. Parker* (2022) 13 Cal.5th 1, 29.) In the absence of evidence that a defendant's refusal to consult with counsel is the product of some form of mental disorder or disability, a person who does not consult with counsel based on his or her religious beliefs is not incompetent, even under the federal standard. (See *Buenrostro*, at p. 388, fn. 10 ["cultural differences alone do not give rise to a *lack of capacity* to

37

understand the nature of the proceedings or assist counsel in preparing a defense, as the *Dusky* standard requires"]; see also *People v. Lewis* (2008) 43 Cal.4th 415, 526 (*Lewis*) [competency hearing not required where a defendant is unwilling, but not unable, to consult with counsel]; *Parker*, at p. 30 [declining to conclude that the defendant's behavior resulted from mental illness as opposed to unwillingness to cooperate]; *People v. Mendoza* (2016) 62 Cal.4th 856, 879 (*Mendoza*) [jury considering evidence of defendant's "religious preoccupation" could reasonably credit "expert's explanation that defendant was not unable but rather was choosing to avoid discussion of the crimes, his personal history, and any other negative material"]; *id.* at p. 895 [rambling, religion-infused comments by the defendant at sentencing did not give rise to the need for a renewed competency hearing].) As discussed below, the evidence supports the trial court's determination in this regard.

In his reply brief, Hronis claims that "it is reasonably possible that a different result would have been reached if the trial court, the appointed doctors, and counsel on both sides had understood the correct standard as subsequently clarified in *Buenrostro*." Hronis thus relies on language in *Buenrostro*, in which we said that, although the "statute requires that the defendant show that, because of a mental disorder or developmental disability, he or she is unable to understand the nature of the proceedings or to rationally assist in his or her own defense" it does "not require that the defendant's mental disorder fit neatly within the standard diagnostic taxonomy." (*Buenrostro, supra*, 6 Cal.5th at p. 389.) But the trial court here expressed no confusion in this regard.

Further, Hronis's claim is unpersuasive because it rests on the faulty premise that *Buenrostro* "clarified" the standard in

section 1367. Yet, well before *Buenrostro*, we held that section 1367 embodied the federal competency standard. (See, e.g., *Stanley*, *supra*, 10 Cal.4th at p. 816.) And Hronis has not pointed to anything in the record suggesting that our further discussion of the standard in *Buenrostro* would have affected the trial court's competency determination. For these reasons, we conclude that *Buenrostro* does not suggest a different conclusion regarding the determination that Hronis was competent to stand trial.

ii. *Sufficiency of the 1995 competency proceedings*

Alternatively, Hronis contends the 1995 competency proceedings were too superficial to support the trial court's determination that Hronis was competent to stand trial and that these proceedings violated his constitutional right to a fair trial. We disagree.

"The law presumes a person is competent to stand trial. [Citation.] 'When the defendant puts his or her competence to stand trial in issue, the defendant bears the burden of proving by a preponderance of the evidence that he or she lacks competence.' " (*Buenrostro*, *supra*, 6 Cal.5th at p. 387.)

As an initial matter, by waiving his right to a jury trial and agreeing to submit the competency determination on the expert reports, Hronis has waived any objection to the sufficiency of the proceedings. (*People v. Weaver* (2001) 26 Cal.4th 876, 904 (*Weaver*) ["To the extent defendant attempts to impugn the validity of the appointed experts' conclusions on grounds they failed to consider the effect of defendant's medication on his competency, the time to raise such a challenge has long since passed. Having submitted the competency

determination on the two psychiatric reports, defendant may not now relitigate that question with arguments he did not make below"].)

Hronis's claim also fails on the merits.[10] The procedure used here, submission to the court of the issue of competence to stand trial based on psychiatric reports, is permissible. (*Weaver*, *supra*, 26 Cal.4th at p. 903.) A defense attorney is not precluded "from waiving a jury, forgoing the right to present live witnesses, and submitting the competency determination on the psychiatric reports filed with the court." (*Id.* at p. 904.)

In *People v. McPeters* (1992) 2 Cal.4th 1148 (*McPeters*), we rejected the claim that submitting on the issue of competence based on expert reports deprives a defendant of any of his rights. We reasoned: "Section 1368 entitles defendant to a 'hearing' on the issue of competence and he received one. Although defendant's counsel, for understandable reasons, elected to waive certain available incidents of the hearing procedure, i.e., the right to jury trial and the rights to present oral testimony and to confront and cross-examine witnesses, defendant presented evidence and received an independent judicial determination of his competence to stand trial based on the stipulated record. [Citation.] [¶] . . . Because defendant had a hearing and does not show it was in any significant way incomplete or unfair, we reject his contention." (*Id.* at p. 1169;

---

[10] To the extent Hronis's argument could be construed to extend to *defense counsel's* initial failure to offer evidence to support the request for a competency hearing, any potential claim of ineffective assistance of counsel based on this omission may be raised in a habeas corpus proceeding, not on direct appeal. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

accord, *People v. Lawley* (2002) 27 Cal.4th 102, 131–132 (*Lawley*).)

Here, as in *McPeters*, the prosecutor and defense counsel stipulated the matter would be presented to the court for determination based on Johnston's and Kobashigawa's reports. (*McPeters*, *supra*, 2 Cal.4th at p. 1168.) These expert reports provided a valid basis for adjudicating Hronis's competence. Both experts opined that Hronis was competent after administering several psychological tests, interviewing Hronis, and questioning him at length about his religious beliefs. They found no indications of significant cognitive defect, active psychotic symptomatology, or significant emotional or cognitive impairment. They also concluded Hronis's religious fervor was not associated with any mental disorder that impaired his ability to understand the nature of the proceedings against him or to assist counsel in the conduct of his defense. (See *State v. Hessler* (Neb. 2011) 807 N.W.2d 504, 519 ["we will not assume that hearing messages from God and following God's perceived commands, without more, demonstrate incompetence"].) After reviewing these reports, the court found defendant competent to stand trial and reinstated the criminal proceedings against him. Against this backdrop, we conclude these proceedings did not deprive Hronis of his right to a fair trial.

iii. *Applicability of section 1369*

Hronis also claims the trial court erred when it failed to appoint a regional center director to evaluate Hronis's competence in 1995 or 2000 because there were sufficient indications at the time that Hronis had a developmental disability. We conclude this claim lacks merit.

At the time of Hronis's competency proceedings, section 1369 provided that if the court declares a doubt as to the defendant's competency and "it is suspected the defendant is developmentally disabled, the court shall appoint the director of the regional center for the developmentally disabled . . . or the designee of the director, to examine the defendant. The court may order the developmentally disabled defendant to be confined for examination in a residential facility or state hospital." (Former § 1369, subd. (a).) Welfare and Institutions Code former section 4512 defined a developmental disability as "a disability which originates before an individual attains age 18, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual . . . . [T]his term shall include mental retardation, cerebral palsy, epilepsy, and autism. This term shall also include disabling conditions found to be closely related to mental retardation or to require treatment similar to that required for individuals with mental retardation." (Welf. & Inst. Code, former § 4512, subd. (a).)

As previously described, at the initial competency proceeding, Hronis agreed to submit the competency determination on the expert reports. Johnston specifically tested Hronis for the possibility of a developmental disability and determined that he did not suffer from one. Although Kobashigawa did not appear to test explicitly for a developmental disability, he estimated Hronis's intelligence to be average. Defense counsel did not submit a declaration or report from an expert to refute Johnston and Kobashigawa. The trial court was entitled to rely on Johnston's and Kobashigawa's reports. (See *People v. Leonard* (2007) 40 Cal.4th 1370, 1390 (*Leonard*); *People v. Townsel* (2016) 63 Cal.4th 25, 39 (*Townsel*).)

Notwithstanding Johnston's determination that Hronis did not have a developmental disability and Kobashigawa's conclusion that Hronis was of average intelligence, Hronis contends several pieces of evidence should have independently prompted the trial court to appoint the director of the regional center pursuant to section 1369, either in 1995 or 2000. He cites counsel's declaration attesting that "on at least one occasion, Mr. Hronis tested at an intelligence quotient level of 69." Defense counsel's reference to Hronis's IQ score does not necessarily give rise to a court's duty to refer a defendant to a regional director under section 1369. (See *People v. Taylor* (2009) 47 Cal.4th 850, 864 (*Taylor*) [reference to defendant's IQ score of 75, without specific connection to developmental disability, was not sufficient to trigger trial court's duty to refer defendant to regional director under § 1369].) Indeed, Hronis has done little to explain his IQ score beyond his counsel's bare reference, and a subsequent reference to an IQ score of 72 while Hronis was in high school.

Hronis relies on *People v. Lara* (2025) 112 Cal.App.5th 1090 (*Lara*), but it is distinguishable. In *Lara*, the Court of Appeal concluded the trial court erred in failing to appoint a regional director under section 1369, based on a psychologist's report that substantiated the defendant's " 'extremely low' IQ of 65, documented [the defendant's] confusion during police interviews and the competency evaluation, and showed scores below the competence cutoff" on three separate parts of a test specifically designed to assess competency to stand trial for intellectually disabled individuals. (*Lara*, at p. 1102.) The appellate court distinguished *Taylor*, *supra*, 47 Cal.4th 850 on its facts, emphasizing the difference between the defendant's IQ in *Taylor* (75) and the IQ of the subject defendant (65) as well as

other indicia of developmental disability that were not present in *Taylor*. (*Lara*, at p. 1103.)

Here, like *Taylor*, Hronis's IQ score was not accompanied by sufficient confirmatory evidence of his claimed developmental disability like the defendant offered in *Lara*. (See *Lara*, *supra*, 112 Cal.App.5th at p. 1103 [highlighting evidence not present in *Taylor*, including scoring below competency on a competency test and exhibiting confusion during police interviews].) Hronis points to his counsel's statement that he had attended special education classes, but this reference is too general to support a suspicion that Hronis was developmentally disabled. Hronis also points to his counsel's statement that he was discharged from the military based on cognitive limitations. Again, however, this fact does not necessarily give rise to a suspicion that Hronis was developmentally disabled.

Further, Nakagawa expressly considered Hronis's discharge from military service based on cognitive limitations, but nevertheless concluded his intellectual functioning was in the "low average range" and he did not suffer from any significant cognitive or developmental problems or delays. Finally, while defense expert Podboy submitted a report whereby he concluded that Hronis "is quite obviously an individual suffering from either mild mental retardation or borderline mental retardation," he did not indicate what tests, if any, he administered to reach this conclusion, and the trial court specifically found Podboy's report unreliable.

Trial courts should, of course, take great care when presented with evidence of IQ scores in the range for borderline intellectual ability. On this record, however, we conclude the

trial court did not violate section 1369 when it failed to appoint a regional director to examine Hronis. Moreover, even if we were to conclude the trial court erred under section 1369, we would find such error harmless because the experts who examined Hronis specifically considered the possibility of a developmental disability, and the evidence strongly supported the trial court's finding that Hronis was not incompetent to stand trial on that basis. (See *Leonard*, *supra*, 40 Cal.4th at p. 1390 [holding that the trial court's failure to appoint the regional director under § 1369 was harmless because the court's "competency determination was based on evidence from experts who were familiar with defendant's developmental disability and who considered it in evaluating his competence"].)

### iv. *Trial court's denial of request for renewed competency proceedings in 2000*

Hronis also maintains that the trial court abused its discretion when it declined to reinstitute competency proceedings following defense counsel's submission of Motion 820 in August 2000. We conclude the trial court acted within its discretion in not reinstituting these proceedings.

" ' "Once a defendant has been found competent to stand trial, a second competency hearing is required only if the evidence discloses a substantial change of circumstances or new evidence is presented casting serious doubt on the validity of the prior finding of the defendant's competence." ' " (*Buenrostro*, *supra*, 6 Cal.5th at p. 409; *People v. Rodas* (2018) 6 Cal.5th 219, 231, 234 (*Rodas*); *Leonard*, *supra*, 40 Cal.4th at p. 1415; *People v. Jones* (1991) 53 Cal.3d 1115, 1152–1153.) "[T]he duty to suspend [proceedings] is not triggered by information that substantially duplicates evidence already considered at an earlier, formal inquiry into the defendant's competence; when

faced with evidence of relatively minor changes in the defendant's mental state, the court may rely on a prior competency finding rather than convening a new hearing to cover largely the same ground." (*Rodas*, at pp. 234–235.) The court may also "appropriately take its personal observations into account in determining whether there has been some significant change in the defendant's mental state. This is particularly true when . . . the defendant has actively participated in the trial." (*People v. Jones*, at p. 1153.)

"Whether there has been a change in circumstances sufficient to call for a new competency hearing is necessarily a fact-specific inquiry." (*Rodas*, *supra*, 6 Cal.5th at p. 235.) We review for substantial evidence the trial court's finding of no substantial change of circumstances and no new evidence casting serious doubt on the initial competency determination, and we review its decision not to reinstate competency proceedings for an abuse of discretion. (*People v. Huggins* (2006) 38 Cal.4th 175, 220 (*Huggins*) ["We apply a deferential standard of review to a trial court's ruling concerning whether another competency hearing must be held"]; *People v. Marshall* (1997) 15 Cal.4th 1, 33 (*Marshall*) [same].)

Hronis first contends the initial competency finding should be given little weight because it was based on the submission of written reports rather than a full evidentiary proceeding. He cites no authority for the proposition that a reviewing court should disregard a trial court's initial determination of competency to stand trial if based on psychiatric reports, rather than a full, trial-type, adversary hearing. As discussed, the procedure used by the trial court here was sufficient to support its determination that Hronis was competent to stand trial. (See *McPeters*, *supra*, 2 Cal.4th at

pp. 1168–1169.)   Consistent with that conclusion, we reject Hronis's claim that the earlier ruling should be accorded little weight in our review of the court's subsequent competency ruling.

On the merits, we conclude substantial evidence supports the trial court's determination that there was no substantial change of circumstances or new evidence casting a serious doubt on the court's prior finding of Hronis's competence.  As discussed above, the initial competency determination considered Hronis's rigid religious belief that God would deliver him from the criminal proceedings.  Johnston and Kobashigawa discussed and analyzed at length Hronis's religiosity.  They connected it to Hronis's narcissism and grandiosity rather than any mental illness or delusion that would impact his ability to understand the proceedings or assist counsel.  In declining defense counsel's renewed request to declare a doubt, the trial court observed that the ground for their request was Hronis's rigid religiosity, which was not a new or changed circumstance.  Indeed, it was central to the prior proceeding.  The court also found that, despite Hronis's deeply held religious beliefs, Hronis "understands what's going on," "[e]ven in the context of the Pro Per voir dire that [the court] did subsequent to the verdict."  Thus, the court reasonably found it was not presented with a substantial change of circumstances or new evidence casting a serious doubt on the validity of the original competency finding.  (*Huggins*, *supra*, 38 Cal.4th at p. 220 [reaffirming that the initial determination of competency "must be viewed as a baseline that, absent a preliminary showing of substantially changed circumstances, eliminate[s] the need to start the process anew"].)

Hronis relies on Podboy's report, but it describes the same or similar behaviors and attitudes that the trial court previously

found insufficient in the original competency proceedings. For example, Podboy described Hronis's steadfast belief that he would be released from prison based on his revelation from God and his interpretations of biblical stories. The impact of Hronis's religious beliefs on his understanding of the proceedings and his ability to rationally assist counsel was thoroughly considered in the previous competency proceedings, and the trial court could reasonably find that Podboy's report contained no substantial evidence of new or changed circumstances casting serious doubt on the prior competency determination. (*Taylor*, *supra*, 47 Cal.4th at p. 864; *Lawley*, *supra*, 27 Cal.4th at pp. 136–137.)

To the extent Podboy's report did offer new observations or conclusions, the trial court reasonably found them insignificant. Indeed, the trial court specifically concluded several aspects of the report to be "extraordinarily weak," indicative of "bias or pre-orientation," and "strongly, firmly, diametrically opposed" to the court's personal observations of Hronis throughout trial. For example, although Podboy's report described Hronis as decompensating and appearing increasingly agitated shortly after he was convicted of the offenses, the trial court noted that "[t]hat type of verdict, of course, has got to have a substantial impact upon any person." The trial court's observation is well supported. (See *People v. Davis* (1995) 10 Cal.4th 463, 526–527 [trial court reasonably viewed defendant's anger and emotion over the guilty verdicts as " 'normal' under the circumstances," rather than evidence of incompetency]; see also *Buenrostro*, *supra*, 6 Cal.5th at p. 410 [concluding that defendant's bizarre behavior which, in defense counsel's view, reflected a "deepening" of defendant's inability to understand the legal proceedings and cooperate with counsel,

"may . . . have simply been a display of her unwillingness to cooperate with counsel"]; *People v. Laudermilk* (1967) 67 Cal.2d 272, 285, citations omitted [holding that "more is required to raise a doubt than mere bizarre actions . . . or bizarre statements . . . or statements of defense counsel that defendant is incapable of cooperating in his defense . . . or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense"], accord, *People v. Bloom* (2022) 12 Cal.5th 1008, 1032.) Indeed, contrary to Podboy's impressions, Hronis appeared "soft spoken, deliberate, and composed" when he explained to the court his reasons for not wanting to put on a penalty phase defense, which were grounded not in his religious revelation that he would be delivered, but rather on a desire to save the state money and send the jury home.

Based on the court's doubts about Podboy's credibility and reliability, the substantial findings of three court-appointed experts, and the court's own personal observations, Podboy's report does not constitute a substantial change of circumstances or new evidence casting a serious doubt on the validity of the court's prior finding of Hronis's competence. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1048 (*Lewis and Oliver*) [expert testimony that one of the defendants was not competent did not constitute substantial evidence because the expert's testimony was rejected by the trial court for "plausible reasons," including lack of credibility]; *Marshall, supra*, 15 Cal.4th at p. 33 [finding no abuse of discretion when trial court determined the statements failed to establish a substantial change of circumstances because "[w]e cannot say as a matter of law that here defendant's statements in question were a 'substantial

change of circumstances' requiring the trial court to hold a second competency hearing"].)

Fundamentally, defense counsel's requests for a renewed competency proceeding were grounded in Hronis's refusal to assist in the preparation of a potential penalty phase defense based on his religious revelation. But this refusal to assist "did not necessarily bear on his *competence* to do so, or reflect a substantial change of circumstances or new evidence casting serious doubt on the validity of the prior finding of the defendant's competence." (*People v. Medina* (1995) 11 Cal.4th 694, 735.) We have on numerous occasions distinguished between a defendant's *unwillingness* to assist his counsel and a defendant's *inability* to assist his counsel; only the latter implicates the competency of a defendant to stand trial. (*Lewis*, *supra*, 43 Cal.4th at p. 526 [no competency hearing required where "there was no substantial evidence that defendant's lack of cooperation stemmed from inability rather than unwillingness"]; *People v. Davis*, *supra*, 10 Cal.4th at pp. 527–528; *Laudermilk*, *supra*, 67 Cal.2d at p. 287.)

We have held that the trial court has a nondiscretionary obligation to suspend proceedings and hold a competency trial if "at least one expert who is competent to render such an opinion, and who has had a sufficient opportunity to conduct an examination, testifies under oath with particularity that, because of mental illness, the accused is incapable of understanding the proceedings or assisting in his defense." (*Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1047; *Sattiewhite*, *supra*, 59 Cal.4th at p. 465.) But we have not applied that rule to *renewed* competency determinations, and for good reason. A trial court's decision whether to reinstitute a competency proceeding, after having previously found the defendant

competent, is fundamentally different from the initial decision to institute competency proceedings. Mere doubt about a defendant's competency is insufficient, since the court has already gone beyond the identification of doubt and determined that defendant is not incompetent. Once a trial court has determined a defendant is competent to stand trial, it would make little sense to require the court to declare a doubt and suspend proceedings whenever an expert opines that the defendant is incompetent, irrespective of whether there is no evidence of changed circumstances or new evidence.

In any event, even considering this rule, it appears Podboy's report is insufficient. First, Podboy's report was addressed to defense counsel, rather than the court, and not made under oath. Second, it is not clear whether Podboy conducted an examination of Hronis for the purpose of determining whether he was competent to stand trial. As noted, defense counsel had retained Podboy to assist in developing evidence relating to the potential penalty phase, including whether Hronis acted under duress or did not have the mental capacity to appreciate the criminality of his conduct. (See *Sattiewhite, supra,* 59 Cal.4th at p. 467 [discounting penalty phase evidence addressing defendant's alleged intellectual disability as not pertaining to the question of competence to stand trial].) Counsel described Podboy's interactions with Hronis as "a nontraditional manner, *not as a clinician.*" After visiting with Hronis on several occasions, Podboy relayed to defense counsel that he did *not* have available data that he felt would be necessary to reach the level of reasonable medical or psychological meetings or interviews necessary to form an opinion. Podboy confirmed this point when he informed the court that the basis for his opinion was his review of Hronis's

statements during the *Marsden* hearings and his conversations with counsel, not from a clinical interview with Hronis. (*Weaver*, *supra*, 26 Cal.4th at p. 953 [psychiatrist's testimony indicating his belief defendant was incompetent came from his observations of defendant's in-court demeanor rather than actual examination of testing of defendant and thus fell "far short" of being substantial].) Although Podboy and defense counsel visited Hronis during jury deliberations and just after Hronis was convicted, there is no evidence that Podboy conducted a clinical evaluation of Hronis at that time. (See *People v. Wycoff* (2021) 12 Cal.5th 58, 86 [recognizing that "not every psychiatrist's opinion is substantial evidence," but finding credible psychologist's opinion that was "supported by three interviews with defendant, a thorough psychiatric history, appropriate psychological testing, and detailed reasoning in which he made clear the factual basis for his conclusions"].) Indeed, Podboy noted in his report that Hronis was "completely unwilling to engage in psychological testing of any sort." Accordingly, Podboy's report was insufficient to require the court to reinstitute competency proceedings.

Because substantial evidence supports the trial court's finding that there was no substantial change of circumstances or new evidence casting serious doubt on the validity of its prior finding that Hronis was competent to stand trial, we conclude the trial court acted within its discretion in declining to order a renewed competency hearing. (*People v. Welch* (1999) 20 Cal.4th 701, 742.)

2. *Denial of severance motions and use of dual jury*
    *procedure*

Bertsch and Hronis contend the trial court erred when it empaneled two separate juries for a joint trial rather than fully severing their cases. We find no error.

a. *Background*

Bertsch and Hronis were jointly charged with the kidnapping, rape, sodomy, robbery, and murder of Canady. Before trial, Bertsch and Hronis moved to sever the trial. The prosecution opposed severance, suggesting instead the use of two juries in a single trial.

Specifically, counsel for Bertsch and Hronis maintained the courtroom was too crowded to accommodate two juries and space constraints could result in tension, inattentiveness, and hostility among jurors. They also contended that conflicting defense strategy, tactics, and evidence counseled against a joint trial. The prosecution maintained that this was a classic case for a joint trial because it involved common events and a common victim. The prosecution explained: "It's the People's theory and the evidence shows that there are two men that kidnapped her. There [are] two semen donors. There are two people using the credit cards. There are two people in Arizona where her car is dumped and there are two people charged. [¶] And these two people are not pointing the fingers at each other that one is more culpable. That will not be their defenses in this case." The prosecution also noted that separate trials would inconvenience more than one hundred anticipated witnesses, at least fifty of whom did not live in the area.

The trial court denied the severance motions and ordered a joint trial with separate juries. Although it acknowledged the

logistical difficulty of managing large groups in the courtroom, the trial court stated, "[T]his is almost a classic dual-jury situation in the sense that the substantial bulk of the evidence in the guilt phase . . . applies to both defendants, particularly the DNA evidence," which the court estimated could take months of testimony "given the number of tests that were run and some of the difficulties or alleged difficulties with some of those tests." The court also found the large number of witnesses, including out-of-town witnesses, and difficulty scheduling expert witnesses weighed in favor of a joint trial with dual juries. The court indicated that it was considering modifying the courtroom or moving proceedings to a larger courtroom to accommodate the number of jurors.

Before the commencement of trial, and after the parties engaged in further discussions regarding courtroom suitability, the court moved the proceedings to a larger courtroom. Bertsch and Hronis lodged various objections to the courtroom layout based on crowding and seating arrangement issues, which the court overruled.

During trial, defense counsel complained again about the courtroom layout based on crowding at the counsel table. They also moved for a mistrial based on their assertion that Bertsch's jurors could observe disapproving facial expressions apparently made by two Hronis jurors. The court admonished the jurors to disregard facial expressions and denied the motion for a mistrial and requests to voir dire or excuse the jurors.

As the trial continued, Bertsch indicated he intended to testify. Hronis's counsel expressed concern that Bertsch would attempt to blame Hronis for Canady's murder, and on that basis moved to exclude Hronis's jury when Bertsch testified. The trial

court denied the request, explaining that "finger-pointing between defendants" "does not in and of itself necessitate a severance."

Bertsch subsequently testified in his defense. On cross-examination, the prosecutor asked Bertsch whether it was true that he was not present and had no participation in the kidnapping, robbery, sexual assault, and murder of Canady. Bertsch answered, "that's true," then blurted out — over the prosecutor's objection and court's attempted intervention — that "Jeff Hronis confided in me" "that him and Jerry [B.] killed Linda Canady." The court admonished the jurors to disregard Bertsch's statement. It denied Hronis's request for a mistrial based on Bertsch's outburst.

At the conclusion of Bertsch's penalty phase trial, the trial court confirmed its prior ruling that the larger courtroom had adequately accommodated the joint trial with two juries. It made a similar finding during Hronis's penalty phase trial.

b. *Analysis*

Section 1098 provides that two defendants jointly charged with any public offense must be tried together unless the trial court orders separate trials. "Joint trials are favored because they 'promote [economy and efficiency'] and ' "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." ' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 (*Coffman and Marlow*).) "[I]mportant concerns of public policy are served if a single jury is given a full and fair overview of the defendants' joint conduct and the assertions they make to defend against ensuing charges." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 379 (*Bryant, Smith and Wheeler*).)

"The court has discretion to order separate trials if there is an incriminating confession, prejudicial association, likely confusion due to evidence on multiple counts, conflicting defenses, or the possibility that a codefendant might provide exonerating testimony at a separate trial." (*People v. Sánchez* (2016) 63 Cal.4th 411, 464; accord, *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 150 (*Letner and Tobin*).) Severance may also be called for when " 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.' " (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 40.)

"The use of dual juries is a permissible means to avoid the necessity for complete severance." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1287 (*Cummings*).) "The procedure facilitates the Legislature's statutorily established preference for joint trial of defendants and offers an alternative to severance when evidence to be offered is not admissible against all defendants." (*Cummings*, at p. 1287; see *Lambright v. Stewart* (9th Cir. 1999) 191 F.3d 1181, 1186 (*Lambright*) ["the use of dual juries can capture both the advantages of a joint trial and the protections of separate trials"].) In *People v. Harris* (1989) 47 Cal.3d 1047 (*Harris*), "We rejected various constitutional and statutory arguments against the dual jury system and concluded that it is 'a permissible practice' and 'is not a basis for reversal on appeal in the absence of identifiable prejudice resulting from the manner in which it is implemented.' " (*People v. Jackson* (1996) 13 Cal.4th 1164, 1208 (*Jackson*), citing *Harris*, at p. 1075.) We have upheld the constitutionality of the dual jury procedure in subsequent decisions. (See, e.g., *People v. Thompson* (2016) 1 Cal.5th 1043, 1085 (*Thompson*); *Cummings*, at p. 1287.)

"Whether the court abused its discretion by denying complete severance and impaneling separate juries is decided on the basis of the facts known at the time of the ruling on the severance motion." (*Cummings*, *supra*, 4 Cal.4th at p. 1287; see *Thompson*, *supra*, 1 Cal.5th at p. 1079.) "If the court properly denied severance at the time, the reviewing court may reverse a judgment only if it finds that the joint trial caused gross unfairness that denied due process." (*People v. Sánchez*, *supra*, 63 Cal.4th at p. 464; *Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 379.) We have frequently found no abuse of discretion and no prejudice in denying severance in a "classic case" for a joint trial, that is, when the defendants are charged together with the same crimes arising from the same events. (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 40; *Letner and Tobin*, *supra*, 50 Cal.4th at p. 150; *Bryant, Smith and Wheeler*, at p. 379; *Cummings*, *supra*, 4 Cal.4th at pp. 1287–1288.)

Initially, because the crimes charged here involved common events and a common victim, the trial court was presented with a " ' "classic case" ' " for a joint trial. (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 40.) Bertsch and Hronis were jointly charged with the kidnapping, robbery, rape, sodomy, and first degree murder of Canady, and they faced kidnapping-murder, robbery-murder, sodomy-murder, and rape-murder special-circumstance allegations. "Virtually no reason existed for severance." (*People v. Sánchez*, *supra*, 63 Cal.4th at p. 464.) There was no incriminating confession or suggestion that a codefendant might provide exonerating testimony at a separate trial. Nor was there a risk of prejudicial association or likely confusion due to evidence that might be offered on counts alleged against only one defendant, given that Bertsch and Hronis committed the offenses together and were

both charged with all counts. To the extent there was a possibility of conflicting defenses at the time the trial court denied Bertsch's and Hronis's severance motions — and assuming without deciding whether antagonistic defenses can ever require severance in the context of separately empaneled juries (see *People v. Flinner* (2020) 10 Cal.5th 686, 714 (*Flinner*)) — we have made clear that "the possible or even actual presentation of antagonistic defenses by codefendants does not . . . *require* severance" unless "the conflict between the defendants *alone* will demonstrate to the jury that they are guilty." (*Bryant, Smith and Wheeler, supra*, 60 Cal.4th at p. 380.) In this case, there was strong independent evidence, including DNA evidence, connecting Bertsch and Hronis to the charges. (*Ibid*.) Accordingly, the court did not abuse its discretion when it denied the motions for severance.

Bertsch and Hronis raise a multitude of claims challenging the use of dual juries, both in general and as implemented in their case. We find none of their contentions persuasive.

Bertsch and Hronis contend the dual jury procedure prejudiced them by inviting jury speculation. We have rejected as "sheer speculation" the claim that the use of dual juries "invites each jury to speculate that, during the time it is excluded, evidence damaging to the defendant whose case that jury is trying is being presented to the second jury." (*Harris, supra*, 47 Cal.3d at p. 1071; *id.* at p. 1072; *People v. Powell* (2018) 6 Cal.5th 136, 146; accord, *Lambright, supra*, 191 F.3d at p. 1186, fn. 5 ["The argument that each defendant's jury will 'necessarily speculate' about the evidence being heard by the other defendant's jury is itself rank speculation"].) In *Harris*, we found no evidence that the defendant's jury speculated in its

absence that the codefendant's jury was hearing different testimony that was highly incriminatory as to the defendant, or that the defendant's jury "was even aware that evidence was being presented to the [codefendant's] jury or that the court was in session on some of the occasions when it was excluded." (*Harris*, at p. 1072.) In this case, although both juries were aware of instances where evidence was heard in their absence, this awareness itself does not suggest improper juror speculation took place or that it informed their views of Bertsch's or Hronis's guilt. Moreover, the trial court admonished prospective jurors to decide the case "solely as it pertain[ed] to [their particular defendant] based on the evidence received." We presume the jurors understood and followed the court's instructions absent evidence to the contrary. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 28 (*Romero and Self*).)

Bertsch and Hronis also claim courtroom conditions distracted and inconvenienced their counsel. Specifically, Bertsch claims one of his attorneys was forced to sit in a cramped area while another was required to stand whenever the projector was used, and the courtroom arrangement made it difficult for counsel to observe the jurors and witnesses at the same time. Hronis asserts the "persistent" and "uncomfortable" crowding must have had a detrimental impact on the general disposition of the lawyers and jurors. These inconveniences "fall[] well short of establishing identifiable prejudice or gross unfairness." (*People v. Powell* (2018) 6 Cal.5th 136, 146 (*Powell*).) This conclusion finds support in the trial court's factual findings made at the conclusion of trial proceedings regarding the adequacy of the courtroom arrangement, including that defense counsel had been able to maintain visual contact with the witnesses and the jury by turning or

repositioning their chairs and the courtroom arrangements had been more than sufficiently workable and did not infringe on Bertsch's or Hronis's right to a fair trial.

Bertsch and Hronis similarly maintain that dual jury procedure caused delay and inconvenience, which frustrated jurors and gave them reason to "retaliate against" Bertsch and Hronis. Our *Harris* decision also rejected as "sheer speculation" the argument that empaneling two juries in a joint trial "creates a danger that jurors frustrated by the delay and inconveniences caused by the procedure will blame the defendant for their discomfiture." (*Harris*, *supra*, 47 Cal.3d at pp. 1071–1072.) Here, as in *Harris*, Bertsch and Hronis make "no effort to substantiate [their] theory that such breaks, whether in a dual jury trial or otherwise, affect the jury's attitude toward the defendant." (*Id.* at p. 1072.) To the contrary, the trial court noted "the juries . . . seem to be in a surprisingly good mood," even "given the total amount of bouncing around we have done on this case."

Bertsch and Hronis further argue the dual jury procedure prejudiced them because they were forced to defend against each other's counsel in addition to the prosecutor. We have previously rejected similar claims of prejudice based on codefendant's counsel acting as a purported "second prosecutor," explaining that just "because the prosecution's case will be stronger if defendants are tried together, or that one defense undermines another, does not render a joint trial unfair." (*Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 379; *Flinner*, *supra*, 10 Cal.5th at p. 715 [same]; *Letner and Tobin*, *supra*, 50 Cal.4th at p. 153 [same]; *People v. Winbush* (2017) 2 Cal.5th 402, 457 (*Winbush*) ["The mere fact that damaging testimony is presented by codefendant's counsel instead of the

prosecutor does not deprive a defendant of constitutional or statutory rights"]; *Jackson, supra*, 13 Cal.4th at p. 1208 [same].) This case is no different.

Separately, Hronis raises several policy arguments against the dual jury procedure. As even Hronis acknowledges, however, "[s]uch arguments are more properly addressed to the Legislature." (*Burnett v. Superior Court* (1974) 12 Cal.3d 865, 874.) Consistent with our prior case law, we decline to consider such policy arguments on their merits or reconsider our prior decisions reaffirming the use of separate juries for jointly tried defendants. (*Thompson, supra*, 1 Cal.5th at p. 1085 [case law upholding the use of dual juries for jointly tried defendants in lieu of outright severance "is settled"]; see also *Turrieta v. Lyft, Inc.* (2024) 16 Cal.5th 664, 711 [policy arguments "should be evaluated and addressed by the Legislature in its policymaking role, not by this court"].)

Hronis also contends the trial court abused its discretion when it kept his jury in the courtroom while Bertsch testified, despite allegedly expecting such testimony "to be false and filled with outbursts that would violate court orders." Specifically, he maintains that by allowing his jury to be present when Bertsch blurted out over the prosecutor's objection that "Jeff Hronis confided in me" "that him and Jerry [B.] killed Linda Canady," the trial court rendered the trial fundamentally unfair and deprived him of his due process rights.

We find no error. Hronis has not shown that the trial court expected Bertsch's testimony to be false and filled with improper outbursts. Moreover, immediately after Bertsch's outburst, the trial court admonished the jurors to disregard the statement. "We presume the jury understood and followed this instruction."

(*Romero and Self, supra,* 62 Cal.4th at p. 28.) Indeed, as the trial court later found in denying Hronis's motion for mistrial based on Bertsch's outburst, Bertsch's credibility was "severely impugned," which likely assisted the jury's ability to follow the court's admonition to disregard the statement. Moreover, outburst aside, portions of Bertsch's testimony were clearly relevant to Hronis's guilt given the intertwined nature of their involvement in Canady's murder. Accordingly, the trial court properly denied Hronis's request to exclude his jury while Bertsch testified.

Hronis further maintains the dual jury procedure prejudiced him by forcing his counsel to "chop up" cross-examination of prosecution witnesses Jerry B. and Martha R. to minimize the number of times the Bertsch jury was excused from hearing portions of their testimony. Hronis does not explain how these types of minor disruptions to his counsel's desired order and flow of the cross-examination establishes identifiable prejudice or gross unfairness. Moreover, we find the record devoid of any support for this argument as well. (*Powell, supra,* 6 Cal.5th at p. 146; *Harris, supra,* 47 Cal.3d at pp. 1071–1072.)

Hronis additionally claims the dual jury procedure prejudiced him when the trial court denied his request to exclude his jury from the testimony of David Moore, Bertsch's expert document examiner. Moore was expected to testify that, based on his comparison of known writings by Bertsch and the signatures of receipts for items purchased with Canady's credit card, Bertsch probably did not sign any of the credit card receipts and that one person probably signed most or perhaps all the receipts. We conclude the trial court acted within its discretion when it denied the motion to exclude the Hronis jury

and allowed the prosecution to elicit the fact that Moore never compared the credit card receipts with Hronis's known writings. The trial court properly reasoned this was a joint trial and the handwriting evidence was relevant to Hronis as well as Bertsch. No gross unfairness resulted from its admission. (*Winbush*, *supra*, 2 Cal.5th at p. 457; *Jackson*, *supra*, 13 Cal.4th at p. 1208.)

In his final claim of error regarding dual juries, Hronis asserts their use violated his right to a speedy trial.[11] He contends that Bertsch caused most of the trial delays, which gave the prosecution more time to utilize new advancements in DNA technology. Even assuming the use of such advancements could constitute prejudice in this context, the record does not support Hronis's claim. To the contrary, pretrial litigation regarding the issue of DNA partition caused most of the delay. To the extent some small delay in bringing Hronis to trial could be attributed to Bertsch, we find the substantial state interests served by a joint trial outweighed Hronis's interests under the circumstances. (*Smith v. Superior Court* (2012) 54 Cal.4th 592, 604 (*Smith*); *People v. Sutton* (2010) 48 Cal.4th 533, 558 (*Sutton*); accord, § 1050.1 ["In any case in which two or more defendants are jointly charged in the same complaint . . . and the court . . . , for good cause shown, continues the . . . trial of one or more defendants, the continuance shall . . . constitute good cause to continue the remaining defendants' cases so as to maintain joinder"].)

---

[11] We address Hronis's standalone claim that he was deprived of his statutory right to a speedy trial in more detail in part II.A.3., below.

Bertsch separately insists the dual jury procedure prejudiced him because it allowed his jury to infer that he was a security threat and more violent than Hronis because Bertsch was shackled while Hronis was not, and a bailiff was seated close to Bertsch.[12] These claims are speculative. There is no evidence to suggest the jury's possible observation that only Bertsch was restrained influenced its finding of guilt. Nor is there any reasonable probability Bertsch would have received a more favorable verdict had the courtroom seating arrangements been different.

Bertsch additionally contends the use of separate juries was prejudicial because it allowed his jury to see expressions of disapproval from two members of Hronis's jury while Bertsch's counsel cross-examined a prosecution DNA expert witness. Again, we find Bertsch's assertion speculative. In any event, the trial court's contemporaneous admonition to Bertsch's jury not to consider such expressions, and its prior instruction to decide the case solely based on evidence admitted against Bertsch, provided sufficient safeguards. (See, e.g., *People v. Pride* (1992) 3 Cal.4th 195, 241 ["We assume the jury followed the court's instruction"].) Bertsch's claim to the contrary is unsupported.

Finally, Bertsch maintains the dual jury procedure prejudiced him because it allowed his jury to compare his and Hronis's behavior at trial. Bertsch points out that he was absent from part of the guilt phase of trial while Hronis was present throughout. However, the trial court instructed Bertsch's jury that Bertsch had chosen not to attend part of the trial and that the jury could not consider his absence on any issue it would be

_____

[12] Bertsch did not object to the use of restraints at trial, and he does not otherwise challenge their use on appeal.

asked to decide. Bertsch also points out that he failed to follow court instructions during his testimony while Hronis sat quietly throughout the trial. Any inference by the jury based on this conduct likely stemmed from the conduct itself, rather than a comparison with Hronis. In other words, to the extent there could have been any prejudice impacting Bertsch, it was based on Bertsch's actions and not the dual jury system itself. In any event, as we have observed, the court likewise admonished the jury not to consider Bertsch's outburst while testifying. We assume the jury followed the court's instructions. (*People v. Bell* (2019) 7 Cal.5th 70, 116.)

In sum, we conclude that the trial court acted within its discretion when it denied Bertsch's and Hronis's motions for severance and conducted a joint trial with dual juries, and that no gross unfairness resulted therefrom.

### 3. *Hronis's right to a speedy trial*

Hronis maintains the nearly 16-month delay between his agreed-upon trial date and the start of trial violated his statutory right to a speedy trial. (§ 1382.) We conclude good cause supported the delay; thus, no violation occurred.

### a. *Background*

After the prosecution filed a felony complaint against Bertsch and Hronis, both waived their right to a speedy trial and sought and received numerous continuances. For example, Hronis waived time to July 14, 1998, a date the parties agreed to start motions in limine. During this time, the parties briefed and litigated several discovery and evidentiary motions related to DNA evidence.

On July 14, 1998, Bertsch and Hronis moved for a continuance to review additional DNA evidence the prosecution

had recently provided. The trial court denied the request because the newly discovered DNA material, which the prosecution intended to analyze using new STR DNA testing technology, did not impact the defense's ability to proceed with planned hearings relating to the admissibility of other types of DNA testing. The in limine motions proceeded.

Three months later, Hronis filed a motion to dismiss based on the court's failure to bring him to trial within the statutory period. The trial court denied the motion. It cited the unique and complicated nature of the case, and it found that the ongoing in limine proceedings, based on motions brought by all parties, constituted good cause to delay jury empaneling.

In limine proceedings continued for several months, with all three parties filing motions and calling witnesses. During this time, Hronis sought and obtained numerous lengthy continuances after one of his attorneys withdrew due to a family health emergency. Hronis also agreed to recess proceedings for several weeks to accommodate a trial conflict for one of Bertsch's attorneys.

In September 1999, after the prosecution completed its presentation on the in limine DNA issues, Hronis complained that his speedy trial rights had been violated due to the prosecution's insistence on introducing DNA evidence at trial. The prosecution responded that defense counsel's objections to the use of DNA evidence had caused the delay of trial, and that it was prepared to select a jury if Hronis withdrew his objection to the use of all DNA evidence. The trial court observed that it was "entirely appropriate for the People to request that the DNA be admitted and to have the Court make determinations consistent with the law." The court found good cause to continue

the trial, with a planned ruling on the DNA admissibility in October 1999. It cited the extensive evidentiary record, the nature of anticipated pleadings by all parties, and the court's need to review those pleadings.

On October 13, 1999, Hronis agreed to waive his speedy trial rights to November 2 to accommodate his attorneys' plan to attend a DNA conference in late October. On November 3, Hronis's jury selection commenced.

b. *Analysis*

"Penal Code section 1382 — one of the principal provisions implementing California's statutory right to a speedy trial — provides that when a defendant charged with a felony is not brought to trial within 60 days of arraignment on an indictment or information (and the defendant has not expressly or impliedly consented to having trial set for a date beyond that period), the criminal charges against the defendant shall be dismissed unless there is 'good cause' for the delay." (*Sutton*, *supra*, 48 Cal.4th at p. 537; see former § 1382, subd. (a)(2); Stats. 1998, ch. 931, § 405.5.)

"Section 1382 does not define 'good cause' as that term is used in the provision, but numerous California appellate decisions that have reviewed good-cause determinations under this statute demonstrate that, in general, a number of factors are relevant to a determination of good cause: (1) the nature and strength of the justification for the delay, (2) the duration of the delay, and (3) the prejudice to either the defendant or the prosecution that is likely to result from the delay. [Citations.] Past decisions further establish that in making its good-cause determination, a trial court must consider all of the relevant circumstances of the particular case, 'applying principles of

common sense to the totality of circumstances.' " (*Sutton, supra,* 48 Cal.4th at p. 546.)

"Good cause within the meaning of section 1382 exists, for example, when the delay beyond the statutory period is caused by the conduct of the defendant or occurs for his or her benefit, or there are unforeseen circumstances such as unexpected illness, unanticipated unavailability of counsel, or the absence of a witness despite due diligence to secure his or her attendance." (*People v. Hajjaj* (2010) 50 Cal.4th 1184, 1198; *People v. Lomax* (2010) 49 Cal.4th 530, 554 [delay caused by defendant constitutes good cause for delay of criminal trial].)

"[A] trial court 'has broad discretion to determine whether good cause exists to grant a continuance of the trial.' " (*Sutton, supra,* 48 Cal.4th at p. 546.) We review a trial court's good-cause determination for abuse of discretion. (*Ibid.*)

The trial court acted within its discretion when it found good cause supported the nearly 16-month delay of Hronis's trial. In limine proceedings concerning the admissibility of DNA evidence caused much of the delay. This evidence was highly probative of Hronis's and Bertsch's guilt, and as the trial court discerned, it was "entirely appropriate" for the prosecution to seek its admission. Hronis's motions objecting to the admissibility of DNA evidence, while certainly permissible, contributed to the delay. Moreover, the delay of trial due to DNA evidence-related litigation cannot be said to have prejudiced Hronis, as the proceedings ensured such evidence met a level of general acceptance in the scientific community. (See *People v. Kelly* (1976) 17 Cal.3d 24, 31–32 (*Kelly*).) Hronis was also responsible for delay caused by the several continuances he sought or agreed to between January 5, 1999,

and November 2, 1999. (See *People v. Williams* (2013) 58 Cal.4th 197, 240.) Finally, our analysis of Hronis's claim does not change even if we consider that Bertsch's separate motions may have caused brief delays in Hronis's trial. We have previously held that such delays generally do not undermine a finding of good cause, especially considering the substantial state interests that are served in proceeding with a joint trial. (*Smith*, *supra*, 54 Cal.4th at p. 604; *Sutton*, *supra*, 48 Cal.4th at p. 545; accord, § 1050.1.) In short, Hronis suffered no violation of his speedy trial rights under section 1382.

### 4. *Hronis's jury selection claims*

#### a. *For-cause challenges not based on views of the death penalty*

Hronis contends the trial court abused its discretion when it denied his challenge for cause to Juror No. 206630. Additionally, he argues the trial court abused its discretion in granting the prosecution's for-cause challenges to Prospective Jurors Kendra M. and Judith W. and denying his challenges for cause as to Prospective Jurors Linda S. and Trieu C. We conclude the trial court did not abuse its discretion in denying Hronis's for-cause challenge to Juror No. 206630. Further, as to the four prospective jurors, we find that Hronis has not shown he was prejudiced by the court's grant or denial of those challenges. The court's rulings provide no basis for reversing the judgment.

#### i. *Legal principles*

"Under both state and federal Constitutions, a criminal defendant is guaranteed the right to be tried by an impartial jury. (Cal. Const., art. I, § 16; U.S. Const., 6th & 14th Amends.) To prevail on a claim that the court erroneously denied a

challenge for cause, 'defendant must demonstrate that the court's rulings affected his right to a fair and impartial jury.' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1048 (*Ramirez*).) " 'A party may challenge a prospective juror for actual bias, defined as a state of mind that would prevent that person from acting impartially and without prejudice to the substantial rights of any party.' " (*Id.* at p. 1049.)

The trial court has broad discretion to assess the qualifications of jurors challenged for cause. (*Uttecht v. Brown* (2007) 551 U.S. 1, 9.) "The trial court must determine whether the prospective juror will be 'unable to faithfully and impartially apply the law in the case.' [Citation.] A juror will often give conflicting or confusing answers regarding his or her impartiality or capacity to serve, and the trial court must weigh the juror's responses in deciding whether to remove the juror for cause. The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence." (*Weaver, supra,* 26 Cal.4th at p. 910; see *People v. Clark* (2011) 52 Cal.4th 856, 895 (*Clark*) ["The trial court is in the best position to determine the potential juror's true state of mind because it has observed firsthand the prospective juror's demeanor and verbal responses"]; *People v. Hillhouse* (2002) 27 Cal.4th 469, 489 ["The trial court is present and able to observe the juror itself" and "can judge the person's sincerity and actual state of mind far more reliably than an appellate court reviewing only a cold transcript"].)

" ' "As a general rule, a party may not complain on appeal of an allegedly erroneous denial of a challenge for cause because the party need not tolerate having the prospective juror serve on the jury; a litigant retains the power to remove the juror by exercising a peremptory challenge. Thus, to preserve this claim

for appeal we require, first, that a litigant actually exercise a peremptory challenge and remove the prospective juror in question. Next, the litigant must exhaust all of the peremptory challenges allotted by statute and hold none in reserve. Finally, counsel . . . must express to the trial court dissatisfaction with the jury as presently constituted." ' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 665.)

ii. *Analysis*

aa. *Juror No. 206630.*

Juror No. 206630 indicated in her questionnaire that she was an attorney and had been hired recently by the state Department of General Services. She was married to another attorney and had two young children. She had previously represented the Department of Corrections in a case while working at a law firm. She wrote that she knew several people who worked at the district attorney's office but did not socialize with them. She wrote that she had no prior knowledge of the case and added that even if she did hear something from an outside source in the future, she would base her decision solely on the evidence presented. She expressed concern about having to view photographs showing significant injuries to Canady but affirmed that she would still be fair and consider all the evidence.

When asked whether there was any reason why she would prefer not to serve as a juror in this case, Juror No. 206630 answered in the affirmative, explaining that she had just started a new job and was on a one-year probationary period. She added that she had a one-year-old baby, and it could distract her if he was sick. She wrote that she was willing to serve as a juror if these reasons were not sufficient to be excused.

Juror No. 206630 subsequently submitted a request to be excused for undue hardship based on her new employment and family obligations. She wrote that she had just started a new job and that serving as a juror would seriously interfere with her training and probationary period. She also explained that her two young children were in daycare, but if they were sick and her husband was unavailable due to work that she would have sole responsibility to care for them. She added that she was planning to have a baby in about 18 months and was concerned that she could not take maternity leave at her new job if she was selected as a juror and had to miss six months of work. Following voir dire on this issue, the trial court denied the hardship request. It acknowledged Juror No. 206630's concerns regarding potential adverse impact on her career if she were to serve as a juror and then seek maternity leave soon after, but it noted that her right to do so was legally protected.

Juror No. 206630 also submitted an update to her jury questionnaire, relaying that her son was in the same second grade class and catechism class as the child of a deputy district attorney. She wrote that she had never spoken with this deputy district attorney and only made the connection after she saw him at a church event over the weekend. In subsequent voir dire, Juror No. 206630 assured the court she had no initial leaning in favor of the prosecution in this case and that she could be fair and impartial to Hronis. She also affirmed that she would not feel awkward or embarrassed if she voted to find Hronis not guilty and then saw the deputy district attorney in the future.

The defense challenged Juror No. 206630 for cause "[b]ased on the relationship with [the deputy district attorney] if for no other reason." The court denied the challenge,

explaining that there was no relationship between them. The court also credited Juror No. 206630's voir dire assurance that she could keep any indirect relationship between the children separate from this case. Juror No. 206630 was ultimately seated as a juror on Hronis's panel.

We conclude that substantial evidence supports the trial court's denial of the challenge for cause. Although Juror No. 206630 expressed concern regarding potentially negative career impacts were she to serve as a juror, become pregnant, and request maternity leave in short succession, nothing in the record suggests the court's denial of her hardship request resulted in any bias against the defense. Nor did the fact that she and her husband were attorneys indicate she could not be fair and impartial. Her tangential acquaintance to a deputy district attorney involved in the case did not undermine her representations. Instead, her written and voir dire responses consistently affirmed her ability to be fair and impartial and to follow the court's instructions in evaluating evidence and making a decision. The record supports the trial court's conclusion that Juror No. 206630 could be a fair juror. Thus, the court did not err by denying Hronis's challenge for cause.

bb. *Prospective Jurors Kendra M., Judith W., Linda S., and Trieu C.*

Hronis also claims the trial court abused its discretion in granting the prosecution's for-cause challenges to Prospective Jurors Kendra M. and Judith W. and denying his challenges for cause as to Prospective Jurors Linda S. and Trieu C. As to Kendra M. and Judith W., even if we were to assume error, any such error would be harmless because it did not adversely affect the resulting trial. (See *People v. Holt* (1997) 15 Cal.4th 619,

73

656 [" '[T]he general rule [is] that an erroneous exclusion of a juror for cause provides no basis for overturning a judgment' "].)

Regarding Linda S. and Trieu C., Hronis's argument proves no more effective. Even if the trial court erred in denying Hronis's challenge for cause, he would still need to establish prejudice. (*People v. Boyette* (2002) 29 Cal.4th 381, 419.) Neither prospective juror sat on Hronis's jury, so it was unaffected. (*Ibid.*) Hronis attempts to demonstrate prejudice by arguing he was forced to exhaust his peremptory challenges, and he further argues the court denied his request for additional peremptory challenges.[13] But even if the court's rulings forced Hronis to exhaust his peremptory challenges, it is insufficient to show prejudice. Hronis must still show that any error resulted in a jury that was not impartial. "When a defendant uses peremptory challenges to excuse prospective jurors who should have been removed for cause, a defendant's right to an impartial jury is affected only when he exhausts his peremptory challenges *and* an incompetent juror, meaning a juror who should have been removed for cause, sits on the jury that decides the case." (*People v. Black* (2014) 58 Cal.4th 912, 920, italics added (*Black*); see *id.* at p. 921 ["the fact that defendant requested additional peremptory challenges that the court did not grant him does not support his claim, because he has failed to show that an incompetent juror sat on his case" (italics omitted)].) Because Hronis has not shown that an incompetent juror sat on his jury, he has not shown prejudice based on the court's denial of his for-cause challenges, even assuming the court erred.

---

[13]     Hronis exercised a peremptory challenge on Linda S.

b. *Voir dire of prospective jurors on their death penalty views*

Hronis next asserts the trial court's death-qualification voir dire was unfairly one-sided in violation of the Eighth and Fourteenth Amendments to the federal Constitution and deprived him of his right to a fair and impartial jury. He contends the court removed prospective jurors opposed to the death penalty with little to no questioning while going to great lengths to rehabilitate prospective jurors who were overly enthusiastic in favor of the death penalty. We conclude the trial court did not err.

i. *Legal principles*

"Trial courts possess broad discretion over both '[d]ecisions concerning the qualifications of prospective jurors to serve' [citation] and the manner of conducting voir dire." (*People v. Whalen* (2013) 56 Cal.4th 1, 29 (*Whalen*).) Although trial courts must be evenhanded in their death-qualification questions, which are designed to discern whether prospective jurors' attitudes both for and against the death penalty will impair their ability to serve as jurors, they retain extensive discretion regarding the number and nature of the questions about the death penalty that are posed to each prospective juror. (*Id.* at p. 30; see *People v. Mills* (2010) 48 Cal.4th 158, 190 ["[W]e cannot predicate a finding of error merely on the number of questions the court asks" death-leaning and life-leaning jurors].) This court has counseled against requiring a trial court's death-qualification voir dire to be similar for each prospective juror, "lest the court feel compelled to conduct a needlessly broad voir dire, receiving answers to questions it does not need to ask." (*People v. Thornton* (2007) 41 Cal.4th 391, 425 (*Thornton*).) We have likewise cautioned reviewing courts that, " ' " [d]espite its

importance, the adequacy of voir dire is not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions.' " ' " (*Whalen*, at p. 30, italics omitted.) Accordingly, "the court's manner of conducting voir dire will not be disturbed on appeal unless it renders the trial fundamentally unfair." (*Id.* at p. 31.)

Here, Hronis points to the court's voir dire of 11 prospective jurors, five of whom expressed that they favored the death penalty and six of whom expressed opposition to it, as evidence that the court engaged in one-sided questioning that resulted in a pro-death panel. A review of the questionnaire responses and voir dire transcripts of these jurors supports the conclusion that the court did not abuse its discretion or display bias in questioning either death-leaning or life-leaning jurors.

ii. *Voir dire of death-leaning prospective jurors*

Hronis first highlights Prospective Juror Kenneth O. This prospective juror was a retired sergeant of the California Highway Patrol. He stated in his written questionnaire that he was strongly in favor of the death penalty and viewed it as necessary. He also indicated, however, that he could keep an open mind about what the penalty should be and would listen to all the evidence and the court's instructions on the law before reaching a decision. During voir dire, he affirmed several times that it was possible he would have an initial leaning in favor of the prosecution based on his decades of service on the California Highway Patrol. He also said that, based on his experience, he

would hold an officer's testimony in higher esteem than a civilian's testimony.

Hronis contends the court used a leading question when it asked Kenneth O. if he could weigh aggravating and mitigating factors to arrive at a verdict of life without the possibility of parole, and he complains that after the prospective juror responded in the affirmative, the court did not further explore this issue. But the trial court *granted* the defense's challenge for cause based on the juror's pro-prosecution bias and favorable views on the death penalty. Accordingly, the court's brief voir dire of Kenneth O. before excusing him for cause does not support Hronis's claim that it went to great lengths to rehabilitate death-leaning prospective jurors.

Hronis also points to voir dire of Prospective Juror Karrie W., who was not removed for cause. In her written questionnaire, this prospective juror indicated she was strongly in favor of the death penalty. But she also wrote that her feelings on the death penalty were not so strong that she would always vote for the death penalty. She likewise affirmed that she would base a penalty determination on the evidence, and she agreed that she would be able to listen to all the evidence and the court's instructions on the law and consider both death and life without the possibility of parole before reaching a decision on penalty.

During voir dire, the trial court asked Karrie W. whether, despite her personal feelings on the death penalty, she could see herself in an "appropriate case" imposing life without the possibility of parole. The prospective juror responded that she could. The court also asked whether she could honestly consider both penalty options before reaching a verdict based on the

evidence of the case and the court's instructions on the law. She answered, "yes."

These questions were sufficient to allow the court to decide whether Karrie W. could perform her duties in this capital case. Hronis's claim that she may have interpreted the court's use of the phrase "appropriate case" to mean one involving self-defense or vehicular manslaughter is speculative and finds no support in the record.

Next, Hronis highlights the voir dire of Prospective Juror Gary C., who provided somewhat ambiguous questionnaire responses. These responses indicated he was strongly in favor of the death penalty based on an "eye for an eye" principle. But he also wrote that he was "all for" life imprisonment without the possibility of parole. He responded in the affirmative when asked whether he felt so strongly in favor of the death penalty that he would vote to find any circumstance true, yet answered "no" when asked whether he had such strong feelings in favor of the death penalty that he would always vote for death, no matter what the evidence presented. He also indicated he believed he was open minded about what the penalty should be in this case and would be able to listen to all the evidence and the court's instructions on the law and consider both penalties before reaching a decision.

During voir dire, the court asked Gary C. whether, given his views in favor of the death penalty, he could consider life without the possibility of parole as an option. He stated that he could. The court rephrased the question, asking whether the prospective juror's feelings about the death penalty would impair his ability "to give good faith, reasonable, honest consideration to life without the possibility of parole as a

sentencing option." He responded that he understood the question, and that his feelings about the death penalty would not impair him. When the court asked whether he could see himself, in an appropriate case, voting for life without the possibility of parole, he said "yes."

The court's probing of Gary C.'s death penalty views, given his somewhat conflicting questionnaire responses, was entirely appropriate. (*Whalen, supra,* 56 Cal.4th at p. 34 ["As we have explained, 'we ordinarily defer to the court's determination that a prospective juror's answers require clarification' "].) Here again, Hronis's claim that the prospective juror may have interpreted "appropriate case" unduly narrowly is without record support.

Hronis also points to the voir dire of Prospective Jurors Linda E., Rosemary D., and Barbara B. as examples of the court's engaging in uneven questioning. He argues that the court did not sufficiently question Linda E. and Rosemary D. about their pro-death penalty views, while it posed too many questions to Barbara B. about her opposition to it. But Linda E. and Rosemary D. gave consistent written and oral responses regarding their ability to put aside their personal feelings on the death penalty and consider both penalties based on the evidence and the court's instructions before reaching a decision. Given their unvarying answers regarding their ability to give fair and honest consideration to both penalties based on the evidence and instructions on the law, we see no error in the court's determination that additional questioning was unnecessary. Moreover, Hronis's counsel could have engaged in follow-up questioning of Linda E. and Rosemary D., but they elected not to do so.

In contrast, Barbara B. gave somewhat conflicting responses regarding her ability to impose the death penalty. Although she described her feelings on the death penalty as neutral, she added "it would only be [appropriate] in the most extreme and heinous situations." During voir dire, the court probed the prospective juror on the latter answer, asking whether it was limited to offenses such as war crimes or horrendous mass activity, or if she would be willing to consider the death penalty in a less severe case. She answered, "I think it would be problematic for me to impose death on another human being. Um, it seems an extreme form of punishment to me." When the court asked the juror whether she could see herself in an appropriate case imposing the death penalty, she responded that although she could see where it was appropriate in the abstract, she had difficulty envisioning herself actually doing it. When the court inquired whether the prospective juror could give good faith, reasonable consideration to both penalties after hearing all the evidence and law in this case and then select the proper sentence, she responded, "I think that would be a decision that would — that would haunt me." The court asked her to clarify whether she could make a decision, even though it bothered her, or whether she could not make it at all, she stated, "I think the, the outstanding fear of having to live with that would prohibit me from making that decision."

Given Barbara B.'s questionnaire responses and initial voir dire answers, the court acted well within its discretion when it probed her views regarding the death penalty through additional questioning. A comparative review of the court's questioning of Linda E. and Rosemary D. does not indicate judicial bias.

### iii. *Voir dire of life-leaning prospective jurors*

Hronis also points to the court's questioning of several other life-leaning prospective jurors as evidence that it engaged in one-sided questioning. First, Hronis highlights the court's voir dire of Prospective Juror Selina B. He contends that because she was a life-leaning juror, the court did not attempt to rehabilitate her in the same manner that it dealt with death-leaning jurors.

Selina B.'s questionnaire responses raised serious doubts about her ability to impose death at all. She wrote, for example, that, "Killing one person will not bring back the life of another. Therefore [i]t will be difficult for me to end a life." She also explained that for her to consider voting for the death penalty, "[t]he evidence would have to be so overwhelming and evil."

Nonetheless, during questioning, the court sought to understand whether Selina B. would truly be unable to impose the death penalty. The court asked, "Is it so difficult to you to do that that you would be unable, for example, to weigh the factors in aggravation and mitigation and impose the death penalty if, in fact, you thought that were the proper penalty?" She responded, "Your honor, I have not been in a situation like that, so it is hard for me to say what I would do at that time." The court stated: "I understand that, and I am asking you in the context here really of an abstract question. When you look in your heart and mind, do you see that it is a reasonable possibility that if the aggravators substantially outweighed the mitigators in this case and we get to a penalty phase that you could go for the death penalty in that situation?" The juror answered, "I don't think I could." The court later granted the People's challenge for cause, noting it found the juror's oral

statement that she could not impose the death penalty to be credible, and her manner was sincere and reflective.

The court acted within its discretion when it asked the clarifying questions it did. (*Whalen, supra,* 56 Cal.4th at p. 33 [trial court did not abuse its discretion when it asked questions testing prospective juror's questionnaire responses that were inconsistent or indicated confusion, to clarify her beliefs and to assess how firmly she held these beliefs before deciding whether she could perform juror duties]; *People v. Martinez* (2009) 47 Cal.4th 399, 446.) In light of Selina B.'s questionnaire responses, the trial court's follow-up questions were sufficient to ascertain whether her views regarding the death penalty would substantially impair her performance as a juror. (*Thornton, supra,* 41 Cal.4th at p. 425.)

Hronis also points to Prospective Juror Jennifer C.'s voir dire, contending the court engaged in leading questioning by asking the juror whether her conscience would allow her to elect a penalty rather than inquiring if she could weigh aggravating and mitigating circumstances. But Jennifer C.'s questionnaire responses strongly suggested she would be unable to vote for death. She answered in the affirmative when asked whether she had any moral or religious beliefs that might conflict with her duties as a juror. She explained that as a Jehovah's Witness, biblical standards governed her thinking and beliefs. When asked for her general feelings on the death penalty, she wrote, "I feel that I would not want to bear that responsibility to choose death for an individual. I believe that if that person were to be put to death, and then later found innocent, I would biblically be responsible for his or her life." Although she characterized her position on the death penalty as neutral, she added, "I would not want to bear the responsibility for the individual's life if I

should choose incorrectly." She later wrote that she would not want the case to get to the penalty phase for fear she would have to choose, and she indicated she was unsure if she could be open minded about what the penalty should be before trial began. She responded in the negative when asked whether she would be able to listen to the evidence and legal instructions and consider both penalties before reaching a decision, explaining that her conscience would not allow her to choose either way. In the concluding questions section, Jennifer C. wrote that she would prefer not to serve as a juror because she did not want to stand in judgment for the life of another and she "would not want to vote either way."

During voir dire, Jennifer C. confirmed that her conscience would not allow her to choose a penalty. When the court asked whether she would abstain from voting if the case went to the penalty phase, she confirmed she would. The court later granted the People's challenge for cause. The court's succinct questioning regarding the juror's ability to consider both penalties was appropriate in light of the prospective juror's consistent written and oral statements affirming she could not do so.

Similarly, the court's relatively brief questioning of Prospective Juror JoAnn Z. was warranted given the juror's forceful oral responses indicating she would be unable to vote to impose the death penalty. In her questionnaire, this prospective juror conveyed a general degree of discomfort with the death penalty. She wrote that her feelings about the death penalty were "[v]ery difficult," her feelings about life imprisonment without the possibility of parole were "[g]ood in capital cases," and she was opposed to the death penalty. She added that it would be a "very, very difficult thing to sentence someone to

death." She wrote that her religion's official position on the death penalty was "not favorable." However, she also indicated her views were not so strong they would prevent her from finding any special circumstance true or require her to always vote against the death penalty.

During voir dire, the court asked JoAnn Z. about her employment status. She responded, "Your Honor, I am firmly opposed to the death penalty." This non sequitur demonstrates the depth of the prospective juror's feeling. When the court asked whether there was any circumstance under which she could see herself voting for the death penalty, she stated, "Absolutely not." She acknowledged her written response was inconsistent but averred that she would like to "burn" her questionnaire. She said this change of heart was based on her opportunity to reflect on her questionnaire responses for two weeks. The court granted the People's subsequent challenge for cause. It observed that JoAnn Z.'s "demeanor and sincerity and even volume in indicating that she wanted to destroy the questionnaire because of her firm opposition to the imposition of the death penalty was compelling." The trial court's brief questioning of the prospective juror was sufficient in light of her forceful and clear responses.

Hronis offers Prospective Juror Patrick M. as "another illustration of how quick the court was to conclude a person against the death penalty was unsuitable." But the court's relatively brief questioning of this prospective juror also was appropriate. Patrick M. wrote in his questionnaire that as a Catholic, he did not feel he could vote for the death penalty. He affirmed that his religion had an official position against the death penalty, and he felt obligated to accept that position in this case, adding he did not believe he had the right to take

anyone's life. He confirmed that he probably felt so strongly against the death penalty that he would refuse to find any special circumstance true, no matter what the evidence showed, in order to end the case before it got to the penalty phase. He further indicated that he was "unsure" whether he would refuse to find the defendant guilty of first degree murder in the guilt phase for the same reason. When asked whether his feelings against the death penalty were so strong that he would always vote against death, no matter what evidence was presented, he responded in the affirmative, adding he "can't take another person's life." He likewise wrote that he was not open minded about what the penalty should be and he could not consider the death penalty as an option. Responding to a written question regarding whether he could serve as a juror in this case, he wrote, "[I] stated many times — I can't vote for the death penalty."

During voir dire, Patrick M. confirmed his inability to vote for death. He said that as a Catholic he felt obligated to accept the church's position against the death penalty. When the court asked whether he could see himself, in an appropriate case, voting for the death penalty, he responded, "No." The court later excused Patrick M. for cause based on his repeated declarations that he could not impose the death penalty. His oral and written statements regarding his ability to consider the death penalty were resolute and unequivocal. Under these circumstances, the court was not required to question him further. (See *Whalen, supra,* 56 Cal.4th at pp. 38–39; *Mills, supra,* 48 Cal.4th at p. 190.)

Finally, Hronis points to the court's voir dire of Prospective Juror Clarence T. as indicative of its refusal to accept the assurances of life-leaning prospective jurors that they

could keep an open mind and give honest and fair consideration to both penalties. But Clarence T.'s questionnaire responses conveyed not only that he was strongly opposed to the death penalty, but also that he harbored serious reservations about his ability to vote for death. He wrote that he did not want to participate in another human's death and explained that society does not have the right to take someone's life. He noted that his religion was officially opposed to the death penalty, although he added that his religion did not dictate his position. Somewhat inconsistently, he affirmed that he would follow the law and the court's instructions relating to special circumstances, but he emphasized that he did not want to take another person's life. He also affirmed that he was open minded about what the penalty should be. He wrote that he would listen to all the evidence and the court's instructions of the law and consider both penalties.

During voir dire, the court probed Clarence T. on his written responses, observing he had indicated he was strongly opposed to the death penalty but that he would be able to consider both death and life without the possibility of parole as penalty options. The prospective juror confirmed those were his beliefs. When the court pointed to his written statement that society does not have the right to take someone's life because society then becomes the murderer, he continued to agree with this sentiment. The court asked, "Is your belief so strong in this regard that it would substantially impair your ability to evaluate the death penalty as a sentencing option?" The juror responded that it would. The court continued: "Let me ask the question one additional way to make sure I understand you. Can you see yourself, in an appropriate case, imposing the death penalty?" The juror answered that he could not. The court

granted the prosecution's challenge for cause. It found that Juror Clarence T.'s "answers were clear, specific, and credible to the [c]ourt with regard to [his] inability to impose the death penalty."

Given Clarence T.'s somewhat inconsistent written responses, the trial court properly probed this prospective juror regarding his ability to vote for death. Upon further questioning, the juror unequivocally confirmed that he would be unable to consider the death penalty. No abuse of discretion or unfairness appears on this record.

In sum, the questionnaire responses and voir dire transcripts of the prospective jurors identified by Hronis reflect that "the court questioned each prospective juror in a manner consistent with its assessment of that person's 'individual characteristics [citation] and asked questions . . . it felt necessary to come to a decision about the ability of the prospective juror to serve on the jury." (*Whalen*, *supra*, 56 Cal.4th at p. 35.) With this in mind, we conclude the court acted well within its discretion and exhibited no judicial bias in questioning the prospective death-leaning and life-leaning prospective jurors identified by Hronis. The court's manner of conducting voir dire came nowhere near rendering the trial fundamentally unfair.

    c. *Challenges for cause based on death penalty views*

In addition to his threshold procedural claim, Hronis separately argues that the trial court erred in its specific rulings on several challenges for cause based on prospective jurors' death penalty views. He asserts this error violated his constitutional right to an impartial jury.

i. *Legal principles*

"With regard to jury selection in a capital case, decisions by this court and the United States Supreme Court have made clear that prospective jurors' personal opposition to the death penalty is not a sufficient basis on which to remove them from jury service in a capital case, ' "so long as they clearly state that they are willing to temporarily set aside their own beliefs in deference to the rule of law." ' " (*People v. Schultz* (2020) 10 Cal.5th 623, 646 (*Schultz*); see *People v. Jones* (2012) 54 Cal.4th 1, 40–41.)

"Still, excusal for cause is permissible when the prospective juror's beliefs regarding the death penalty 'would "prevent or substantially impair the performance of his [or her] duties as a juror in accordance with [the court's] instructions and [the juror's] oath." ' [Citations.] 'While a prospective juror may not be excused for cause based on "general objections" or "conscientious or religious scruples" against the death penalty [citation], excusal is proper when a prospective juror cannot "consider and decide the facts impartially and conscientiously apply the law as charged by the court" [citation].' " (*People v. Scully* (2021) 11 Cal.5th 542, 579 (*Scully*); accord, *Wainwright v. Witt* (1985) 469 U.S. 412, 423 (*Witt*) ["Here, as elsewhere, the quest is for jurors who will conscientiously apply the law and find the facts"].)

"When a challenge is based on the prospective juror's views on the death penalty, the trial court must determine whether those views would prevent or substantially impair the performance of that person's duties. [Citation.] The standard of review of the court's ruling regarding the prospective juror's views on the death penalty is essentially the same as the

standard regarding other claims of bias. If the prospective juror's statements are conflicting or equivocal, the court's determination of the actual state of mind is binding. If the statements are consistent, the court's ruling will be upheld if supported by substantial evidence." (*People v. Horning* (2004) 34 Cal.4th 871, 896–897.) The party seeking removal for cause based on a juror's death penalty views bears the burden of developing evidence for dismissal. (*Witt, supra,* 469 U.S. at p. 423 ["As with any other trial situation where an adversary wishes to exclude a juror because of bias, . . . it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality"]; *People v. Armstrong* (2019) 6 Cal.5th 735, 750.)

ii. *Analysis*

aa. *Denial of defense challenges based on death penalty views*

Hronis contends the trial court erroneously denied defense challenges for cause to seven prospective jurors — Linda E., Gary C., B. Kristine C., Alfred C., Jennifer L., Alicia R., and Marie W. — based on their death penalty views. He has not shown reversible error.

To prevail on a claim based on the erroneous denial of a challenge for cause, the " 'defendant must demonstrate that the court's rulings affected his right to a fair and impartial jury.' " (*Whalen, supra,* 56 Cal.4th at p. 44.) Hronis cannot prevail because none of the prospective jurors he unsuccessfully challenged for cause sat on his jury. Marie W. was never selected as a potential juror, and the prosecutor exercised a peremptory challenge against Alfred C. Hronis used peremptory challenges to remove Linda E., Gary C.,

B. Kristine C., Jennifer L., and Alicia R., so they did not sit on his jury either.

The loss of a peremptory challenge in this way may be grounds for reversal " ' "if the defendant exhausts all peremptory challenges *and an incompetent juror is forced upon him.*" ' " (*Whalen*, *supra*, 56 Cal.4th at p. 44.) Hronis has not made this showing.

He points to Juror No. 206630, whose son was in the same elementary school class as a deputy district attorney involved in the case, but we have already determined that this juror was not biased against Hronis. Hronis also identifies Juror No. 241721, but he makes no argument on appeal that the trial court erred by denying Hronis's challenge to that juror. Hronis has therefore failed to establish he was prejudiced by the loss of one or more peremptory challenges. (*Whalen*, *supra*, 56 Cal.4th at p. 45.)[14]

### bb. *Grant of prosecution challenges based on death penalty views*

Hronis also argues the court erroneously granted the prosecution's challenges for cause of five prospective jurors based on their death penalty views. We conclude substantial evidence supports the trial court's conclusion that these prospective jurors' views regarding the death penalty would have prevented or substantially impaired them from performing their duties as jurors.

---

[14] We do not need to address whether multiple errors by a trial court that "substantially disadvantaged the defendant relative to the prosecution" might also be sufficient to show prejudice. (See *Black*, *supra*, 58 Cal.4th at p. 923 (conc. opn. of Liu, J.).)

Hronis complains the trial court improperly dismissed Prospective Jurors Selina B., Jennifer C., JoAnn Z., Barbara B., and Clarence T. All the jurors highlighted by Hronis were also identified in his claim of judicial bias above. As previously described, each of these jurors expressed doubt in their questionnaire answers regarding their ability to impose death, and their oral responses to the court confirmed they were unable to do so. "When a prospective juror repeatedly says he does not know whether he could realistically impose the death penalty, we will not second-guess the trial court's determination that the juror is substantially impaired." (*People v. Turner* (2020) 10 Cal.5th 786, 815; see *People v. Wall* (2017) 3 Cal.5th 1048, 1063 [prospective juror's statements that she did not know whether she had the ability to impose the death penalty "provide substantial evidence that she 'harbored very serious doubts concerning whether, if seated on a capital jury, she could ever personally vote to impose the death penalty' "].) Here too, we find no error in the court's excusal of the five prospective jurors for cause based on their death penalty views.

Hronis asserts the court failed to obtain sufficient information regarding the prospective jurors' state of mind to permit a reliable determination regarding whether their views would prevent or substantially impair their performance as a capital juror. (See *People v. Leon* (2015) 61 Cal.4th 569 (*Leon*).) We held in *Leon* that the trial court erred when it dismissed three prospective jurors based on their opposition to the death penalty because it did not inquire about the jurors' ability to set aside their biases and follow the law, despite clear statements in the questionnaires expressing the jurors' willingness to do so. (*Id.* at p. 593.) We recognized that although "[p]rospective jurors may be dismissed based on written questionnaire

responses alone if the responses leave no doubt that their views on capital punishment would prevent or substantially impair the performance of their duties in accordance with the court's instructions and the jurors' oath," "if a juror's questionnaire responses are inconsistent and do not clearly reveal an inability to serve, the court may not grant a cause challenge without further questioning to clarify the juror's views." (*Id.* at p. 592.) Because the dismissed jurors in *Leon* "expressed opposition to the death penalty in their questionnaires, but all definitively stated they could set aside their personal feelings and follow the law as the court explained it," their written responses indicated the jurors appeared qualified to serve. (*Ibid.*) We concluded the dismissed jurors thus "could not be excused for cause unless further questioning established that they were in fact unable or unwilling to set aside their personal views and follow the law in determining penalty." (*Ibid.*)

*Leon* does little to advance Hronis's claim. Here, unlike in *Leon*, the trial court questioned each of the five prospective jurors regarding their ability to set aside their personal views and follow the law in determining a penalty. The prospective jurors confirmed their views on capital punishment would prevent or substantially impair the performance of their duties in accordance with the court's instructions and the jurors' oath. Substantial evidence supports the court's excusal of these jurors for cause.

### 5. *Claims related to DNA evidence*

Bertsch and Hronis raise various claims related to the admission of DNA evidence at trial. They contend (1) the trial court improperly permitted several expert witnesses to relay case-specific, testimonial hearsay during pretrial hearings and

at trial; (2) the court should have exercised its gatekeeping function to exclude certain DNA evidence at trial; (3) the court improperly quashed their subpoena of materials related to experimental validation of specific DNA testing equipment; (4) the court prejudicially erred by restricting Bertsch's advisory counsel's participation in court when Bertsch was representing himself; (5) the court improperly allowed the prosecutor to elicit evidence regarding Hronis's DNA experts' pretrial actions; (6) the court abused its discretion when it limited cross-examination of a prosecution DNA expert; and (7) the court improperly admitted out-of-court statements critical of a defense expert's work and compensation. Bertsch also contends he suffered cumulative prejudice because of the DNA-related evidentiary errors. We address these arguments in turn.

a. *Asserted errors under* Crawford *and* Sanchez

Before trial commenced in this case, the trial court conducted numerous pretrial hearings relating to the admissibility of certain scientific evidence pursuant to what has become known as the *Kelly* rule.[15] Described in greater detail below, the *Kelly* rule "provides a framework within which courts can analyze the reliability of expert testimony based on new or novel scientific methods or techniques." (*People v. Lucas* (2014) 60 Cal.4th 153, 223 (*Lucas*).) "Expert testimony based on the application of a scientific technique is admissible in California if the technique is generally accepted in the pertinent scientific

---

[15] Although "[f]ormerly known as the *Kelly-Frye* rule, based on the rulings of [*Kelly, supra*, 17 Cal.3d 24] and *Frye v. U.S.* (D.C. Cir. 1923) 293 F. 1013, the rule is now the *Kelly* rule in California after changes to the Federal Rules of Evidence that superseded *Frye*." (*People v. Nieves* (2021) 11 Cal.5th 404, 442, fn. 8.)

community." (*People v. Azcona* (2020) 58 Cal.App.5th 504, 510.) At a pretrial *Kelly* hearing, the proponent of evidence derived from a new scientific methodology must show (1) the reliability of the new technique has gained general acceptance in the relevant scientific community, (2) the expert testifying about the technique is qualified to give an opinion on the subject, and (3) the correct scientific procedures were used in the particular case at hand. (*Jones, supra,* 57 Cal.4th at p. 936.)

Bertsch and Hronis first contend the trial court reversibly erred when it allowed various DNA experts to testify about matters not within their personal knowledge in violation of *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). Specifically, they claim the trial court erroneously admitted the testimony of Steven Myers, Lawrence Presley, and Robin Cotton during pretrial hearings and at trial.

### i. *Legal principles*

This case was tried before the United States Supreme Court's decision in *Crawford* and this court's decision in *Sanchez*, which altered the paradigm for analyzing the admissibility of expert testimony.

Prior to *Crawford*, the admission at trial of a witness's or declarant's hearsay statements did not violate the confrontation clause of the Sixth Amendment if the witness or declarant was unavailable and the statements had adequate " 'indicia of reliability,' " meaning they fell within a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." (*Ohio v. Roberts* (1980) 448 U.S. 56, 66, overruled by *Crawford, supra,* 541 U.S. 36.) In *Crawford*, the high court "announced a new standard for determining when the

confrontation clause of the Sixth Amendment prohibits the use of hearsay evidence." (*People v. Cage* (2007) 40 Cal.4th 965, 969 (*Cage*).) *Crawford* held that the confrontation clause prohibits the admission of hearsay that is testimonial "if the declarant neither takes the stand at trial nor was otherwise available for cross-examination by the accused." (*Cage*, at p. 969.) Hearsay that is nontestimonial does not implicate the confrontation clause and is unaffected by *Crawford*. (*Davis v. Washington* (2006) 547 U.S. 813 (*Davis*).)

"Statements are nontestimonial," the *Davis* court explained, "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis*, *supra*, 547 U.S. at p. 822.) Stated differently, testimonial statements are "statements, made with some formality, which, *viewed objectively*, are for the *primary purpose* of establishing or proving facts for possible use in a criminal trial." (*Cage*, *supra*, 40 Cal.4th at p. 984, fn. 14.)

Following *Crawford*, we reexamined the permissible scope of expert testimony in *Sanchez*. We observed that the line between expert testimony as to general background information and case-specific hearsay had become blurred, and the latter was often presented to juries under the theory that such hearsay was not offered for its truth but only to explain the basis for the expert's opinions. (*Sanchez*, *supra*, 63 Cal.4th at p. 678.) Reexamining this logic in *Sanchez*, we determined it was not persuasive. (*Ibid*.) We clarified that "[w]hen an expert relies on

hearsay to provide case-specific facts, considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth." (*Id.* at p. 682.) Instead, "If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception. Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Id.* at p. 684, fn. omitted.)

"Nonetheless, an 'expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so. Because the jury must independently evaluate the probative value of an expert's testimony, Evidence Code section 802 properly allows an expert to relate generally the kind and source of the "matter" upon which his opinion rests. . . . There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception.' " (*People v. Curiel* (2023) 15 Cal.5th 433, 457, quoting *Sanchez, supra,* 63 Cal.4th at pp. 685–686.) "Thus, although *Sanchez* narrowed the scope of permissible expert testimony, it did not impact the ability of an expert to rely on hearsay evidence to reach his or her opinions, relate those opinions to the jury, and explain in general terms their bases. Nor did *Sanchez* foreclose the introduction of case-specific evidence through other means." (*Curiel*, at p. 457.)

In sum, adhering to *Crawford* and *Sanchez*, we analyze the admissibility of expert testimony using a two-step analysis. (*Sanchez*, *supra*, 63 Cal.4th at p. 680.) First, a court must ascertain whether the testimony relays an out-of-court statement and the statement is being offered to prove the truth of the facts asserted. (*Ibid*.) If an expert relays case-specific out-of-court statements to explain the bases for the expert's opinion, those statements are hearsay and require an applicable hearsay exception to be admissible. (*Id*. at p. 684.) Second, if the hearsay statement is being offered by the prosecution in a criminal case, the court must decide whether the statement contains testimonial hearsay. (*Id*. at p. 680.) If the statement contains testimonial hearsay, it is inadmissible under *Crawford* unless (1) the out-of-court declarant is unavailable to testify and (2) the defendant had a previous opportunity to cross-examine the declarant or forfeited the right to do so. (*Ibid*.)

ii. *Testimony of Steven Myers*

aa. *Pretrial testimony*

At one *Kelly* hearing, the prosecution called Myers to testify as an expert about STR testing. Myers testified that he tested the extracted DNA from Bertsch's and Hronis's reference samples as well as from Canady's vaginal swabs, anal swabs, and underwear. Myers personally performed the quantification work for the DNA samples, undertook PCR prep work on the samples, reviewed the raw data produced by the ABI Prism 310 Genetic Analyzer (310 machine), and ultimately prepared a report on his work.

Myers testified that he performed two separate testing runs on the 310 machine in the Bertsch and Hronis case because he noticed a problem with elevated baselines on the

electropherograms generated after the first run.  Myers related that in his first test run of electrophoresis, he had used a software module that was listed in the protocol by the manufacturer, but which was not meant for the size syringe that he was using.  Myers explained that although a one-millimeter or a two-and-a-half-millimeter syringe would work with the machine, they utilized separate modules.  Myers had initially used the two-and-a-half-millimeter syringe with the one-millimeter module.  After he understood the difference, he remedied the issue by using the one-millimeter syringe for the second diagnostic run.

On cross-examination, defense counsel followed up regarding this troubleshooting work.  Myers testified, "On the very first training when someone was showing me how to set the instrument up, I did not notice that he had used a module that was different than the one specified in the protocol.  [¶]  And so when I went and just simply followed the steps in the protocol, I used what turned out to be an incorrect module for that syringe.  And then when we tried to figure out what was going wrong with my runs, it was determined, oh, okay, used the wrong module.  Once we cleared that up, the runs went much better, of course."  Myers clarified that his use of "we" when discussing troubleshooting referred to himself and Martin Buoncristiani, another criminalist who served as a second reader or reviewer in the case.  He explained that he and Buoncristiani wrote notes regarding their troubleshooting work, but he did not know the specifics of the troubleshooting runs that Buoncristiani had performed. Myers added that he knew Buoncristiani had concluded the syringe size was the source of the problem because the second testing run was successfully performed with the smaller syringe.

Following Myers's testimony, the defense attempted to subpoena Buoncristiani. The trial court granted the prosecution's motion to quash the subpoena, finding that additional testimony regarding the troubleshooting runs would be irrelevant and cumulative. Specifically, the court found the troubleshooting runs "were not part of the test in this case in the normal sense of the words but, rather, were part of a repairing or fix-it process directed at the machine and not runs designed, for example, to produce something of evidentiary value." It believed the problem relating to the baseline was apparent in the test results, analogizing it to a television showing a scrambled picture as obviously not functioning properly. The court added, "With regard to the data results that the People intend to introduce, the baseline is not elevated. There was not a problem with the baseline. [¶] As a result, the relevancy of the trouble-shooting diminishes to the point of being — as to the baseline issue diminishes to the point of being not relevant and, in the alternative, certainly cumulative."

Bertsch and Hronis claim Myers improperly relayed case-specific hearsay regarding troubleshooting work that Buoncristiani performed on the 310 machine while Myers was not present. We find no confrontation clause violation, and any *Sanchez* error was harmless.

We have not addressed whether the confrontation clause applies at a pretrial evidentiary hearing. However, decisions from the high court indicate that testimony admitted in a pretrial *Kelly* proceeding would not violate the confrontation clause. (*Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 52 (plur. opn. of Powell, J.) ["The opinions of this Court show that the right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense

counsel may ask during cross-examination"]; *Kentucky v. Stincer* (1987) 482 U.S. 730, 740 [no confrontation clause violation even though defendant was excluded from pretrial hearing on witness competence when defendant subsequently had the opportunity to cross-examine at trial]; *Gannett Co., Inc. v. DePasquale* (1979) 443 U.S. 368, 394 (conc. opn. of Burger, C. J.) [confrontation clause does not apply to pretrial hearing on a motion to suppress evidence]; *California v. Green* (1970) 399 U.S. 149, 157 ["[I]t is this literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause"]; *Barber v. Page* (1968) 390 U.S. 719, 725 ["The right to confrontation is basically a trial right"].)

Our precedent also suggests that *Kelly* pretrial evidentiary hearings allow for the admission of testimonial hearsay without implicating the confrontation cause. In *People v. Gonzales* (2012) 54 Cal.4th 1234, 1267, we found no violation of the defendant's federal confrontation rights when he was not permitted to confront a witness at a preliminary hearing. "We have made it clear," we stated, "that the right to confrontation is a trial right that does not apply with full force at a preliminary hearing." (*Ibid*.) In *People v. Miranda* (2000) 23 Cal.4th 340, 351, we held that testimony by a qualified law enforcement officer relating single-level hearsay at a preliminary examination was "admissible as against hearsay, confrontation clause, and due process objections." In *Whitman v. Superior Court* (1991) 54 Cal.3d 1063, 1078, we found it "doubtful that the federal confrontation clause operates to bar hearsay evidence offered *at a preliminary hearing* held to determine whether probable cause exists to hold the defendant for trial." We observed that the high court has never held that the Sixth

or Fourteenth Amendment guarantees a right of confrontation and cross-examination at preliminary hearings. (*Whitman*, at p. 1078.) We have also concluded that a defendant does not have a Sixth Amendment right of confrontation at a sentencing hearing. (*People v. Arbuckle* (1978) 22 Cal.3d 749, 754.)

Meanwhile, several courts in other states have held that certain pretrial hearings do not implicate the confrontation clause. (See, e.g., *State v. Zamzow* (2017) 374 Wis.2d 220, 234; *Oakes v. Commonwealth* (Ky. 2010) 320 S.W.3d 50, 55; *State v. Daly* (Neb. 2009) 775 N.W.2d 47, 66; *Sheriff v. Witzenburg* (Nev. 2006) 145 P.3d 1002, 1004–1005; *State v. Woinarowics* (N.D. 2006) 720 N.W.2d 635, 641; *People v. Brink* (N.Y. App. 2006) 31 A.D.3d 1139, 1140; *People v. Felder* (Colo. App. 2005) 129 P.3d 1072, 1073–1074; *Vanmeter v. State* (Tex. App. 2005) 165 S.W.3d 68, 71–75.)

Consistent with the high court's indications, our prior decisions, and the decisions of our sister states, we hold that the confrontation clause does not apply to *Kelly* pretrial hearings. A *Kelly* hearing is very different from a criminal trial. At a *Kelly* hearing, the trial judge decides whether evidence derived from a new scientific technique may be put before a jury. (*People v. Pizarro* (2003) 110 Cal.App.4th 530, 555.) Consistent with this limited function, the focus of a *Kelly* hearing is narrower, and fundamentally different from, the ultimate question of a defendant's guilt or innocence. (See *People v. Venegas* (1998) 18 Cal.4th 47, 81 (*Venegas*) [explaining that to satisfy this prong, "the testifying expert [must] understand the technique and its underlying theory, and be thoroughly familiar with the procedures that were in fact used in the case at bar to implement the technique"; the hearing is not concerned with "all derelictions in following the prescribed scientific procedures"

such as "mislabeling, mixing the wrong ingredients, or failing to follow routine precautions against contamination"]; *People v. Cooper* (1991) 53 Cal.3d 771, 814 (*Cooper*) [" '[T]he *Kelly/Frye* rule tests the fundamental validity of a new scientific methodology, not the degree of professionalism with which it is applied,' " such that " '[c]areless testing affects the weight of the evidence and not its admissibility' "].)  And if the People prevail at a *Kelly* hearing, they must still present evidence *at trial* concerning the technique and its application in the case, at which time a defendant's federal confrontation clause rights will attach.  These considerations all weigh against extending the confrontation clause's protections to *Kelly* hearings.[16]

*Sanchez*, too, has not previously been applied to testimony at a pretrial *Kelly* hearing.  But even assuming that *Sanchez* applies, and that Myers testified to case-specific hearsay statements regarding Buoncristiani's troubleshooting, we conclude that any assumed error was harmless.

Absent a confrontation clause violation, we evaluate prejudice stemming from the allowance of expert testimony in violation of *Sanchez* under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), which requires reversal if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (*Id.* at p. 836; see also *Sanchez, supra*, 63 Cal.4th at p. 698  [improper  admission  of  nontestimonial  hearsay

---

[16]    Although we reject the application of the confrontation clause to *Kelly* hearings, we express no opinion as to whether the confrontation clause may extend to other types of pretrial hearings.

constitutes state law statutory error assessed under *Watson*]; *People v. Valencia* (2021) 11 Cal.5th 818, 840 (*Valencia*) [same].)

As a preliminary matter, the trial court made a factual finding that the troubleshooting runs conducted by Buoncristiani were not intended to produce evidence in this matter but were case-neutral actions taken to diagnose and remedy a problem with the testing machine. Consistent with that holding, we discern no reasonable probability that the exclusion of Myers's *pretrial* testimony regarding Buoncristiani's troubleshooting of the 310 machine would have resulted in the exclusion of Myers's testimony *at trial* regarding the STR DNA analysis in this matter, let alone a reasonable probability that the exclusion of this testimony would ultimately have affected the judgment.

The purpose of Myers's *Kelly* hearing was to determine whether the trial court would allow the introduction of STR DNA testing evidence based on (1) its general acceptance in the relevant scientific community as reliable, (2) Myers's qualification to give an opinion on the subject, and (3) whether the correct scientific procedures were used in the particular case. (*Jones*, *supra*, 57 Cal.4th at p. 936.) Buoncristiani's troubleshooting of the 310 machine was, at best, only tangentially related to these topics. Because the DOJ's STR testing would still have been admissible at trial even absent Myers's pretrial testimony on this point, there is no reasonable probability that the exclusion of this testimony during pretrial *Kelly* hearings would have affected the juries' ultimate verdicts of guilt.

bb. *Trial testimony*

Myers also testified as an expert in STR testing at trial. On direct examination, Myers explained that he conducted a second testing run due to elevated baselines in the first run. When the prosecution asked what happened between the two runs, the trial court sustained hearsay objections from defense counsel. The prosecution then asked Myers whether he personally saw anything different on the testing instrument during the second run. He responded that he saw a different sized syringe was being used.

On cross-examination, Bertsch's counsel asked Myers about the troubleshooting work performed by other individuals. Myers testified that he had been away at a conference and that Buoncristiani and a representative from Perkin-Elmer (the 310 machine manufacturer) had performed the actual troubleshooting work. Upon Myers's return, he determined the results from Buoncristiani's last troubleshooting run appeared good enough to proceed with a second testing run of the DNA extracted in the Bertsch and Hronis case. Hronis's counsel also asked Myers about the troubleshooting work performed in his absence. At Hronis's counsel's request, Myers related from Buoncristiani's notes that 15 troubleshooting runs had been conducted.

We conclude there was no *Sanchez* or *Crawford* error. As to the asserted *Crawford* error, we are not persuaded that Buoncristiani's relation of his troubleshooting efforts to Myers and his handwritten notes regarding troubleshooting runs implicate *Crawford*. The primary purpose of Buoncristiani's communications regarding his troubleshooting work was to determine whether the 310 machine was operating properly

rather than to establish facts for possible use in a criminal trial. (See *Davis, supra,* 547 U.S. at p. 822.) Regarding claims of *Sanchez* error, Myers's testimony on direct examination did not relate any case-specific hearsay regarding Buoncristiani's troubleshooting. It was not error under *Sanchez.* Moreover, to the extent a *Sanchez* error can be predicated on testimony elicited by a defendant (or a codefendant), any error was harmless. Myers's testimony regarding Buoncristiani's 15 troubleshooting runs did not lend credibility to Myers's conclusions. If anything, the number of troubleshooting runs cast doubt on the eventual result. There is no reasonable probability that Bertsch or Hronis would have achieved a better result at trial had it been excluded.

### iii. *Testimony of Lawrence Presley*

#### aa. *Pretrial testimony*

At another *Kelly* hearing, the prosecution called Presley to testify as an expert on the FBI's RFLP testing procedures. Presley was assigned to process the vaginal swab and blood samples received in the Hronis and Bertsch case. Presley supervised the technicians who extracted the DNA and conducted the sequencing in 1989 and 1992, and he personally reviewed the autoradiographs' machine generated results. Presley relied on the technicians' records when he concluded that the FBI's RFLP testing in 1989 and 1992 followed scientifically correct procedures. The technicians did not testify at the *Kelly* hearing. The court found the FBI laboratory records, including the technicians' notes, were admissible under either the official records exception or the business records exception to the hearsay rule.

Bertsch and Hronis first claim that Presley's reliance on the technicians' notes during the *Kelly* hearing violated their right to confrontation. We disagree. As previously explained, the confrontation clause does not apply to a *Kelly* pretrial hearing.

As to Bertsch's and Hronis's claims of *Sanchez* error, the Attorney General concedes that Presley related case-specific hearsay statements within the meaning of *Sanchez* at the pretrial *Kelly* hearing but contends the admission of these statements, if error, was harmless because it is not reasonably probable that exclusion of this testimony during *Kelly* proceedings would have resulted in a more favorable ruling at trial. Emphasizing that the thrust of the *Kelly* hearing was to determine whether the FBI had used "correct scientific procedures" in implementing the RFLP DNA testing (*Kelly*, *supra*, 17 Cal.3d at p. 30), the Attorney General maintains "[n]othing would have prevented Presley from testifying based on his general knowledge about the steps of RFLP testing, then explaining that he had reviewed the entire file, including autoradiographs and bench notes, before forming an opinion that the scientifically correct procedures had be[en] used," without violating *Sanchez*. The Attorney General also argues that, even without Presley's testimony regarding the technicians' bench notes, the existence of interpretable autoradiographs supported Presley's opinion that the correct procedures had been used because each step of RFLP analysis must be performed properly before an interpretable autoradiograph can be produced. (See *Venegas*, *supra*, 18 Cal.4th at pp. 60–62.)

Even assuming the trial court erred in admitting Presley's testimony relaying the technicians' notes under *Sanchez*, we

conclude any error was harmless because there is no reasonable probability Bertsch and Hronis would have obtained a more favorable result at trial if the technicians' notes had been excluded at the *Kelly* hearing. (*Watson, supra,* 46 Cal.2d at p. 836; *Valencia, supra,* 11 Cal.5th at p. 840.) "To determine prejudice, we examine the record as though [Presley's] testimony regarding the actions carried out by [the lab technicians] had not been admitted. But this analysis does not require us to set aside [Presley's] testimony in its entirety." (*Schultz, supra,* 10 Cal.5th at p. 661.)

Again, the parties agree that the purpose of Presley's *Kelly* hearing concerned whether the FBI had used correct scientific procedures. The existence of readable bands on the autoradiographs supported Presley's opinion that the FBI had, in fact, used the correct scientific procedures in each step of the RFLP analysis. As such, even without the technicians' notes, the trial court could readily have concluded that the evidence derived from the FBI's RFLP testing met *Kelly*'s standard for determining the admissibility of new scientific techniques at trial. And because the trial court could have allowed testimony regarding RFLP testing even absent Presley's pretrial testimony on this point, there is no reasonable probability that the exclusion of this pretrial testimony ultimately would have affected the juries' verdicts of guilt. We therefore perceive no reversible error stemming from the trial court's admission of Presley's pretrial testimony regarding the lab technicians' notes.

bb. *Trial testimony*

At trial, Presley testified that he supervised a technician who had extracted the DNA in the Bertsch and Hronis case and run the RFLP testing process up until the evaluation of the

autoradiographs generated by the tests. Presley testified that he personally reviewed the autoradiographs, measured the actual bands, interpreted the results, and drafted his findings in a report. After the trial court admitted the autoradiograph generated results, Presley independently interpreted the autoradiograph images from the witness stand.

Bertsch and Hronis assert the admission of Presley's testimony relaying the lab technician's analysis violated *Crawford* and *Sanchez*. Specifically, they maintain Presley's testimony regarding certain testing steps performed by the technician related case-specific hearsay and violated their confrontation rights. They also claim that Presley's separate interpretation of the autoradiograph images was based on the improper assumption that the lab technician correctly performed the RFLP testing.

"The question of whether and when statements in technical reports qualify as 'testimonial hearsay' remains an evolving area of the law." (*People v. Gonzalez* (2021) 12 Cal.5th 367, 398 (*Gonzalez*).) In *Gonzalez*, we summarized our jurisprudence in this area as follows: "In 2012, this court issued three companion cases that addressed confrontation clause claims involving testimony detailing the results of technical reports that had been prepared by a nontestifying witness. (See *People v. Lopez* (2012) 55 Cal.4th 569; *People v. Dungo* (2012) 55 Cal.4th 608 . . .; *People v. Rutterschmidt* (2012) 55 Cal.4th 650 . . . .) Those cases generated numerous separate opinions, reflecting the fragmented nature of the high court's reasoning in this area. [Citations.] More recently, we have noted that ' "considerable flux" [continues to] surround[] the high court's Sixth Amendment jurisprudence' [Citation], and

that '[a] comprehensive definition of the term 'testimonial' awaits articulation.' " (*Ibid.*)

In *Gonzalez*, we declined to "delve further into the high court's divided confrontation clause jurisprudence" because, even assuming a Sixth Amendment violation in that case, it was " ' "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." ' " (*Gonzalez, supra*, 12 Cal.5th at p. 398.) We adopt that same approach here. Even assuming the trial court violated Bertsch's and Hronis's confrontation rights when it admitted Presley's trial testimony regarding the lab technicians' RFLP testing procedures, these errors were harmless beyond a reasonable doubt. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159 (*Livingston*) [confrontation clause violations are subject to *Chapman* harmless error analysis].)

Even without admission of the RFLP DNA evidence, the evidence of Bertsch's and Hronis's guilt — including other, more reliable DNA evidence — was overwhelming. The evidence showed that Bertsch and Hronis committed a string of armed robberies in the weeks preceding Canady's murder and that they were being pursued by law enforcement. Indeed, Hronis pleaded guilty to five of the robberies and Bertsch admitted on direct examination that he had also participated in the robberies. Two witnesses testified that Bertsch and Hronis communicated their plan to evade law enforcement by staking out a shopping center parking lot, finding someone they could overpower, and taking their car. Shortly thereafter, Canady was carjacked and abducted from a shopping center parking lot.

Two individuals that generally matched Bertsch's and Hronis's descriptions then used Canady's credit cards as they

traveled south from Sacramento to Arizona, the very location that Bertsch's and Hronis's friend had advised them to go. Signatures on several of the credit card receipts matched Hronis's handwriting. Hronis admitted to Jerry B. that they had killed a girl and later told Loren G. that he had used a stolen credit card belonging to a woman who had been murdered, possibly by his friend. Bertsch also told a deputy sheriff that he needed to speak with the investigators and prosecutor about a recent DNA article, adding he knew they had DNA evidence against him that was found on the victim.

DNA testing also provided convincing corroborating evidence of guilt. Even without testimony regarding the FBI's RFLP DNA testing (or Cellmark's DQ-Alpha/Polymarker DNA testing, per our discussion below), the DOJ's DQ-Alpha testing and more advanced STR testing proved that Bertsch and Hronis sexually assaulted Canady. The DOJ's DQ-Alpha testing on a sperm fraction extracted from Canady's anal swab indicated a major sperm contributor with a genotype consistent with Bertsch's genotype, and a minor sperm contributor was consistent with Hronis's genotype. STR DNA testing also implicated Bertsch and Hronis. STR testing of the sperm fraction extracted from Canady's anal swab revealed allele readings identical to those in Bertsch's reference sample at all nine loci, with the random match probability rate of one in 2.4 trillion Caucasians. The allele readings observed in the sperm fraction extracted from Canady's underwear were also identical to the allele readings in Bertsch's reference sample at all nine loci and matched the allele readings in Hronis's reference sample at seven of nine loci. The random match probability rate for the second donor profile that matched Hronis's profile was one in 2.4 trillion Caucasians.

The RFLP testing "added little if anything to the properly admitted evidence" against Bertsch and Hronis. (*People v. Penunuri* (2018) 5 Cal.5th 126, 158 (*Penunuri*).) It paled in comparison to the force of the DNA evidence produced by STR testing.[17] Moreover, the jury was likely to give little relative weight to Presley's 1989 RFLP interpretation in light of his subsequent downgrading in 1992 of the statistical significance of those test results. Additionally, Mueller offered alternative calculations of the RFLP testing, which produced significantly higher probabilities of unrelated individuals randomly contributing to the DNA found in the biological evidence gathered at the crime scene than what Presley opined. Thus, a defense expert's testimony undercut the impact of Presley's 1989 RFLP interpretation as well.

On this record, it appears beyond any reasonable doubt that any error in admitting Presley's testimony did not contribute to the verdict.

iv. *Testimony of Robin Cotton*

aa. *Pretrial testimony*

At another *Kelly* hearing, the prosecution initially called former Cellmark employee Julie Cooper-Kidd to testify as an expert in DQ-Alpha and Polymarker testing. Cooper-Kidd had performed the actual DNA testing in Bertsch's and Hronis's case at Cellmark, which Robin Cotton had supervised. However, before defense counsel completed their cross-examination of

---

[17] The many advantages of STR testing over RFLP testing, including its ability to test a smaller sample, less susceptibility to sample degradation, simpler technology, and greater discrimination power, eventually rendered RFLP testing "obsolete." (*Cordova, supra,* 62 Cal.4th at p. 127.)

Cooper-Kidd, she informed the court that her continued absence from her current employment would be challenging. After the prosecution moved to strike Cooper-Kidd's testimony due to the incomplete cross-examination, defense counsel stipulated to the admission of Cooper-Kidd's direct examination and waived any right to further cross-examination.

The prosecution subsequently called Cotton to testify as an expert in DQ-Alpha/Polymarker testing. Cotton testified that Cooper-Kidd had conducted the DNA analysis in the Bertsch and Hronis case, but Cotton personally reviewed the data, notes, and other records in the file. Cotton also reviewed the actual DQ-Alpha and Polymarker test strips as well as photographs of the strips, taken immediately after testing, and she provided her own interpretation of the results. Cotton then compared her interpretation of the results against Cooper-Kidd's interpretation. After the court found Cotton's final report admissible under the business records exception to the hearsay rule (Evid. Code, § 1271), Cotton relayed information from the report, including the log sheet record of the handling of samples and notations about how the samples had been amplified and applied to test strips. Cotton explained that Cooper-Kidd and another Cellmark employee had reviewed the test strips twice while they were wet, and that Cotton personally reviewed photographs of them. Based on her independent review of the photographs, notes, and records in the file, as well as her knowledge of Cellmark protocols, scientific testing, the testing kit's instructions, and her background and training, Cotton determined that proper procedures had been followed in the Bertsch and Hronis case.

Bertsch and Hronis maintain that the admission of Cotton's testimony describing Cooper-Kidd's work violated

*Crawford* and *Sanchez*. For the reasons detailed above, we again conclude the right to confrontation is not implicated at a pretrial *Kelly* hearing, and thus no *Crawford* error occurred.

Regarding *Sanchez,* we find that any error in admitting Cotton's testimony regarding Cooper-Kidd's analysis was harmless. As previously mentioned, Bertsch and Hronis stipulated to the admission of Cooper-Kidd's testimony on direct examination, in which she described each step of her DNA analysis using DQ-Alpha and Polymarker testing and concluded that she had used the correct scientific procedures. Cooper-Kidd's testimony, standing alone, was compelling evidence that the prosecution had met *Kelly*'s third prong, whether the generally accepted scientific procedures had actually been utilized in this case, and thus the DQ-Alpha/Polymarker evidence could be introduced at trial. Accordingly, there is no reasonable probability that the exclusion of Cotton's pretrial testimony regarding Cooper-Kidd's analysis would have led to a more favorable result for Bertsch or Hronis.

### bb. *Trial testimony*

At trial, Cotton testified that she had reviewed the records produced by Cooper-Kidd and another Cellmark lab technician of the DQ-Alpha and Polymarker testing in Bertsch's and Hronis's case. Based on Cotton's review of Cooper-Kidd's bench notes and the test strips produced in this case, Cotton related the steps Cooper-Kidd undertook when Cooper-Kidd tested the DNA extracted from the reference samples. Cotton also testified that she personally conducted an independent analysis of the raw data based on her review of photographs of the DQ-Alpha and Polymarker strips produced in this case.

The Attorney General concedes that portions of Cotton's testimony relating the analysis of other technicians violated Bertsch's and Hronis's right to confrontation. Assuming Cotton related case-specific, testimonial hearsay, as we did with Presley's testimony above, we conclude any error was harmless beyond a reasonable doubt. As previously described, the scientific and nonscientific evidence in this case overwhelmingly established Bertsch's and Hronis's guilt. Cellmark's DQ-Alpha and Polymarker testing "was cumulative of the stronger [DNA evidence]" establishing Bertsch's and Hronis's guilt, most notably the more advanced STR testing. (*Penunuri*, *supra*, 5 Cal.5th at p. 158.)

Additionally, defense counsel's cross-examination blunted the impact of Cook's testimony. Counsel was able to impeach Cotton and highlight her limited role in running the DNA tests. For example, Cotton admitted that her primary role in the instant matter was to review the report authored by lab technicians and sign off on that report. In other words, Cotton acknowledged that she did not "do any of the work in this case." Defense counsel also impeached Cotton with her prior testimony where she admitted that she was not present in the laboratory while all the DNA testing was being conducted. Further, after describing the steps taken to analyze the DNA samples, Cotton admitted she did not observe any of those steps. Moreover, Cotton admitted that the technicians did not analyze the DNA samples in the usual way but, instead, decided to type the reference samples first (DNA samples from Bertsch and Hronis) before dealing with the crime scene biological material (evidence samples). Simply put, defense counsel's effective cross-examination undermined the effectiveness of Cotton's testimony, further supporting our conclusion that any error here

114

was harmless beyond a reasonable doubt.[18]  Finally, as noted below, defense counsel were permitted to present and argue to the jury that there was internal disagreement at Cellmark regarding certain aspects of Cooper-Kidd's analysis.

b. *Asserted errors under* Kelly

Bertsch and Hronis contend the RFLP, DQ-Alpha/Polymarker, and STR DNA testing failed to meet the requirements for admission of new scientific evidence under *Kelly*.  We disagree.

i. *Legal principles*

As described above, under the *Kelly* rule, the proponent of evidence derived from a new scientific methodology must show (1) the reliability of the new technique has gained general acceptance in the relevant scientific community, (2) the expert testifying about the technique is qualified to give an opinion on the subject, and (3) the correct scientific procedures were used in the particular case.  (*Jones*, *supra*, 57 Cal.4th at p. 936; *Kelly*, *supra*, 17 Cal.3d at p. 30.)

"Whether a new scientific technique has gained general acceptance is a mixed question of law and fact.  [Citation.]  '[W]e review the trial court's determination with deference to any and all supportable findings of "historical" fact or credibility, and then decide as a matter of law, based on those assumptions, whether there has been general acceptance.'  [Citation.]  Once a published appellate decision has affirmed admission of a scientific technique, the technique's general acceptance is

---

[18]  Although we find any error harmless beyond a reasonable doubt, Cotton's testimony at trial underscores potential drawbacks of using a surrogate analyst for testimony.

established as a matter of law. Further hearings on general acceptance are unnecessary 'at least until new evidence is presented reflecting a change in the attitude of the scientific community.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 447 (*Doolin*); see *Cordova*, *supra*, 62 Cal.4th at p. 127; *Venegas*, *supra*, 18 Cal.4th at p. 53.)

"The trial court's determination on the qualifications of an expert is reviewed for abuse of discretion [citation] as is its ruling on the use of correct scientific procedures in the particular case [citation]." (*Doolin*, *supra*, 45 Cal.4th at p. 447.)

ii. *The RFLP evidence was properly admitted under* Kelly

After the completion of *Kelly* hearings, the trial court made an omnibus ruling in which it found that the RFLP DNA evidence was admissible under *Kelly*. The court pointed to several published appellate decisions establishing that RFLP testing was generally accepted by the relevant scientific community. It also determined Presley was qualified to testify as an expert on this procedure, and it found credible Presley's testimony that the FBI had used correct testing procedures in this case.

Bertsch and Hronis claim the RFLP evidence did not satisfy *Kelly*'s first and third prongs. Specifically, Hronis contends the court erred when it found the RFLP testing was reliable because it was performed before the scientific community had accepted the new technology. He also argues the RFLP evidence was unreliable because the FBI later discounted two loci probes, which altered their random match probability calculations. Bertsch likewise asserts the evidence did not support the court's ruling that the FBI employed correct

scientific procedures in this case. We find the trial court acted within its discretion when it determined the RFLP evidence was admissible under *Kelly*.

At the time of the trial court's ruling, three California appellate decisions — *Venegas*, *supra*, 18 Cal.4th 47, *People v. Barney* (1992) 8 Cal.App.4th 798, and *People v. Axell* (1991) 235 Cal.App.3d 836 (*Axell*) — had confirmed the general scientific acceptance of RFLP analysis. Such authorities are ordinarily sufficient to support a trial court's finding of general scientific acceptability. "In the absence of proof of any material scientific distinction between the . . . methodologies, therefore, the trial court could properly rely on [these decisions] as establishing general scientific acceptance of the FBI's RFLP methodology used in this case to elicit and compare the DNA profiles of the evidentiary samples." (*Venegas*, at p. 54.) Hronis did not offer any evidence at trial to rebut this showing, such as that RFLP testing was no longer generally accepted in the scientific community.

Hronis argues that the FBI's subsequent exclusion of two loci probes in its random probability calculations renders the RFLP evidence unreliable under *Kelly*. But the first prong of *Kelly* requires proof that the technique is generally accepted as reliable in the relevant scientific community. Numerous published appellate decisions established that RFLP testing was generally accepted. Once a scientific technique "is deemed to be admissible, criticism of any particular methodology goes to the weight of the evidence, not to its admissibility." (*People v. Fierro* (1991) 1 Cal.4th 173, 214.) The fact that the technique is later refined does not mean the earlier approach was unreliable.

Hronis maintains that the appellate opinions establishing the general acceptance of RFLP testing must have existed at the time the FBI conducted RFLP testing in this case, rather than the time the trial court ruled on its admissibility. However, he cites no authority and provides no reasoned argument in support of his position. To the contrary, the Court of Appeal in *People v. Allen* (1999) 72 Cal.App.4th 1093 (*Allen*) specifically considered and rejected this argument, explaining, "The issue is not *when* a new scientific technique is validated, but *whether* it is or is not valid; that is why the results generated by a scientific test once considered valid can be challenged by evidence the test has since been invalidated." (*Id.* at pp. 1100–1101.) We agree with *Allen*'s reasoning. Accordingly, we hold that *Kelly*'s first prong was met here as a matter of law.

Regarding the third prong, the trial court acted within its discretion when it determined the FBI used correct scientific procedures in this case. The third prong of the *Kelly* test requires "that the testifying expert understand the technique and its underlying theory, and be thoroughly familiar with the procedures that were in fact used in the case at bar to implement the technique." (*Venegas*, *supra*, 18 Cal.4th at p. 81.) Presley clearly understood RFLP DNA testing and demonstrated a familiarity with the procedures used in this case to implement the technique. He was qualified to testify regarding the correctness of the scientific procedures followed by the FBI in conducting that analysis. As such, his testimony at the *Kelly* hearing "satisfied the prosecution's threshold burden of producing evidence that correct scientific procedures were used." (*Ibid.*)

Bertsch and Hronis contend Presley's review of bench notes describing the various steps performed by lab technicians

did not provide a sufficient basis for him to conclude the proper procedures were followed. We disagree. *Kelly*'s third prong does not require the testifying expert to have personally performed the technique in question but merely that he or she is thoroughly familiar with the procedures that were used. Indeed, in *Venegas*, we held that the FBI DNA examiner who oversaw the RFLP testing in that case was "thoroughly familiar with the procedures that were in fact used in the case at bar to implement the technique" (*Venegas*, *supra*, 18 Cal.4th at p. 81), even though a laboratory technician assisted her in her work (*id.* at p. 68). (See also *Axell*, *supra*, 235 Cal.App.3d at pp. 849–850, 862 [finding third prong of *Kelly* satisfied where experts based their conclusions that the correct procedures were performed on their review of notes of technicians who actually tested the DNA].)

Accordingly, the RFLP evidence was properly admitted under *Kelly*.

### iii. *The DQ-Alpha/Polymarker evidence was properly admitted under Kelly*

During the *Kelly* hearings, a dispute arose regarding the applicability of *Morganti*, *supra*, 43 Cal.App.4th 643, in which the Court of Appeal had affirmed that PCR analysis of the DQ-Alpha gene was generally accepted as a reliable technique by the relevant scientific community. (*Id.* at p. 671.) While the prosecution argued that *Morganti* established as a matter of law that DQ-Alpha testing was generally accepted, defense counsel contended the scientific community's consensus had changed. The trial court deferred its decision on whether *Morganti* was binding as to *Kelly*'s first prong and allowed additional argument and expert testimony on this issue.

Hronis's counsel argued that *Morganti* did not establish that DQ-Alpha testing was generally accepted in this case because the PCR testing performed by the laboratory in the *Morganti* case, SERI Labs, differed in certain respects from the procedures used by Cellmark and the DOJ. A defense expert testified that while Cellmark and the DOJ had used the standard 32-cycle amplification process, the SERI lab in *Morganti* had used 47 cycles, a fact that does not appear in the *Morganti* opinion. The prosecution objected to any new evidence about the DQ-Alpha procedures in *Morganti* that went beyond what was described in the *Morganti* opinion, including the different number of amplification cycles.

The trial court ultimately held that any specific evidence of nonstandard practices in the *Morganti* testing procedure was not relevant to its *Kelly* determination in this case and granted the prosecution's motion to strike. It subsequently ruled that *Morganti* and *People v. Wright* (1998) 62 Cal.App.4th 31 (*Wright*) established DQ-Alpha/Polymarker testing's general acceptance in the scientific community and there was no evidence in the case law of a controversy surrounding DQ-Alpha or DQ-Alpha/Polymarker.

As to *Kelly*'s third prong, the court determined Cooper-Kidd and Cotton were qualified as experts to give an opinion on DQ-Alpha/Polymarker testing, and it credited their testimony that correct procedures were followed in this case. The court noted that although there was some internal disagreement at Cellmark regarding whether the presence of a faint dot from a possible second contributor on the anal swab should be excluded from the analysis (with Cooper-Kidd and Cotton disagreeing with another technician regarding whether it should be included), the court determined the presence or absence of the

dot itself was a proper issue for the jury to consider. The court also noted that the DOJ's subsequent independent DQ-Alpha testing had produced the same results, which further supported its ruling with regard to Cellmark's testing.

We conclude the trial court properly found the DQ-Alpha/Polymarker testing was admissible under *Kelly*. Regarding the first prong, although Hronis maintains the trial court erred when it relied on *Morganti*, he makes no such claim regarding *Wright*, which was also binding appellate precedent. The trial court correctly found that *Kelly*'s first prong was satisfied here. (*Wright*, *supra*, 62 Cal.App.4th at p. 41 ["The PCR method has obviously acquired general acceptance in the scientific community"].)[19]

Bertsch and Hronis also contend the court abused its discretion in finding that Cellmark's DQ-Alpha/Polymarker testing complied with *Kelly*'s third prong, citing numerous alleged problems with the testing, such as the inclusion of the 1.1 allele on the anal swab in the revised Cellmark report and internal disagreement about the presence of a "B" allele and faint "A" allele at different loci. These alleged issues go to the weight of the evidence, not its admissibility under *Kelly*. (See *Wright*, *supra*, 62 Cal.App.4th at p. 41.) As the trial court noted, "the defense arguments focus on the issues regarding whether the dot is there or not and the reporting or nonreporting of the presence of that dot and focus less as to the meaning and

---

[19] More recent published decisions confirm this point. (See, e.g., *Jones*, *supra*, 57 Cal.4th at p. 937 ["PCR analysis of the DQ-Alpha gene is now firmly established as a scientific technique that satisfies the *Kelly* test"]; *People v. Stevey* (2012) 209 Cal.App.4th 1400, 1411.)

conclusions to be reached from the dot's presence." We agree with the trial court that Bertsch's and Hronis's complaints regarding the evidence are not truly *Kelly* issues. (See *Cordova, supra,* 62 Cal.4th at p. 128.)

Cooper-Kidd and Cotton testified regarding their knowledge of and experience with DQ-Alpha/Polymarker testing. Based on their testimony regarding their qualifications and experience, the trial court was entitled to give due weight to their opinions that the work in this case had been conducted in an appropriate scientific manner. That Cellmark analysts disagreed over whether certain results were intense enough to warrant reporting does not undermine the court's ruling. Defense counsel were free to explore these issues at trial. Accordingly, the trial court acted within its discretion in finding *Kelly*'s third prong satisfied.

### iv. *Sensabaugh's statistical calculations were properly admitted under* Kelly

Bertsch and Hronis maintain the court erred in finding that prosecution expert Sensabaugh was competent to testify as an expert on population genetics statistical analysis and that he used correct scientific procedures in analyzing the RFLP and DQ-Alpha/Polymarker data. We discern no error.

During pretrial *Kelly* proceedings, Sensabaugh testified that he had reviewed the FBI's RFLP testing data and Cellmark's DQ-Alpha/Polymarker data and conducted his own statistical analysis of that data using a random match exclusion analysis. Sensabaugh considered using two different statistical approaches, the random match exclusion approach and the likelihood ratio approach. He chose the former because it was "intuitively easier to understand" and generally gave a more

conservative estimate, which tended to be more favorable to the defendant.

To reach a statistical conclusion regarding the FBI's RFLP testing data, Sensabaugh evaluated the FBI reports from the sperm cell fraction of Canady's vaginal swab. Sensabaugh included all four bands in his random match exclusion analysis and calculated the sum of frequencies for every possible genotype. Sensabaugh concluded that the FBI's RFLP testing could exclude as potential donors 99.95 percent of the Caucasian population, 99.98 percent of the African American population, and 99.91 percent of the Hispanic population. He testified that he had also calculated the likelihood ratios based on the data, which showed an even greater likelihood that the DNA was contributed by Bertsch and Hronis.

For the DQ-Alpha/Polymarker data, Sensabaugh evaluated Cellmark's report on the sperm cell fraction from Canady's vaginal swab. He calculated that the combination DQ-Alpha/Polymarker data excluded 99.75 percent of the Caucasian population, 99.8 percent of the African American population and 99.9 percent of the Hispanic population as potential donors.

Sensabaugh acknowledged that the Second National Research Council Report on Forensic DNA Evidence[20] (NRC-2) had recently endorsed applying the likelihood ratio approach instead of the random match exclusion method because the

---

[20] Weir, The second National Research Council report on forensic DNA evidence (1996) <https://pmc.ncbi.nlm.nih.gov/articles/PMC1914912/> [as of Apr. 20, 2026]. All internet citations in this opinion are archived by year, docket number, and case name at <https://courts.ca.gov/opinions/cited-supreme-court-opinions>.

former maximized the use of all available evidence. Nevertheless, Sensabaugh opined that the random match exclusion method remained an accepted scientific approach and that he used the correct procedures in calculating the statistical frequencies using the RFLP and DQ-Alpha/Polymarker data in this case.

The trial court ruled that Sensabaugh was qualified to testify as an expert on statistical calculations arising from RFLP and DQ-Alpha/Polymarker testing. Regarding *Kelly*'s third prong, the court determined that Sensabaugh used the correct scientific approach in his statistical calculations even though his approach differed from the FBI's approach. (Sensabaugh had used four probes in analyzing the RFLP data, while the FBI used only two in its initial RFLP calculations.) The court determined that Sensabaugh's use of additional probes was justified, explaining that "given the different statistical approach by Sensabaugh which makes no assumption on the genotypes of the donor, Dr. Sensabaugh need not rely on band intensity and therefore the use of four probes is in this [c]ourt's opinion correct scientific procedure."

Bertsch and Hronis contend the court erred under *Kelly*'s second and third prongs when it found that Sensabaugh was qualified to give an expert opinion on statistical calculations, and that he correctly applied these calculations in this case. We disagree.

Regarding Sensabaugh's qualifications to testify on statistical analysis of forensic evidence, evidence admitted during the *Kelly* hearing amply supports the trial court's ruling. Sensabaugh held a doctoral degree in criminology from the University of California, Berkeley, where he focused on

population genetics and statistical approaches for analyzing genetic typing markers. He later served as a member of the faculty at Berkeley, where he taught forensic biology, which included the interpretation of forensic biological evidence using population genetics, evolutionary biology, and biochemistry. He also analyzed data published in scientific literature to determine whether the population distribution results he obtained in Berkeley's laboratory were compatible with the frequencies observed in other people's typing. He had testified as an expert about forensic statistical issues in approximately 30 cases. In some of these, he reviewed statistical computations made by other people, while in others he made his own calculations of statistical frequencies based upon forensic work. The trial court properly ruled that Sensabaugh's education and experience qualified him to testify as an expert on statistical analysis.

As for the court's ruling that Sensabaugh applied correct scientific procedures in his statistical calculations based on the RFLP and DQ-Alpha/Polymarker testing data in this case, Bertsch and Hronis do not contend Sensabaugh incorrectly applied a random match exclusion calculation to the data. Rather, they assert the court should not have permitted Sensabaugh to use two RFLP probes that the FBI had discounted. But the trial court reasonably found Sensabaugh's decision in this respect was scientifically justified because he utilized a different statistical approach than the FBI. Sensabaugh's approach made no assumption regarding the genotypes of the donor, and therefore it did not need to rely on band intensity, so use of the two RFLP probes was acceptable.

The court was likewise entitled to credit Sensabaugh's testimony that the random match exclusion calculation was still

scientifically valid, notwithstanding the NRC-2's preference for likelihood ratio calculations. Bertsch's and Hronis's claim that Sensabaugh's use of the "excluded population" percentage was unprecedented and "not a technique that is supported by any case law or literature in the field" is incorrect. (See, e.g., *People v. Xiong* (2013) 215 Cal.App.4th 1259, 1273–1274 [case law and secondary sources show that "both the frequency and the random match probability are relevant [even] in cold hit cases"]; *id.* at p. 1273 [" 'The rarity of the DNA profile shared by the perpetrator and defendant, *expressed by the random match probability statistic*, is always relevant and admissible' "].) Likewise, Sensabaugh's random match probability approach did not invoke what has been "referred to as the 'so-called "prosecutor's fallacy," ' " because it did not encourage the jury to assume " 'that the random match probability is the same as the probability that the defendant was not the source of the DNA sample.' " (*Cordova, supra*, 62 Cal.4th at p. 131.) Sensabaugh's analysis was properly limited to the probability of a random match, and he did not refer to the probability that either defendant had contributed to the DNA samples found on Canady's body.

Accordingly, the trial court did not abuse its discretion in ruling that Sensabaugh's testimony was admissible under *Kelly*.

> v. *The STR DNA evidence was properly admitted under* Kelly
>
> aa. *Background*

The DOJ conducted STR DNA testing in this case, which is an application of PCR testing. It used a DNA testing kit called Profiler Plus on a Perkin-Elmer 310 capillary electrophoresis

genetic analyzer machine. Several witnesses testified about the general acceptance of STR testing during the *Kelly* proceedings.

Dr. Steven Lee, who worked in the DOJ's DNA laboratory, testified that STR testing was generally accepted within the scientific community as reliable for analyzing crime scene evidence. He further stated that the Profiler Plus testing kit and the 310 machine were generally accepted by the scientific community. He also explained that the DOJ had used both the Hitachi 377 machine and the 310 machine, and the processes utilized by each essentially performed the same function.

Dr. Jurgen Henke, one of Hronis's DQ-Alpha experts, testified that STR testing was generally accepted by the scientific community as reliable for forensic testing, and that the 310 machine and the Hitachi 377 machine were both generally accepted for use in analyzing crime scene evidence. Dr. Terrance Owen testified that he considered the use of gel electrophoresis for STR testing to be generally accepted within the scientific community as reliable for crime scene evidence, but he did not yet view capillary electrophoresis to be sufficiently established to produce reliable results.

Defense expert Berger testified that the DOJ's validation studies for the 310 machine appeared to be in developmental stages. Defense counsel maintained that the 310 machine's capillary electrophoresis process was not yet generally accepted, and the prosecution could not rely on the scientific community's general acceptance of the 377 machine because that machine used a different, gel-based electrophoresis procedure.

At the conclusion of the proceedings, the trial court found that the DOJ's STR testing was admissible under *Kelly*. In its ruling, the trial court noted the parties had disagreed about

"what level, how far down the chain, to apply the general acceptance standard." It observed that while the prosecution contended that published appellate decisions compelled the court to conclude that all PCR testing is generally accepted, the defense maintained that "not only must there be a general acceptance for a PCR, but there must be general acceptance shown for each test, STRs would be but one example, and additionally for each kit — Promega, Cetus, Perkin-Elmer, what have you — and each machine — Hitachi 377, 310, what have you." Based on its review of DNA cases in California and other jurisdictions, the court held that a general acceptance determination should be made as to the testing methodology, such as RFLP and STR, but need not be made for each new kit or machine. The court then cited *Allen*, *supra*, 72 Cal.App.4th 1093, as establishing STR testing's general acceptance in the relevant scientific community.

In the alternative, the court independently concluded that STR testing was generally accepted in the relevant scientific community. Out of an abundance of caution, it also ruled that if *Kelly*'s prong one required a kit-level or machine-level finding of general acceptance, the scientific literature and expert testimony supported a finding that the Profiler Plus kit and the 310 machine used in this case were generally accepted.

Regarding the DOJ's compliance with generally accepted standards, *Kelly*'s third prong, the trial court found the weight of the evidence supported the conclusion that the DOJ's internal validation substantially complied with that recommended in scientific literature. It found frivolous the defense's critique of the literature supporting the validation performed by the DOJ.

bb. *Analysis*

Bertsch and Hronis do not dispute that at the time the trial court issued its ruling on the admissibility of STR DNA evidence, published appellate decisions confirmed that STR testing was a widely used and generally accepted methodology in forensic DNA testing. (*Allen, supra*, 72 Cal.App.4th at p. 1100.) Nevertheless, they maintain the specific "capillary electrophoretic method" utilized in the 310 machine failed *Kelly*'s first prong because it had not yet become sufficiently established to have gained general acceptance in the relevant scientific community.

Irrespective of whether capillary electrophoresis amounted to a materially different scientific technique requiring a prong one *Kelly* hearing at the time of trial, it is uncontroverted that subsequent published decisions have specifically found STR testing using the 310 machine and/or capillary electrophoresis are generally accepted in the scientific community. (See, e.g., *People v. Lazarus* (2015) 238 Cal.App.4th 734, 783; *People v. Jackson* (2008) 163 Cal.App.4th 313, 324; *People v. Henderson* (2003) 107 Cal.App.4th 769, 783; *People v. Smith* (2003) 107 Cal.App.4th 646, 671–672.) Indeed, in *Henderson*, the Court of Appeal concluded that "since its introduction to the world of forensic science, capillary electrophoresis and its various permutations have gained not only general acceptance, but also have become the method of choice for DNA testing under certain circumstances." (*Henderson*, at p. 785.) That the trial of this case predated these decisions provides no basis to doubt the scientific reliability of using the 310 machine in STR testing. (*Lucas, supra*, 60 Cal.4th at p. 245; *People v. Riel* (2000) 22 Cal.4th 1153, 1192 (*Riel*).) As

such, Bertsch's and Hronis's contention that the DOJ's use of the 310 machine failed prong one of *Kelly* is unpersuasive.

Relatedly, Bertsch and Hronis contend the DOJ's failure to properly validate the 310 machine precluded a finding that the STR testing method was generally accepted. The trial court properly concluded that criticisms regarding the DOJ's validation methods and troubleshooting issues had little bearing on the general acceptability of the capillary electrophoresis technique. Instead, these criticisms went to the weight of the evidence and were proper issues for the jury to consider. Bertsch and Hronis have not shown error.

In their final *Kelly*-related claim, Bertsch and Hronis contend the trial court failed to exercise its gatekeeping role under *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 when it deferred to expert opinions on the validity of STR testing. But as we made clear in *Sargon*, the " 'general acceptance' test for admissibility of expert testimony based on new scientific techniques [citation] still applies in California courts" despite the high court's rejection of a similar test in federal courts. (*Id.* at p. 772, fn. 6.) We emphasized that "[n]othing we say in this case affects our holding in [*People v. Leahy* (1994) 8 Cal.4th 587] regarding new scientific techniques." (*Ibid.*) In *Lucas*, we reaffirmed our rejection of the argument "that the first prong of *Kelly* improperly relies upon what the scientific community accepts as to the reliability of a technique, thereby supplanting the trial court's independent determination of reliability as required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579." (*Lucas*, *supra*, 60 Cal.4th at p. 245, fn. 36.) We also reiterated that *Sargon* "did not, by using the term 'gatekeeper,' indicate any move away from the *Kelly* test toward the federal

*Daubert* standard." (*Ibid.*, citing *Sargon*, at p. 772, fn. 6.) Bertsch and Hronis provide no persuasive reason to revisit those holdings here.

### c. *Subpoena of Perkin-Elmer's validation materials*

Bertsch and Hronis assert the trial court abused its discretion when it quashed their subpoena for Perkin-Elmer's validation materials relating to the 310 machine used in the DOJ's STR testing. They claim the court should have required Perkin-Elmer to produce these materials and reviewed them in camera. Hronis separately contends that any material relevant to the *Kelly* proceedings should have been disclosed to the attorneys under a protective order. Bertsch and Hronis seek a limited remand to permit the trial court to review the validation materials that would have been provided had it ordered the production. We conclude the trial court did not abuse its discretion in quashing the subpoena, and there is no need for a remand.

### i. *Background*

In August 1999, as pretrial DNA proceedings neared completion, Bertsch's counsel informed the court he had subpoenaed Perkin-Elmer for the raw data underlying its internal development and validation of the 310 machine used by the DOJ. Perkin-Elmer moved to quash the subpoena. At a hearing on the motion to quash, counsel for Perkin-Elmer represented it would take a team of four people nearly four months to gather the requested documents. Bertsch's counsel estimated it would then take him a minimum of two to three weeks to review the requested materials. The prosecution responded that the lateness of the subpoena, which in its view

would likely produce irrelevant information, "plac[ed] this trial at significant peril."

The trial court granted the motion to quash. It found that the subpoena would impose a significant burden on Perkin-Elmer, which substantially outweighed Bertsch's and Hronis's need for the materials given the extensive documentation about the DOJ's validation process that had been made available to the defense. The court likened the subpoena to a "fishing expedition," describing defense counsel's request as "hoping to find information regarding deficiency in the kit as opposed to specifically going after something that the defense knows will be particularly relevant." It denied Bertsch's and Hronis's subsequent motion for reconsideration, again ruling the burden on Perkin-Elmer "far outweigh[ed] the demonstrated need for information."

ii. *Analysis*

"As a rule, a criminal defendant 'may compel discovery by demonstrating that the requested information will facilitate the ascertainment of the facts and a fair trial.' [Citation.] But the trial court has discretion ' "to protect against the disclosure of information which might unduly hamper the prosecution or violate some other legitimate governmental interest," ' or when there is an ' "absence of a showing which specifies the material sought and furnishes a 'plausible justification' for inspection [citations]." ' [Citation.] Although policy may favor granting liberal discovery to criminal defendants, courts may nevertheless refuse to grant discovery if the burdens placed on government and on third parties *substantially* outweigh the demonstrated need for discovery." (*People v. Kaurish* (1990) 52 Cal.3d 648, 686 (*Kaurish*).)

We find that the trial court acted within its discretion to grant Perkin-Elmer's motion to quash. Requiring Perkin-Elmer to produce all its internal validation documentation would have placed a significant burden on it. Perkin-Elmer estimated it would take four people nearly four months to complete the request. Bertsch and Hronis failed to demonstrate their need for this discovery, particularly given the DOJ's production of substantial materials regarding its own independent validation of the 310 machine used to test the evidence in this case. As such, the burden placed on Perkin-Elmer substantially outweighed the demonstrated need for discovery. (See *Lemelle v. Superior Court* (1978) 77 Cal.App.3d 148, 165 [defendant's request for 10 years' worth of arrest reports of two police officers pertaining to charges of resisting arrest was overbroad and burdensome].) The fact that Perkin-Elmer ultimately published its validation materials four years later does not change the facts that it would have been burdensome for Perkin-Elmer to produce these materials at the time of trial and that defendants had failed to demonstrate any persuasive justification for their request, whatever the burden. Unlike *State v. Pickett* (N.J. App. 2021) 246 A.3d 279 cited by Hronis, neither he nor Bertsch demonstrated any particularized need for the requested materials.

For identical reasons, we reach the same conclusion regarding Hronis's claim that the court should have ordered Perkin-Elmer to disclose the materials under a protective order.

### d. *Restrictions on the role of Bertsch's advisory counsel*

Bertsch contends the trial court abused its discretion when it precluded his advisory counsel from litigating DNA issues while Bertsch was representing himself. Bertsch claims

133

this ruling effectively prevented him from conducting his own defense and forced him to relinquish his right to represent himself. He is incorrect.

#### i. *Background*

Before trial began, Bertsch alternated between representing himself under *Faretta* and being represented by counsel. On March 22, 1996, Bertsch first invoked his *Faretta* rights. He represented himself until December 10, 1996, when he requested the appointment of counsel. On September 5, 1997, he asserted his *Faretta* rights again and remained self-represented until November 12, 1998.

On February 9, 1999, Bertsch filed a third *Faretta* motion. At the hearing on the motion, the court advised Bertsch that if it granted him advisory counsel after approving the *Faretta* request, then only Bertsch would be permitted to speak to the court, not advisory counsel. The court explained that although it had previously given advisory counsel some leeway while Bertsch was self-represented, it would not do so going forward given Bertsch's pattern of opting in and out of self-representation and prior instances when Bertsch's position conflicted with that of advisory counsel. Bertsch countered that his attorney, James Sherriff, had been appointed as a special DNA counsel, and that he wished to keep that appointment. The court responded that if it granted Bertsch's *Faretta* motion, then Bertsch, and not Sherriff, would be questioning the DNA witnesses. Bertsch went forward with his *Faretta* motion.

The trial court granted the motion and ordered Sherriff and Mark Millard, another defense attorney, to remain as advisory counsel. The court advised Bertsch that he could consult with advisory counsel, but he alone would be permitted

to ask questions of witnesses and make arguments to the court. Bertsch moved for reconsideration on this point, asking that Sherriff be permitted to speak on all DNA matters. The court denied the request, citing the multiple prior occasions when a conflict arose between Bertsch and his counsel. It explained: "Mr. Bertsch, in your pro per status you are your own attorney. Mr. Sherriff is there to advise you. I will afford reasonable opportunities for you to consult with him to garner that advice even during the course of the proceeding. [¶] But you, sir, are to address me on the matters that you, I underline the word you, you want to address me about whether it be DNA or any other subject." Bertsch then withdrew his *Faretta* request and requested the reappointment of counsel, which the court granted.

ii. *Analysis*

A criminal defendant has a Sixth Amendment right to conduct his or her own defense. (*Faretta*, *supra*, 422 U.S. at p. 819.) However, "A criminal defendant does not have a right to simultaneous self-representation and representation by counsel. [Citations.] '[N]one of the "hybrid" forms of representation, whether labeled "cocounsel," "advisory counsel," or "standby counsel," is in any sense constitutionally guaranteed.'" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1368 (*Bradford*).) "Criminal defendants have the constitutional right to have an attorney represent them, and the right . . . to represent themselves, but these rights are mutually exclusive." (*People v. Moore* (2011) 51 Cal.4th 1104, 1119–1120 (*Moore*).)

"Although there is no constitutional right to hybrid representation, we have long recognized that trial courts retain the discretion to permit the sharing of responsibilities between

a defendant and a defense attorney when the interests of justice support such an arrangement." (*Moore*, *supra*, 51 Cal.4th at p. 1120.) "For example, if the defendant so desires and assisting counsel agrees, the court may allow counsel's limited participation as a trial advocate, where this will serve the interests of justice and efficiency." (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1164, fn. 14 (*Hamilton*).) "The court retains authority to exercise its judgment regarding the extent to which such advisory counsel may participate." (*Bradford*, *supra*, 15 Cal.4th at p. 1368.)

Bertsch contends the trial court abused its discretion when it declined to allow advisory counsel to litigate the DNA phases of trial while Bertsch represented himself in all other phases of trial. We disagree.

"As we previously stated regarding a challenge to the denial of hybrid representation, 'as with other matters requiring the exercise of discretion, "as long as there exists a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be here set aside." ' " (*Moore*, *supra*, 51 Cal.4th at p. 1120.) Here, the trial court provided reasonable grounds for placing limits on the role of advisory counsel, namely that Bertsch had exhibited a pattern of opting in and out of being represented, and that while self-represented he and advisory counsel had on occasions taken conflicting positions and caused delay in proceedings. "Having granted [defendant's] requests for self-representation and for advisory counsel, the court was not obliged to accede to the defense's requests both for self-representation and for whatever degree of participation in the proceedings it desired for advisory counsel." (*Bradford*, *supra*, 15 Cal.4th at p. 1369.) The trial court's decision not to allow hybrid representation between Bertsch and

Sheriff is also supported by the historic conflict between Bertsch and his attorneys, which suggests the proposed relationship would not have served the interest of judicial efficiency. (*Hamilton, supra*, 48 Cal.3d at p. 1164, fn. 14.) We therefore conclude the trial court did not abuse its discretion in refusing to permit advisory counsel to address the court directly on DNA issues. And because Bertsch has no constitutional right to any manner of advisory counsel or hybrid representation (*Bradford*, at p. 1368), Bertsch's corollary constitutional claims are meritless.

### e. *Defense DNA expert*

Hronis contends the trial court deprived him of his right to effective assistance of counsel when it allowed the prosecution to elicit testimony and comment on the fact that defense experts had observed the state's DNA testing and had been provided samples to conduct independent testing. He contends this invited speculation regarding what the defense experts observed and what results they received during their own testing. We perceive no error.

### i. *Background*

Prior to trial, at defense counsel's request, the trial court ordered the remaining DNA samples be divided and distributed to the parties, and that defense experts be allowed to observe the prosecution's additional testing of its samples. Thereafter, multiple defense experts were present for the DNA partitioning and took possession of the defense's portions of the samples. One defense expert later attended and observed the DOJ's DQ-Alpha testing, and two defense experts observed the DOJ's STR testing.

Before opening statements commenced, Bertsch requested the prosecution be prohibited from mentioning that defense experts were present at the state's DNA testing or that biological samples for testing purposes had been made available to Bertsch and Hronis. The court denied the request. It found that these facts did not implicate the work product privilege and were likely relevant to countering any defense attacks on the reliability of the state's testing. The court pointed to defense counsel's cross-examination of the prosecution's expert witnesses during the *Kelly* hearings, in which they challenged the conduct of the tests and alleged negligence or even fraud.

During trial, Bertsch and Hronis unsuccessfully lodged the same objections. Noting that "the validity of the accuracy of the DNA testing is . . . arguably the singular most substantive issue in the case," the court observed that defense counsel's opening statements had attacked the reliability of the DNA testing. The court found the presence of a defense expert at partitioning and testing relevant to the question of the DNA tests' validity because it demonstrated an openness of the process and an opportunity for the defense to identify deficiencies or anomalies or to produce expert testimony of their own. It rejected a defense request that the evidence be excluded under Evidence Code section 352, finding no undue prejudice.

Subsequently, former DOJ criminalist Faye Springer testified that several individuals were present when the DOJ's Sacramento crime lab divided the remaining DNA samples, including Dr. Benjamin Grunbaum and Dr. Simon Ford. Springer testified that Ford took possession of the partitioned evidence, and that neither Grunbaum nor Ford worked for Sacramento County.

During Cotton's direct examination, the prosecution asked whether she had arranged for an expert to be present while Cellmark's DNA testing took place in this case. Hronis's counsel objected on hearsay, lack of foundation, and relevance grounds. Bertsch's counsel objected under Evidence Code section 352. Outside the presence of the jury, the parties agreed the prosecution could ask one leading question regarding the presence of Grunbaum, a non-Cellmark employee, during Cellmark's DNA testing in this case. When direct examination resumed, Cotton testified that Grunbaum, a non-Cellmark employee, had been present.

After the prosecution concluded its case-in-chief, defense expert Mueller testified on direct examination that laboratory error rate was a critical factor in calculating probability statistics. On cross-examination, the prosecution asked Mueller whether the presence of defense experts during DNA testing could provide direct observations of an error instead of extrapolating an arbitrary error rate. The prosecution also asked about a statement in a scientific report that independent retesting could significantly reduce the risk of error. Hronis's counsel objected and later moved for a mistrial based on prosecutorial misconduct and improper shifting of the burden of proof. The court denied the motion. It noted that Mueller had testified on direct examination that the error rate was critical to the reliability of a statistical result, and the prosecution was entitled to challenge that opinion. When cross-examination resumed, the prosecution again asked Mueller whether the observations of defense experts present during DNA testing could provide direct evidence of an error instead of extrapolating the possibility of an error from an error rate. Mueller responded that the presence of another expert could catch a few errors that

would otherwise go unnoticed, but that there were no guarantees.

Prior to closing arguments, the court ruled on a prosecution motion addressing the bounds of permissible argument concerning these issues. In light of Bertsch's and Hronis's attacks on the validity of the state's DNA testing, both in their opening statements and in cross-examination of the prosecution's expert witnesses, the court determined the prosecution could mention that defense experts were present for the state's DNA testing and themselves had DNA material available for retesting, but no experts were called to testify regarding their observations of the state's testing or whether any retesting had been performed. The court declined Bertsch's and Hronis's subsequent request to reconsider its ruling.

During closing arguments, the prosecution mentioned that Grunbaum was present when Cellmark's DQ-Alpha testing was performed and when the additional DNA samples were partitioned, that Grunbaum and Ford received portions of the additional samples, and that the DOJ performed testing in the presence of defense experts. The prosecution also reminded the jury that the defense was under no obligation to call Grunbaum as a witness even though he witnessed certain DNA testing in this case.

### ii. *Analysis*

Hronis contends the trial court deprived him of his right to effective assistance of counsel by allowing the prosecutor to (1) elicit evidence that defense experts were present during the state's DNA analysis and had received partitioned DNA samples for independent testing and (2) comment during closing

argument on the fact that the defense had not called their expert to testify.

We recently considered and rejected similar arguments in *People v. Nadey* (2024) 16 Cal.5th 102 (*Nadey*). There, the defendant contended the trial court erred when it allowed the prosecutor to elicit evidence that the defense had retained a DNA expert. (*Id.* at p. 144.) We disagreed, observing that although a criminal defendant is entitled to keep communications with his or her experts confidential, "a defense expert's identity is not necessarily confidential in itself." (*Id.* at p. 149.) We noted that defense counsel had made the identity of the retained expert known to the prosecution by asking the prosecutor to release the DNA testing materials from the prosecution's expert to the defense expert. (*Ibid.*)

We rejected the defendant's contention that the prosecution committed misconduct and violated work product privilege when it called the jury's attention to the defense expert's involvement by asking the prosecution's expert witness about it. (*Nadey*, *supra*, 16 Cal.5th at p. 150.) We first distinguished *People v. Coddington* (2000) 23 Cal.4th 529, 603, which involved evidence related to psychiatric experts and reports that had never been disclosed by the defense. We explained, "Here, defense counsel voluntarily disclosed to the prosecution that [the defense expert] was their expert. By making this disclosure, and encouraging their expert to communicate directly with the prosecution expert about the case, the defense effectively waived any work product protections applicable to [the defense expert's] identity and role." (*Nadey*, at p. 150.)

We also noted that *Coddington*'s holding had been superseded by statute, which now limits the definition of "'""'"work product"'"''" in criminal cases to "'"'any *writing* reflecting "an attorney's impressions, conclusions, opinions, or legal research or theories."'"''" (*Nadey, supra,* 16 Cal.5th at p. 151, citing *People v. Zamudio* (2008) 43 Cal.4th 327, 355.) We specified: "The fact that the evidence concerned the potential retesting of samples by a defense expert is not sufficient to establish a violation of the work product privilege or Penal Code section 1054.6." (*Nadey,* at p. 151.) "Moreover, testimony establishing 'that forensic evidence was made available to the defense does not constitute comment on the "exercise of" the work product privilege.'" (*Ibid.*)

We likewise rejected the defendant's claims of irrelevance and undue prejudice, observing: "The DNA match identifying defendant as the source of semen found on the victim's body was critical in establishing his guilt. It was apparent from defendant's opening statement, if not before, that a fundamental part of the defense strategy would be to attack the validity of the state's DNA testing, and in particular the credibility of its expert . . . . Evidence that a defense expert had reviewed all notes from [the prosecution expert's] testing, and that samples had been preserved to allow retesting, was relevant to show that [the prosecution's expert] had professionally performed the testing and to support his credibility by showing that the evidence was made available for defense scrutiny." (*Nadey, supra,* 16 Cal.5th at pp. 151–152.) We noted that "[i]f the jury had been left with the false impression that the DNA evidence had been kept from the defense, they may have ignored it, believing the defense had been put at an unfair disadvantage." (*Id.* at p. 152.)

We also rejected the defendant's related claims of prosecutorial misconduct. We explained that the prosecutor's questions merely sought to elicit relevant evidence that the prosecution expert's "work had been reviewed by an outside expert." (*Nadey, supra,* 16 Cal.5th at p. 152.) "The fact that evidence, or an inference drawn therefrom, is harmful to the defendant's case does not mean the evidence is unfairly prejudicial." (*Ibid.*) We found unpersuasive the defendant's argument that testimony about a defense expert's involvement in the case improperly shifted the burden of proof. (*Ibid.*) We noted that the jury was properly instructed on the burden of proof and admonished that neither side was required to call all witnesses who might have relevant knowledge. (*Ibid.,* citing CALJIC Nos. 2.11, 2.61, & 2.90.)

Our prior case law is consistent with *Nadey.* In *People v. Foster* (2010) 50 Cal.4th 1301, 1357, the trial court permitted the admission of evidence establishing that serological evidence was preserved and released to the defense. We held the prosecution's inquiries concerning defense testing were relevant in light of defense attacks on the reliability of the state's DNA testing. (*Ibid.*) We added: "The prosecutor's questions suggested only what was implied by the evidence — that the defense did not possess any contrary serological evidence. Nor did the prosecutor's focus upon the absence of contrary evidence insinuate that defendant bore the burden of offering evidence of his innocence." (*Ibid.*; see *Kaurish, supra,* 52 Cal.3d at p. 680 ["The prosecution is entitled to comment on the state of the evidence, including the lack of conflicting serological evidence"].)

In *Cooper, supra,* 53 Cal.3d at p. 823, the prosecution's expert scientific witness testified that a defense expert was present during the testing of a drop of blood and had made

certain suggestions in retesting the material, which the prosecution's expert had followed. The defense expert also testified regarding the analysis of the drop of blood. (*Ibid*.) On cross-examination, he testified that he had previously worked with the prosecution's expert and the two had generally obtained the same results. (*Id*. at p. 824.) On appeal, the defendant asserted that the prosecution improperly " 'utilized' " the defense expert as a witness against the defense, which infringed on his right to the effective assistance of counsel. (*Ibid*.) We rejected his contention. "Since the defense made an issue of the manner in which the blood was tested," we reasoned, "the prosecution was entitled to question [the prosecution's expert] about all the circumstances surrounding the testing, including the involvement of the defense expert. The defense may choose either to have or not have an expert participate in the analysis of evidence, but if it chooses the former, no authority prohibits evidence of such participation. The jury was entitled to learn of all the circumstances involved in the testing, not merely the truncated version defendant desires." (*Ibid*.)

Although *Nadey*, *Foster*, and *Cooper* present somewhat different factual scenarios than the instant matter, those cases nonetheless support the conclusion that the trial court did not err here when it permitted the prosecution to elicit evidence that defense experts were present during the state's DNA testing and had also received partitioned DNA samples for independent testing. That is not to say that the presence of defense experts during the prosecution's DNA testing was sufficient to prevent all errors, but, as Mueller admitted during cross-examination, the presence of defense experts at the testing could catch errors that would otherwise go unnoticed. Moreover, Bertsch and Hronis repeatedly attacked the veracity and reliability of the

state's DNA testing. The prosecution was entitled to rebut these attacks by eliciting evidence that Bertsch's and Hronis's own experts had observed the state's testing and obtained DNA material to conduct their own testing. This did not deprive Hronis of his right to effective assistance of counsel or improperly shift the burden of proof.

Nor was it improper for the prosecution to comment on the defense's failure to call their expert as a witness. In *People v. Panah* (2005) 35 Cal.4th 395, 464, we held the prosecution did not commit misconduct when it commented on the defense's failure to produce DNA or fingerprint evidence, because the defense had called into question the prosecution's collection of evidence. Similarly, in *People v. Bolden* (2002) 29 Cal.4th 515, we found the prosecution's comment on the defense's failure to call their expert, who had collaborated on bloodstain testing, was appropriate. (*Id.* at pp. 552–553; see also *People v. Wash* (1993) 6 Cal.4th 215, 263 ["prosecutorial comment upon a defendant's failure 'to introduce material evidence or to call logical witnesses' is not improper"].) As in these prior cases, we conclude the trial court did not err when it permitted the prosecution to so comment here.

### f. *Limitation on cross-examination of Myers*

Hronis maintains the trial court erred when it restricted his cross-examination of Myers for potential bias. We conclude the court acted within its discretion to limit this cross-examination under Evidence Code section 352.

Before trial commenced, the court granted a prosecution motion precluding the defense from suggesting to the jury that the DOJ had not complied with the court's discovery orders. During trial, however, Bertsch's attorney asked Myers whether

he had refused to provide the defense with printouts of the raw data from his STR testing. The court sustained the prosecutor's objection on relevance and Evidence Code section 352 grounds.

Outside the presence of the jury, Hronis's counsel asked the court for renewed discovery of the raw data mentioned in cross-examination and urged the court to allow Bertsch's question. Hronis's counsel claimed the question went to bias, motive, and credibility because Myers was "willing to respond to the prosecution's request to pinpoint areas in the [testing] run and do screen dumps," but the defense did not have the same opportunity. The prosecution responded that the court had already ruled on the defense discovery request, which included an allotment of twenty screen captures from the DOJ that defense counsel had not utilized.

Bertsch's counsel persisted in his request to ask questions of Myers to establish bias. He wanted to ask about Myers's refusal to agree to informal discovery requests made by the defense or "even take a phone call" from defense counsel. The prosecutor objected, noting that the law specifically required all informal discovery requests go through the prosecution, and not be made directly to the agency. The court declined to allow further questioning. It explained that "the relevance is slight[,] virtually nonexistent because there was an extended lengthy discovery dispute" and the DOJ "complied specifically with the [c]ourt rulings following that dispute." The court also found that the time consumption and confusion that would result from getting into the court's previous discovery orders exceeded any probative value under Evidence Code section 352.

Hronis maintains that this line of questioning would have been highly relevant to prove bias and would not have consumed

a significant amount of time or caused confusion, and the trial court's refusal to allow the inquiry amounted to an abuse of discretion. We disagree.

"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

Applying this standard, we find no abuse of discretion. First, there appears to be little impeachment value in Myers's failure to comply with defense counsel's informal discovery requests or to "even take a phone call" from them. Second, the question of informal discovery requests, notwithstanding the DOJ's compliance with the court's *formal* discovery orders, could cause juror confusion and raise a number of collateral issues, such as whether a DOJ policy existed that would have prevented Myers from directly receiving informal requests from defense counsel, the relationship between informal and formal discovery, and the history of discovery actually provided. Under the circumstances, we cannot say that the court exceeded the bounds of reason in excluding this line of questioning. (*People v. Harris* (2008) 43 Cal.4th 1269, 1291 [trial court has wide latitude to exclude impeachment evidence in individual cases under Evid. Code, § 352]; *People v. Ayala* (2000) 23 Cal.4th 225, 301 ["Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that

is repetitive, prejudicial, confusing of the issues, or of marginal relevance"].)

### g. *Admission of statements regarding defense expert's work and compensation*

Hronis contends the trial court erred when it allowed the prosecution to impeach defense expert Mueller with (1) letters sent to Mueller rejecting publication of an article he had written for a scientific journal, (2) Mueller's correspondence with the FBI regarding a disagreement over Mueller's use of FBI statistics, and (3) Mueller's yearly earnings as an expert witness. We conclude there was no error.

### i. *Background*

Defense counsel offered Mueller as an expert in forensic applications of population genetics. During voir dire of Mueller's qualifications before the jurors, defense counsel asked Mueller several questions regarding articles he had published, including peer reviewed articles related to forensic testing. Subsequently, the prosecution asked Mueller whether he had submitted articles about forensic application of population genetics that had been rejected. Mueller confirmed that he had. Mueller acknowledged that he recognized a copy of the rejection letter he had received from a scientific journal, as well as accompanying peer review comments criticizing Mueller's work and suggesting changes.

The prosecution requested the letters and peer review comments be published or displayed to the jury. Defense counsel objected on hearsay, vagueness, and foundational grounds. The court initially ruled the peer review comment letters were not admissible on the issue of Mueller's competence as an expert, but it subsequently reversed course and allowed

the peer review comments to be published.  The court explained that because Mueller had relied on what the peer review comments said in forming his opinion about whether the article was proper or needed more work and in deciding whether to make the recommended changes to get his article published, this reliance brought the comments within a hearsay exception.  The court also ruled it went directly to the issue of Mueller's expertise and experience, which was an issue in the trial.  The prosecution then used the screen projector to show certain excerpts of the peer review comments criticizing Mueller's statistical methods.

The prosecution also questioned Mueller during voir dire about critiques he received from Dr. Bruce Budowle of the FBI on a different draft article.  Mueller had used unpublished population data provided by Budowle in the draft article, with the FBI retaining the right to decide whether it would be published.  Budowle reviewed Mueller's draft article and disagreed with its analysis, leading the FBI to prohibit publication.  Defense counsel responded by asking Mueller about his own criticisms of the FBI's methodology.

Later, on cross-examination, the prosecution asked Mueller about his yearly income for consulting and testifying in DNA cases.  Defense counsel did not object to this questioning.  During subsequent testimony regarding Mueller's involvement in cases in which Bertsch's counsel had served as one of the defense attorneys, Bertsch's counsel specifically objected to questions that mentioned specific DNA markers used in prior cases.  Hronis's counsel did not object.

The prosecution sought to introduce two letters to impeach Mueller regarding his prior testimony regarding his dispute

with Budowle and the FBI. One was a letter dated May 14, 1990 from Budowle to Mueller, and the second was a response from Mueller to Budowle dated June 11, 1990. Defense counsel objected to their admission on confrontation clause and Evidence Code section 352 grounds. The court overruled the Evidence Code section 352 objection, finding the content of Mueller's letter was inconsistent with his testimony. It later overruled the hearsay objections based on Evidence Code sections 720 and 1235.

ii. *Analysis*

As relevant here, Evidence Code section 721 provides that a witness testifying as an expert "may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to (1) his or her qualifications, (2) the subject to which his or her expert testimony relates, and (3) the matter upon which his or her opinion is based and the reasons for his or her opinion." (Evid. Code, § 721, subd. (a).) An expert witness testifying in the form of an opinion may not be cross-examined regarding "the content or tenor of any scientific, technical, or professional text, treatise, journal, or similar publication" unless "[t]he witness referred to, considered, or relied upon such publication in arriving at or forming his or her opinion." (*Id.*, subd. (b).)

" 'The scope of cross-examination permitted under [Evidence Code] section 721 is broad, and includes examination aimed at determining whether the expert sufficiently took into account matters arguably inconsistent with the expert's conclusion.' " (*Townsel, supra*, 63 Cal.4th at p. 55; *id.* at pp. 55–56 [prosecutor properly cross-examined expert concerning the discrepancy between her opinion and the contrary opinion of

other experts].) " 'It is common practice to challenge an expert by inquiring in good faith about relevant information, including hearsay, which he may have overlooked or ignored.' " (*Id.* at p. 56.)

Hronis contends the trial court erred when, during Mueller's qualification voir dire, it published portions of a letter from a scientific journal rejecting Mueller's article and corresponding critical peer review comments because they did not fall within an admissible hearsay exception. Hronis is incorrect. The rejection letter and accompanying peer review comments are not hearsay because they were not offered for their truth. (Evid. Code, § 1200.) Instead, they were introduced for the purpose of impeaching Mueller's qualifications as an expert under Evidence Code section 721, subdivision (a), by showing that Mueller's work had not been accepted by the same scientific community that he purported to draw his opinions from. Nor do they appear to relate *case-specific facts*, meaning "those relating to the particular events and participants alleged to have been involved in the case being tried," about which an expert has *no personal knowledge*. (*Sanchez, supra*, 63 Cal.4th at p. 676.) Instead, the prosecution's questions regarding the letter and peer reviews related to Mueller's qualifications to serve as an expert and amounted to background information, which an expert may relate to the jury to support the expert's opinion. (*People v. Veamatahau* (2020) 9 Cal.5th 16, 21.)

Similarly, we conclude the letters between Mueller and Budowle are relevant and admissible as challenges to Mueller's qualifications under Evidence Code section 721, subdivision (a). To the extent the correspondence could be construed as hearsay, they also fall within a valid hearsay exception. Mueller's response letter to Budowle was admissible as a prior

inconsistent statement because it appeared inconsistent with Mueller's testimony regarding the reason his article was not published. Although Mueller testified that the FBI refused to publish his paper because Mueller had reached scientific conclusions that did not support the FBI's implicit assumptions regarding their statistics, Mueller's letter suggested Budowle had not agreed to publication because Mueller had repeatedly attributed Budowle as an author without his permission. (Evid. Code, § 1235; *In re Bell* (2017) 2 Cal.5th 1300, 1307; *People v. Homick* (2012) 55 Cal.4th 816, 859 (*Homick*).)

Budowle's initial letter to Mueller, meanwhile, provided context for and meaning to Mueller's response. (Evid. Code, § 356 ["Where part of [a] . . . conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a . . . conversation, or writing is given in evidence, any other . . . conversation, or writing which is necessary to make it understood may also be given in evidence"]; *People v. Harris* (2005) 37 Cal.4th 310, 334–335; *People v. Zapien* (1993) 4 Cal.4th 929, 959 [" ' "In the event a statement admitted in evidence constitutes part of a conversation or correspondence, the opponent is entitled to have placed in evidence all that was said or written by or to the declarant in the course of such conversation or correspondence, provided the other statements have *some bearing upon, or connection with*, the admission or declaration in evidence" ' "].) Budowle's letter clarifies that the primary cause of tension between the FBI and Mueller was the misappropriation of Budowle's name in Mueller's work, not any specific disagreement regarding Mueller's methodology. Budowle's statements to Mueller were admissible for the nonhearsay

purpose of placing Mueller's response into context. Accordingly, we conclude the court did not err in allowing the prosecution to question Mueller regarding his correspondence with Budowle.

Finally, as for the prosecution's questions regarding Mueller's compensation in prior cases, Hronis's counsel forfeited any challenge to this line of questioning by failing to interpose a contemporaneous objection. (*People v. Martinez* (2010) 47 Cal.4th 911, 964 (*Martinez*).) In any event, his contention fails on the merits, since "it is not misconduct to question an opponent's expert witness about payment for services or about the expert's testimony in prior cases involving similar issues." (*People v. Price* (1991) 1 Cal.4th 324, 457; see Evid. Code, § 722, subd. (b) ["The compensation and expenses paid or to be paid to an expert witness by the party calling him is a proper subject of inquiry by any adverse party as relevant to the credibility of the witness and the weight of his testimony"].)

h. *Cumulative error*

Bertsch contends the cumulative impact of the errors relating to the admission of DNA evidence prejudiced him. We have assumed error in two claims brought by Bertsch (Presley's testimony and Cotton's testimony regarding testing performed by lab technicians) as well as one claim brought by Bertsch and Hronis (Myers's testimony on cross-examination regarding Buoncristiani's troubleshooting) but found these errors to be harmless. We have already determined that the cumulative impact of these errors did not prejudice Bertsch or Hronis. There are no other errors to accumulate.

6. *Instructional error claims*

a. *CALJIC guilt phase instructions as a whole*

Bertsch asserts the jury instructions were not sufficiently understandable to satisfy the heightened reliability required for a capital trial. In support, Bertsch cites a statement from the Judicial Council's Blue Ribbon Commission on Jury System Improvement that California's jury instructions "are, on occasion, simply impenetrable to the ordinary juror," and its recommendation to create a task force to draft "more understandable" instructions. (Wonder et al., *Final Report of the Blue Ribbon Commission on Jury System Improvement* (1996) 47 Hastings L.J. 1433, 1512, 1514.) Bertsch also references empirical studies suggesting limited juror comprehension of capital instructions.

We rejected a similar argument in *Lucas*, *supra*, 60 Cal.4th 153. There, we held: "The fact that the commission ultimately drafted the newer CALCRIM instructions, which the Judicial Council subsequently adopted [citation], does not establish that the prior CALJIC instructions were constitutionally defective. 'Nor did their wording become inadequate to inform the jury of the relevant legal principles or too confusing to be understood by jurors.' " (*Id*. at p. 294.) Bertsch offers no persuasive reason for us to reconsider our prior determination.

b. *Requested instruction regarding courtroom behavior and definition of evidence*

Bertsch contends the trial court erred by declining to give Bertsch's requested instruction to disregard his courtroom behavior and by failing to instruct his jury sua sponte not to consider the presence and conduct of Canady's parents, thereby

154

violating his federal constitutional rights to a fair trial, confrontation, due process, and the right to counsel. We find no error.

Before trial commenced, Bertsch's defense counsel requested that the trial court instruct the jury to disregard Bertsch's appearance, demeanor, and conduct in the courtroom and to not consider it for any purpose. The court declined the request, reasoning that "some moments of tension between Mr. Bertsch and his counsel" did not require a special instruction.

On appeal, Bertsch maintains that the trial court's refusal to instruct the jury on his courtroom conduct and provide an alternative definition of "evidence" that would exclude the jury's observations of courtroom spectators' conduct or presence amounted to federal constitutional error. On the latter point, he contends the court's instruction of CALJIC No. 2.00, which provides that "[e]vidence consists of testimony of witnesses, writings, material objects, or anything presented to the senses and offered to prove the existence or non-existence of a fact," allowed the jury to conclude that Bertsch's courtroom demeanor and Canady's parents' courtroom presence and conduct was evidence because they were "presented to the senses."

We disagree. First, by failing to request an additional instruction on the scope of evidence or a special instruction concerning Canady's parents' presence and conduct in the courtroom, Bertsch has forfeited any challenge on these points. (*Martinez, supra*, 47 Cal.4th at p. 964.)

In any event, these claims, as well as his claim regarding an instruction on his courtroom demeanor, fail on the merits. CALJIC No. 2.00 specifies that evidence must be *"offered to*

*prove* the existence or non-existence of a fact." (Italics added.) The foregoing instruction makes clear that the jury could consider only evidence that was offered and admitted at trial. "We presume the jurors were capable of reading, understanding, and applying the instruction in this commonsense manner . . . ." (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1225.) Moreover, the trial court also instructed the jury with CALJIC 1.00, which provided that jurors must "determine what facts have been proved from the evidence received in the trial and not from any other source." Based on settled principles, we conclude the jury understood and applied the instructions given, which properly limited their consideration to evidence that was offered and received into evidence during the trial. (See *People v. Williams* (1997) 16 Cal.4th 635, 675 [claims of instructional error are evaluated "in the context of the overall charge" to the jury].)

### c. *CALJIC No. 2.27*

Bertsch contends that CALJIC No. 2.27's instruction on single witness testimony erroneously implied that Officer Jones's uncorroborated out-of-court statement regarding Bertsch's abandoned vehicle was insufficient to prove any fact, which resulted in prejudicial error. We disagree.

Bertsch's defense placed great emphasis on an out-of-court statement made by Officer Jones to the officer investigating the Sacramento robberies, Detective Edwards. According to Detective Edwards, Officer Jones had stated he was "positive" Bertsch's abandoned AMC Rebel was not parked on the side of the road prior to January 3, 1986, when Officer Jones noticed it. At trial, however, Officer Jones testified that although he had reported first seeing the AMC Rebel on January 3, he also had

no independent recollection of the timing of his discovery and that January 3 was probably the date he first put "two and two together." Bertsch later impeached Officer Jones's testimony with his prior out-of-court statement to Detective Edwards.

CALJIC No. 2.27, as provided, stated: "You should give the uncorroborated testimony of a single witness whatever weight you think it deserves. Testimony by one witness which you believe concerning any fact whose testimony about that fact does not require corroboration is sufficient for the proof of that fact. You must carefully review all the evidence upon which the proof of that fact depends." Bertsch asserts that the instruction's reference to "testimony" and not "out-of-court statements" erroneously suggested the instruction did not apply to out-of-court statements, which could have led the jury to conclude that Officer Jones's out-of-court statement required corroboration and to disregard it because there was no corroboration.

We conclude there was no error. Even assuming the out-of-court statement was not "testimony," CALJIC No. 2.27 did not suggest that Officer Jones's prior out-of-court statement *required* corroboration. Moreover, the jury was also instructed on prior inconsistent statements using CALJIC No. 2.13, which stated: "Evidence that at some other time a witness made a statement or statements that is or are inconsistent or consistent with his or her testimony in this trial, may be considered by you not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on that former occasion." These instructions properly explained to the jury that it could consider Officer Jones's uncorroborated out-of-court statement concerning the date he first saw the abandoned AMC Rebel.

d. *CALJIC No. 2.71.5*

Bertsch argues the trial court prejudicially erred when it failed to admonish his jury to view his alleged adoptive admission with caution. We find no error.

As previously noted, Jerry B. testified at trial that he spoke with Bertsch and Hronis over the phone after Canady was murdered. Hronis told Jerry B. they killed a girl, and Bertsch responded, "Don't tell nobody that."

The trial court instructed the jury with CALJIC No. 2.71, which defines admissions and advises that evidence of an oral admission by the defendant not made in court must be viewed with caution. The court further instructed the jury with CALJIC No. 2.71.5, which defines an adoptive admission as silence upon, or a false or evasive reply to, an accusation. CALJIC No. 2.71.5 allows the jury to determine whether a defendant's silence or conduct indicated an admission that the accusatory statement was true.

Bertsch contends that because CALJIC No. 2.71.5 did not admonish the jurors to view adoptive admissions with caution, while CALJIC No. 2.71's oral admission instruction did so, the jury likely would have concluded that the court found Bertsch's alleged adoptive admission more credible than any oral admission. We find this claim unpersuasive.

As a preliminary matter, Bertsch forfeited his claim by failing to request modifications to CALJIC No. 2.71.5, which correctly stated the law. (See *Martinez*, *supra*, 47 Cal.4th at p. 964.) Nevertheless, the claim also fails on the merits. CALJIC No. 2.71, which defines admissions, properly instructed the jury to view with caution *any* out-of-court oral admission by Bertsch. CALJIC No. 2.71.5 gives additional context to CALJIC

No. 2.71 by defining and describing adoptive admissions. Here, Bertsch made an equivocal response to an express accusation. Read together, CALJIC Nos. 2.71 and 2.71.5 properly instructed the jury to consider Bertsch's oral adoptive admission with caution. No additional clarification was required.

e. *CALJIC No. 2.21.2*

Bertsch contends the trial court prejudicially erred when it failed to define the phrase "material part" as used in CALJIC No. 2.21.2, thereby violating his state and federal constitutional rights to due process and fair trial by jury. Again, we find no error.

The trial court instructed the jury with CALJIC No. 2.21.2, which provided: "A witness who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars."

Bertsch claims the phrase "material part" has a technical legal meaning and should have been defined for the jury as relating to a fact which could be determinative of the case. The court's failure to do so, asserts Bertsch, permitted the jury to rely on an overly broad ordinary meaning of the term and affected its consideration of the evidence in violation of Bertsch's due process and fair trial rights. We have rejected such a claim. (*Lucas*, *supra*, 60 Cal.4th at pp. 292–293 [trial court did not err by failing to define "material" as used in CALJIC No. 2.21.2, because the term had no peculiar technical meaning as used in the instruction]; see *People v. Wade* (1995) 39 Cal.App.4th 1487, 1496 [holding that term " 'material' " as used in CALJIC

No. 2.21.2 "carries its ordinary meaning of 'substantial, essential, relevant or pertinent' " and thus does not require sua sponte definition].)  We see no reason to depart from our prior assessment of this issue.

### f.  *CALJIC No. 2.13*

Bertsch argues that the trial court committed reversible error in instructing the jury on prior inconsistent statements pursuant to CALJIC No. 2.13.  Bertsch contends the instruction improperly bolstered the credibility of Martha R. and Jerry B. because it directs the jury to consider prior statements of witnesses as evidence of the truth but not of their falsity.

We have repeatedly rejected such claims, noting that " 'the instruction in no way directs the jury to accept prior statements as the truth; it merely covers the hearsay exceptions provided in Evidence Code sections 1235 and 1236, in a neutral fashion.' " (*People v. Friend* (2009) 47 Cal.4th 1, 41; accord, *Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 438; *People v. Harris*, *supra*, 43 Cal.4th at p. 1293.)  Bertsch offers no reasoned basis for us to reconsider these holdings.

### g.  *CALJIC No. 2.52*

Bertsch asserts the trial court prejudicially erred when it instructed the jury on flight as consciousness of guilt because the instruction was unnecessary, misleading, argumentative, and allowed the jury to draw irrational inferences against him. He also contends the instruction should not have been given over defense objection.  We find no error.

Over defense objection, the trial court instructed the jury with CALJIC No. 2.52, as follows:  "The flight of a person immediately after the commission of a charged crime is not sufficient in itself to establish his guilt, but is a fact which, if

proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide."

We have long rejected claims that the standard flight instruction is argumentative, unnecessary, and permits the jury to draw irrational permissive inferences of guilt (e.g., *People v. Rogers* (2013) 57 Cal.4th 296, 333), and we do so again here. As to Bertsch's specific contention that the instruction erroneously allowed his jury to rely on consciousness of guilt to convict Bertsch of the non-robbery charges, he ignores the evidence that he fled to Georgia following Canady's murder, which the jury could properly consider in deciding whether Bertsch was guilty of the charged offenses. Moreover, Bertsch's argument that the court should not have instructed the jury on flight over defense objection must fail in light of section 1127c's requirement that a trial court provide such an instruction whenever the prosecution relies on evidence of flight as tending to show a defendant's consciousness of guilt.

Bertsch also maintains the trial court's giving of CALJIC No. 2.52 erroneously allowed his jury to consider his consciousness of guilt in determining the special-circumstance allegations. We have previously rejected this contention and do so again here.

As noted, CALJIC No. 2.52 instructed the jury that evidence of flight "may be considered on the *question of guilt*." (*People v. Covarrubias* (2016) 1 Cal.5th 838, 933 (*Covarrubias*).) The court also gave CALJIC No. 17.31, which ordered the jury to disregard any instruction not applicable to its analysis of the facts. As in *Covarrubias*, "if . . . the consciousness of guilt

evidence was not relevant to the special circumstance allegations, then the jury would have disregarded the instructions. Consequently, there is no reasonable likelihood that the jury applied the consciousness of guilt instructions in a manner that violates the Constitution." (*Covarrubias*, at p. 933.)

### h. *CALJIC Nos. 17.40 and 17.50*

Bertsch asserts the trial court erred when it failed to sufficiently instruct the jury regarding the selection, duties, and powers of the foreperson. As a result, defendant contends, the foreperson was permitted to exercise undue influence over the jurors and undermine the fairness and reliability of the guilt and penalty deliberations. We perceive no error.

After closing arguments, the trial court instructed the jury with CALJIC No. 17.50, which provides: "You shall now retire and select one of your number to act as foreperson. He or she will preside over your deliberations. In order to reach verdicts, all twelve jurors must agree to the decision and to any finding you have been instructed to include in your verdict. As soon as you have agreed upon a verdict, so that when polled each may state truthfully that the verdicts express his or her vote, have them dated and signed by your foreperson and then return with them to this courtroom. Return any unsigned verdict forms." The court also instructed the jury with CALJIC No. 17.40, which provides that each juror must decide the case for themselves and may not decide any question in a particular way because a majority of the jurors, or any of them, favor that decision.

Preliminarily, Bertsch has forfeited this claim by failing to lodge a timely objection to CALJIC Nos. 17.40 or 17.50 or request an additional instruction. In any event, the claim also

fails on the merits. The trial court's instructions that "each juror must 'decide the case for yourself' and not 'decide any question any particular way because a majority of the jurors or any of them favor such a decision'" were sufficient to "negate[]" any concerns that "the lack of instruction concerning the role of the foreperson gave that person undue influence during deliberations and that the jury should have been instructed that the foreperson's vote carried no greater weight than the vote of any other juror." (*Lucas*, *supra*, 60 Cal.4th at p. 299; see *Covarrubias*, *supra*, 1 Cal.5th at p. 924; cf. *People v. Engelman* (2002) 28 Cal.4th 436, 444 [CALJIC Nos. 17.40 and 17.50 "fully informed the jury of its duty to reach a unanimous verdict based upon the independent and impartial decision of each juror"].)

### i. *CALJIC No. 3.19*

Bertsch and Hronis assert the trial court committed structural error when it gave an instruction requiring the defense to prove by a preponderance of the evidence whether certain witnesses were accomplices in the charged offenses. Specifically, they claim the court should have also instructed the juries on the relationship between the defense and the prosecution's burden of proof. We disagree.

The prosecution requested the court instruct the jury with CALJIC No. 3.19, which addresses the burden to prove a corroborating witness is an accomplice. The instruction as requested would ultimately relate to Martha R. and Jerry B. Bertsch later voiced concern that requiring the defense to prove the accomplice status of Martha R. or Jerry B. would suggest that Bertsch was also guilty as an accomplice. The trial court determined the instruction's language referring to the defense's burden was proper and declined to strike it.

As given, CALJIC No. 3.19 instructed the juries: "You must determine whether the witness Martha [R.] and/or Jerry [B.] was an accomplice as I have defined that term. [¶] The defendant has the burden of proving by a preponderance of the evidence that Martha [R.] and/or Jerry [B.] was an accomplice in the crimes charged against the defendant."

Bertsch contends that because his defense focused on Jerry B. as a perpetrator under a third party culpability theory, the trial court should have instructed his jury, sua sponte, on the relationship between the defense and the prosecution's burden of proof. Instead, Bertsch contends, the court's giving of CALJIC No. 3.19 without any additional instruction unconstitutionally shifted the burden of proof to Bertsch. Hronis joins these concerns. We are not persuaded.

Regarding the third party culpability instruction, Bertsch and Hronis were required to request a pinpoint instruction on this defense theory, which they failed to do. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) The trial court did not err by not instructing the juries on this point. (*Ibid.*) In addition, no third party culpability instruction was necessary because the court properly instructed the jury with CALJIC No. 2.90, which specifies that a criminal defendant is presumed innocent until proven guilty and entitled to a verdict of not guilty if the jury has reasonable doubt regarding his or her guilt, and the prosecution bears the burden of proving a defendant guilty beyond a reasonable doubt. (See *Gutierrez*, at pp. 824–825.)

As to accomplice liability, we also perceive no error in the court's instructions. Section 1111 provides that a defendant may not be convicted based upon the testimony of an accomplice unless it is corroborated by other evidence. When a defendant

claims that a witness is an accomplice, which would invoke section 1111's corroboration requirement, the defendant bears the burden of so proving by a preponderance of the evidence. (*Rangel, supra,* 62 Cal.4th at p. 1222; *Bryant, Smith and Wheeler, supra,* 60 Cal.4th at p. 430; *People v. Tewksbury* (1976) 15 Cal.3d 953, 962–968.) Accordingly, the trial court correctly instructed the jury that Bertsch bore the burden of proving by a preponderance of the evidence that Jerry B. was an accomplice. The giving of CALJIC No. 3.19 did not improperly shift the burden of proof to Bertsch.

j. *CALJIC No. 2.90*

Bertsch and Hronis raise several arguments related to the court's instruction on the burden of proof. We conclude none of their arguments has merit.

The trial court instructed the jury with CALJIC No. 2.90, which defines reasonable doubt. As given, the instruction provides: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

Bertsch and Hronis first assert the trial court erred when it refused to give Bertsch's proposed supplemental instruction

elaborating on the reasonable doubt and clear and convincing evidence standards of proof because CALJIC No. 2.90's use of the phrase "abiding conviction" suggests a clear and convincing standard of proof. He contends the instructional error violated his federal constitutional rights to a jury trial and to due process of law.

We discern no error. In *Victor v. Nebraska* (1994) 511 U.S. 1 (*Victor*), the United States Supreme Court held that "[a]n instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, correctly states the government's burden of proof." (*Id.* at pp. 14–15.) CALJIC No. 2.90 does so. Moreover, we have on numerous occasions rejected similar claims regarding CALJIC No. 2.90 and upheld the "abiding conviction" language in that instruction (*People v. Freeman* (1994) 8 Cal.4th 450, 501–505 (*Freeman*); *People v. Webb* (1993) 6 Cal.4th 494, 531), as have the Courts of Appeal (*People v. Guerrero* (2007) 155 Cal.App.4th 1264, 1267–1268; *People v. Haynes* (1998) 61 Cal.App.4th 1282, 1298–1299; *People v. Light* (1996) 44 Cal.App.4th 879, 885–886). Bertsch offers no persuasive reason for us to reconsider this issue.

Bertsch and Hronis offer the related contention that the omission of the "moral certainty" language from CALJIC No. 2.90 created an unconstitutional ambiguity because the instruction does not define the degree of persuasion to which the "abiding conviction" must be held. Initially, Bertsch and Hronis forfeited this claim by failing to ask the trial court to modify CALJIC No. 2.90. The argument also fails on the merits. In *Freeman*, we held that because "[t]he high court [in *Victor v. Nebraska*] made clear that the terms 'moral evidence' and 'moral certainty' add nothing to the jury's understanding of reasonable doubt," trial courts could safely delete that language in the

standard reasonable doubt instruction. (*Freeman*, *supra*, 8 Cal.4th at p. 504.) We have since reaffirmed this holding. (*People v. Brown* (2004) 33 Cal.4th 382, 392 ["If the inclusion of 'moral evidence' and 'moral certainty' [in CALJIC No. 2.90] adds nothing of value, then plainly their exclusion can take away nothing of value"].) We find no compelling reason to revisit the issue.

Next, Bertsch raises (and Hronis joins) a series of forfeited claims relating to CALJIC No. 2.90. He asserts the instruction failed to adequately inform the jury that (1) the defense had no obligation to refute or present evidence, (2) the rejection or disbelief of defense evidence does not satisfy the prosecution's burden of proof, (3) a conflict in the evidence or lack of evidence could leave the jury with a reasonable doubt as to guilt, (4) the presumption of innocence continues through the entire trial, (5) the instruction's use of the term "until" should not be interpreted to imply that proof will necessarily be forthcoming, (6) the jury was not required to articulate the logic and reasons for their doubt, (7) a "possible doubt" may amount to "reasonable doubt," and (8) the term "burden" carries a technical meaning, which the trial court should have defined. We have rejected each of these complaints as meritless (*Covarrubias*, *supra*, 1 Cal.5th at pp. 910–911; *Lucas*, *supra*, 60 Cal.4th at pp. 294–296; *Romero and Self*, *supra*, 62 Cal.4th at pp. 42–43), and we do so again here.

In another forfeited claim, Bertsch asserts the absence of an "application paragraph" from CALJIC No. 2.90, which would have applied the abstract law to the facts of the case and informed the jury what must be proven before Bertsch could be convicted, amounted to reversible error. We conclude that CALJIC No. 2.90, together with the other instructions defining

the elements of the charged offenses, adequately explained what was required for conviction.

Bertsch raises another forfeited argument that CALJIC No. 2.90 was constitutionally infirm because it failed to instruct the jurors that the prosecution must prove every element of the charge. We reject this challenge, as we have in previous decisions. (*People v. Thomas* (2011) 52 Cal.4th 336, 356.) "A single jury instruction may not be judged in isolation, but must be viewed in the context of all instructions given. [Citations.] The alleged deficiency in the standard [reasonable doubt] instruction given here was supplied by other instructions, which did expressly inform the jury that every element of the charged crimes and special circumstances had to be proven beyond a reasonable doubt." (*Ibid*.)

Bertsch also contends, in yet another forfeited claim, that the giving of CALJIC No. 2.90 violated the equal protection clause of the federal Constitution because it permits juries in different cases to apply different standards of proof. We disagree. As previously stated, the United States Supreme Court has concluded that the language of CALJIC No. 2.90 correctly states the government's burden of proof. (*Victor*, *supra*, 511 U.S. at pp. 15–16.) In so concluding, the high court implicitly held that the instruction provides an adequate and uniform standard for determining the level of certainty a juror must possess to be persuaded that the prosecution has met its burden of proof. We find Bertsch's perfunctory contention to the contrary unconvincing. (Cf. *People v. Hearon* (1999) 72 Cal.App.4th 1285, 1286 [regarding as frivolous the "well-worn argument" that CALJIC No. 2.90 did not provide adequate guidance regarding the level of certainty to which the jury must

be persuaded, given the Court of Appeal's resounding rejection of it].)

      k. *CALJIC No. 2.01*

Bertsch contends that portions of CALJIC No. 2.01, the sufficiency of circumstantial evidence instruction, unconstitutionally lightened the prosecution's burden of proof and created a mandatory conclusive presumption of guilt. We perceive no deficiency in the instruction as alleged.

The trial court instructed the jury with CALJIC No. 2.01, which as given provided: "[A] finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion. [¶] Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt. [¶] Also, if the circumstantial evidence as to any particular count permits two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation that points to the defendant's innocence, and reject that interpretation that points to his guilt. [¶] If, on the other hand, one interpretation of this evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

Bertsch claims the instruction reduced the prosecution's burden of proof by requiring the jury to decide between his guilt and innocence, and to assume the evidence was incriminatory, and on that basis compel a finding of guilt, if the evidence "appeared reasonable." This claim is forfeited and, in any event, unmeritorious. (See *Riel*, *supra*, 22 Cal.4th at p. 1200 [standard instruction on circumstantial evidence does not reduce the prosecution's burden of proof]; *People v. Crittenden* (1994) 9 Cal.4th 83, 144 [CALJIC No. 2.01 does not convey an unconstitutional, mandatory, conclusive presumption of guilt]; *People v. Wilson* (1992) 3 Cal.4th 926, 943 [same]; *People v. Jennings* (1991) 53 Cal.3d 334, 386 ["No reasonable juror would have interpreted [CALJIC Nos. 2.01 and 2.02] to permit a criminal conviction where the evidence shows defendant was 'apparently' guilty, yet not guilty beyond a reasonable doubt"].)

In another forfeited claim, Bertsch argues that CALJIC No. 2.01 is also deficient because it failed to inform the jury that if direct evidence, like circumstantial evidence, is susceptible to two reasonable interpretations, the jury must adopt the interpretation that points to Bertsch's innocence. "We have previously rejected this claim because direct evidence, unlike circumstantial evidence, does not generate conflicting inferences." (*Lucas*, *supra*, 60 Cal.4th at p. 298.) "Differentiating between direct and circumstantial evidence does not undermine the reasonable doubt standard or presumption of innocence for the simple reason that direct evidence and circumstantial evidence are different. 'Circumstantial evidence involves a two-step process — first, the parties present evidence and, second, the jury decides which reasonable inference or inferences, if any, to draw from the evidence — but direct evidence stands on its own. So as to direct

evidence no need ever arises to decide if an opposing inference suggests innocence.' " (*Livingston*, *supra*, 53 Cal.4th at p. 1166.) We reject this argument again here.

### l. *CALJIC Nos. 2.01, 2.21.1, 2.27, 2.51, and 8.20*

Bertsch, joined by Hronis, claims that a series of guilt phase instructions unconstitutionally diluted the prosecution's burden of proof. They assert CALJIC Nos. 2.01, 2.21.1, 2.27, 2.51, and 8.20 implicitly replaced the constitutionally required "beyond a reasonable doubt" standard with the "preponderance of the evidence" test. We reject these claims.

As to CALJIC No. 2.01, we have already rejected Bertsch's argument that the instruction reduces the prosecution's burden of proof. With regard to the rest of the challenged instructions, this court has previously rejected identical challenges to them, including claims that: (1) CALJIC No. 2.21.1, which pertains to discrepancies within and between witness testimony, lessens the prosecution's burden of proof (*People v. Carey* (2007) 41 Cal.4th 109, 130–131); (2) CALJIC No. 2.27, which concerns the sufficiency of testimony of one witness, erroneously suggested that both the prosecution and defense had the burden of proving facts (*Covarrubias*, *supra*, 1 Cal.5th at p. 912) and violates the defendant's right to due process because the " 'which you believe' " language allowed for proof based on mere " 'belief' " that a single witness was telling the truth (*ibid.*); (3) CALJIC No. 2.51, which informed the jurors that motive is not an element of an offense, conflicted with CALJIC No. 8.21, the standard instruction on felony murder, by improperly suggesting to the jurors that they need not find that the defendant intended to commit robbery in order to convict him of first degree murder (*Covarrubias*, at p. 912); and (4) CALJIC

No. 8.20 misled the jury regarding the prosecution's burden of proof because its instruction that premeditation and deliberation " 'must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation' " could be interpreted to require the defendant to disprove the possibility of premeditation (*Covarrubias*, at p. 913). Bertsch and Hronis offer no convincing reason for us to depart from our prior precedent.

### 7. *Claims relating to the trial court's use of court attendants during trial*

Bertsch raises several contentions relating to the trial court's use of court attendants, who monitored the jurors throughout the trial. We find these claims unmeritorious.

#### a. *Lack of written communications between the trial court and court attendants in the record*

During trial, the court utilized two court attendants to relay scheduling instructions to jurors and to ensure jurors did not communicate or discuss the case with anyone. The record indicates that the court received and responded to written notes from the court attendants on occasion during trial. No court attendant notes appeared in the clerk's transcript.

Appellate counsel for Bertsch requested that the record be augmented to include all court attendant notes. In a tentative ruling, the trial court ruled no correction to the record was necessary, explaining: "It is this Court's procedure to communicate with its staff via handwritten notes when court is in session. Most of these communications involve inconsequential requests (such as retrieving books from chambers, copying documents, or fetching office supplies and

beverages for the judge). The notes often involve other cases or scheduling issues that are unrelated to the trial at hand. [¶] Whenever a note was pertinent to this trial, the [c]ourt ordered it retained and it is already part of the appellate record. All other notes were destroyed at the time and are not available."

At a certification hearing, the court reiterated that it "has a habit of writing notes to my court attendants" about matters unrelated to the case, such as " 'get me a soda pop,' 'bring me a book,' 'check in the hall,' " or "related to the case in the sense of checking the hall to see if a witness is there or a juror has arrived," or if the court needs more pens or is searching for a file. The court repeated that these were operational notes and not part of the trial. The court indicated it would ask the clerk to look through the clerk's transcript again to see if any individual anomalies could be located and the court would issue an appropriate ruling on that later.

At a subsequent hearing, Bertsch's appellate counsel observed the trial court had not issued a ruling with respect to whether a search for court attendant notes had been conducted and whether any notes relevant to the trial from the attendant had been located. Counsel added, "I'm assuming that no notes were located. And if that's the case, I would simply request an order from the Court or minute order stating that that is [indeed] the case. [¶] Obviously, if there were notes and they haven't been added to the record, then I would request that they would be added to the record." After hearing additional remarks on lingering certification issues from the other attorneys of record, the court stated, "The inquiry has been made and the certified record will reflect the changes that the Court has made." It is not clear whether the court's statement regarding

inquiry was directed at the request for a search of court attendant notes.

Bertsch contends that because the clerk's transcript does not contain any court attendant notes, it is impossible to verify whether any matters relevant to the trial were communicated in those notes, which renders the appellate record incomplete and constitutes structural error.  He also maintains that "[w]ithout the attendant notes themselves, their absence cannot be shown to be harmless, and because the burden of showing harmlessness lies with [the People], reversal is compelled."  We are unpersuaded.

"A criminal defendant is entitled under the Eighth and Fourteenth Amendments to an appellate record that is adequate to permit meaningful review.  [Citations.]  An appellate record is inadequate 'only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal.' " (*People v. Young* (2005) 34 Cal.4th 1149, 1170 (*Young*).)  "No presumption of prejudice arises from the absence of materials from the appellate record [citation], and defendant bears the burden of demonstrating that the record is inadequate to permit meaningful appellate review [citations]." (*People v. Samayoa* (1997) 15 Cal.4th 795, 820.)  "Inconsequential inaccuracies or omissions are insufficient to demonstrate prejudice." (*Young*, at p. 1170.)  Nor is it sufficient to demonstrate prejudice to speculate that "missing material may have contained matter that demonstrated error or reflected a constitutional violation." (*Ibid.*; *People v. Bennett* (2009) 45 Cal.4th 577, 589 ["Inconsequential inaccuracies or omissions [from the record] are insufficient to constitute prejudice.  Nor will mere speculation suffice"].)

Bertsch has not met his burden here. As a threshold matter, he has not identified any claim that is undeterminable due to an inadequate record. Moreover, the record indicates that the notes passed by court attendants were purely logistical and ministerial and thus their omission was not error. The trial court characterized its communications with court attendants as involving trivial requests unrelated to the disputed issues at trial, such as retrieving books from chambers or checking to see if a witness or juror had arrived. Such instructions are commonly relayed orally between and among the court and its staff, and it has never been held that such instructions must be made part of the trial record. The reporter's transcripts support the court's description, as they refer to court attendant notes related to matters such as scheduling, seating arrangements, and juror attentiveness. Accordingly, Bertsch has failed to demonstrate the record precludes meaningful appellate review because it does not include court attendant notes.

b. *Utilization of court attendants to remind Bertsch's jury of the trial court's prior admonishments*

On a few occasions, the trial court also asked court attendants to advise jurors on when to return to the courtroom and to remind them that the court's earlier admonitions remained in effect. Bertsch contends the trial court erroneously delegated its duty to admonish and instruct the jurors in violation of his right to personal presence, counsel, and a public trial. He relies on *Riley v. Deeds* (9th Cir. 1995) 56 F.3d 1117, 1121, in which the Ninth Circuit Court of Appeals held that the trial court's absence during jury deliberations and the law clerk's reading back of trial testimony amounted to a "complete

abdication of judicial control over the process" and compelled reversal.

To the extent the trial court's instruction to court attendants to remind jurors that the prior admonitions remained in force constituted a violation of section 1122, subdivision (b) [describing trial court's duty to admonish the jury "at each adjournment of the court before the submission of the cause to the jury"], we find such error to be harmless beyond a reasonable doubt. By directing court attendants to remind jurors that the prior instructions — which were given in open court by the trial court — remained in effect, the trial court did not abdicate judicial control over the process as the court did in *Riley*. The court attendants were not given control over what admonitions to give; the trial court made the decision to direct court attendants to remind the jury of the prior admonitions provided by the court. (See *People v. Robinson* (2005) 37 Cal.4th 592, 636, fn. 21.) Nor is it reasonably probable that the outcome would have been different had the trial court, rather than court attendants, reminded the jury that the court's prior admonitions remained in effect.

### 8. *Sufficient evidence supports Bertsch's rape and sodomy convictions and corresponding special-circumstance findings*

Bertsch maintains the rape and sodomy convictions and corresponding special circumstance findings must be reversed because there is no evidence Canady was alive when the crimes were committed. We disagree.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether

it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Avila* (2009) 46 Cal.4th 680, 701; see *Letner and Tobin, supra,* 50 Cal.4th at p. 161, fn. 19 [we apply the same standard of review in assessing the sufficiency of the evidence supporting special circumstance findings].) "'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.'" (*Clark, supra,* 52 Cal.4th at p. 943.)

Applying these principles, we conclude the evidence is sufficient to support the convictions for the rape and sodomy of Canady and the true findings on the rape-murder and sodomy-murder special-circumstance allegations. Bertsch's semen was found on swabs from Canady's anus and vagina, as well as on a clipping from her underwear. There was blood on the exterior of Canady's vagina, and the pathologist observed hemorrhaging and small amounts of blood in Canady's vaginal vault and the lining of her uterus. The forensic pathologist testified that if a victim is rendered unconscious at the time of the assault, little to no trauma would result. He also testified, however, that if a woman is beaten and does not resist physically in an act of intercourse or sodomy, that would also explain why there may be no trauma there. Moreover, when Canady's body was found, her wrists were bound behind her back with duct tape, and her ankles, mouth, and head were also bound. Viewed in the light most favorable to the judgment, a reasonable juror could conclude that Canady was alive at the time of the rape and sodomy but did not resist the attack because she was beaten and bound at the time. (See *People v. San Nicolas* (2004) 34 Cal.4th 614, 659–661 [concluding substantial evidence supported the

jury's finding that victim was alive at the time of the sexual assault].)

### 9. *California's felony-murder special-circumstance scheme is constitutional*

Bertsch argues the felony-murder special circumstance is unconstitutional because it fails to narrow the class of death-eligible murders, fails to require the prosecution to prove mens rea, fails to require that the killing be intentional, violates equal protection, and erodes the relationship between criminal liability and moral culpability. He also contends Proposition 115's amendments to section 190.2, the felony-murder special-circumstance statute, were not validly enacted.

As Bertsch concedes, we have repeatedly rejected these claims. (See, e.g., *Covarrubias*, *supra*, 1 Cal.5th at p. 934 [felony-murder special circumstance is constitutional]; *People v. Boyce* (2014) 59 Cal.4th 672, 700 [same]; *People v. Stanley* (2006) 39 Cal.4th 913, 968 [same]; *Yoshisato v. Superior Court* (1992) 2 Cal.4th 978, 991 ["the various modifications and amendments made by Proposition 115 to paragraph (17) of section 190.2, subdivision (a) . . . are . . . effective"]; *People v. Morgan* (2007) 42 Cal.4th 593, 622 [§ 190.2 is a validly enacted statute].) We decline Bertsch's invitation to reconsider our prior decisions.

### B. Penalty Phase Issues

#### 1. *Trial court's grant of Hronis's* Faretta *motion*

Hronis contends that even if he was properly found competent to *stand trial*, the trial court erred when it found him competent to *represent himself* at the penalty phase. We conclude that, due to intervening changes in law that altered the governing standard for self-representation by certain defendants suffering from mental illness, allowing Hronis to

represent himself at the penalty stage constituted prejudicial error.

### a. *Background*

As discussed above, on August 23, 2000, the jury found Hronis guilty of first degree murder. Five days later, Hronis made another *Marsden* request. Although the court denied the *Marsden* motion, Hronis informed the court that he wished to represent himself, indicating that he did not want to contest the penalty phase. The court then ended the in camera proceedings to allow Hronis to make his *Faretta* motion in open court. At that time, Motion 820, questioning Hronis's competence to stand trial, was pending.

In open court, Hronis confirmed that he was seeking to represent himself for the reasons he expressed to the court during the in camera hearing. His counsel observed that they were in "direct conflict with [Hronis] on his intended course of action." The court then took a brief recess to determine how to address Hronis's *Faretta* request, "given the state of the record at this point." Ultimately, the trial court declined to rule on Hronis's request at that time.

Nearly three weeks later, after the trial court denied Motion 820, the trial court granted Hronis's request to represent himself at the penalty phase and ordered his attorneys to serve as standby counsel and attend all further proceedings. Hronis did not offer evidence in his own defense, testify, or give a closing argument during the penalty phase.

### b. *Legal principles*

As Hronis acknowledges, when the trial court issued its *Faretta* ruling in 2000, it was understood that the standard of competency for self-representation mirrored the standard of

competency to stand trial. (*People v. Johnson* (2012) 53 Cal.4th 519, 526–527 (*Johnson*).) However, in 2008, the high court decided *Indiana v. Edwards* (2008) 554 U.S. 164 (*Edwards*), which held that "the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (*Id.* at pp. 177–178.)

We examined *Edwards* in *Taylor*, *supra*, 47 Cal.4th 850. There, as here, a trial court granted a defendant's motion for self-representation before *Edwards* was decided. (*Id.* at p. 880.) We rejected the defendant's claim that the trial court erred by using the pre-*Edwards* standard because "at the time of defendant's trial, state law provided the trial court with no test of mental competence to apply other than the *Dusky* standard of competence to stand trial." (*Id.* at p. 879.) We based this conclusion on a comprehensive examination of how California courts had evaluated defendants' requests for self-representation before *Edwards*. We determined that California had never applied a heightened standard of mental competence to a defendant bringing a *Faretta* motion, so the *Dusky* standard governed. (*Id.* at pp. 880–881.) Then we looked at the state of the law at the time of the defendant's trial and determined that the trial court correctly applied that law. (*Id.* at p. 881.) In doing so, we noted that the trial court "did not state or necessarily imply that, if permitted to do so, it would find defendant incompetent to represent himself." (*Ibid.*)

Notably, in *Taylor*, we did not address whether California courts *should* apply a new standard following *Edwards* and whether any new standard would be retroactive. Instead, we focused on the possibility of federal constitutional error and explained that *Edwards* did not support any such claim of error in a case where a defendant's request to represent himself was granted. (*Taylor*, *supra*, 47 Cal.4th at p. 878.)

Our later opinion in *Johnson* addressed the proper competency standard for self-representation in California after *Edwards*. In *Johnson*, a trial court applied *Edwards* to *revoke* a defendant's self-representation. (*Johnson*, *supra*, 53 Cal.4th at p. 525.) In concluding the trial court did not err, we explained that "California law provides *no* statutory or constitutional right of self-representation." (*Id*. at p. 528.) Thus, "trial courts may deny self-representation in those cases where *Edwards* permits such denial." (*Ibid*.) Moreover, we confirmed that no standard, other than the standard in *Edwards*, should apply: "[W]e believe the standard that trial courts considering exercising their discretion to deny self-representation should apply is simply whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Id*. at p. 530.)

*Edwards* and *Johnson* were decided well after Hronis's trial concluded. Thus, to determine whether the *Johnson* standard applies here, we must consider whether this standard should be applied retroactively to cases, like this one, that are not yet final on appeal. The first step in this analysis is determining whether *Johnson* articulated a new rule. (*People v. Guerra* (1984) 37 Cal.3d 385, 399 (*Guerra*).) "If it does, the new rule may or may not be retroactive . . . ; but if it does not, 'no

question of retroactivity arises,' because there is no material change in the law." (*Ibid.*)

"Under California law, a rule is new where the decision '(1) explicitly overrules a precedent of [the California Supreme Court] [citation], or (2) disapproves a practice impliedly sanctioned by prior decisions of [the California Supreme Court] [citation], or (3) disapproves a longstanding and widespread practice expressly approved by a near-unanimous body of lower-court authorities.' " (*In re Milton* (2022) 13 Cal.5th 893, 906, citing *Guerra, supra,* 37 Cal.3d at p. 401.)

Before *Edwards,* "California courts tended to view the federal self-representation right as absolute, assuming a valid waiver of counsel." (*Taylor, supra,* 47 Cal.4th at p. 872.) Further, based on *Faretta* and *Godinez v. Moran* (1993) 509 U.S. 389, we generally concluded that courts could not impose a higher standard of competency for self-representation than the standard of competency to stand trial. (*Taylor,* at pp. 874–875.) By contrast, *Edwards* explicitly allows states to apply a higher standard to self-representation determinations if they choose to do so. (*Edwards, supra,* 554 U.S. at p. 174.) We considered the consequences of *Edwards*'s invitation in *Johnson* when we confirmed that California courts could apply a new standard. (*Johnson, supra,* 53 Cal.4th at pp. 528, 530.) *Johnson*'s application of *Edwards* changed the way trial courts should evaluate *Faretta* motions. Accordingly, *Johnson* created a new rule.

A new rule is generally presumed to apply retroactively to matters not yet final on appeal. " 'As a rule, judicial decisions apply "retroactively." [Citation.] Indeed, a legal system based on precedent has a built-in presumption of retroactivity.' "

(*Guerra, supra*, 37 Cal.3d at p. 399.) However, "we have long recognized the potential for allowing narrow exceptions to the general rule of retroactivity when considerations of fairness and public policy are so compelling in a particular case that, on balance, they outweigh the considerations that underlie the basic rule. A court may decline to follow the standard rule when retroactive application of a decision would raise substantial concerns about the effects of the new rule on the general administration of justice, or would unfairly undermine the reasonable reliance of parties on the previously existing state of the law. In other words, courts have looked to the 'hardships' imposed on parties by full retroactivity, permitting an exception only when the circumstances of a case draw it apart from the usual run of cases." (*Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 983.)

None of these exceptions overcomes the general rule of retroactivity here. *Edwards* was decided 17 years ago, and we are not aware of any indication that trial courts are struggling to properly apply *Johnson*. Similarly, because *Edwards* and *Johnson* have been established law for over a decade, a finding of retroactivity to nonfinal cases would not unduly impact the general administration of justice or unfairly undermine the reasonable reliance of parties on the previous law.

c. *Analysis*

Having concluded that *Johnson* applies retroactively, we must evaluate whether the record demonstrates error. Here, the trial court did not apply the new standard we articulated in *Johnson*, which is not surprising because neither *Edwards* nor

*Johnson* had been decided at the time.[21]  Thus, the trial court erred.  To determine whether this error warrants reversal, we apply *People v. Brown* (1988) 46 Cal.3d 432 (*Brown*) because the error at issue is a "state-law error at the penalty phase of a capital trial." (*Id.* at p. 448.)  Under this standard, an error is prejudicial if it is " 'reasonably possible' " the error affected the verdict.  (*Ibid.*)

We conclude the error in this case was prejudicial. Although the trial court found that Hronis was competent to stand trial under the *Dusky* standard, it did not consider whether Hronis met the *higher* standard of competence to represent himself that the high court allowed in *Edwards*.  The distinction between the two is not insubstantial in this case. " '[D]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant.' " (*Edwards, supra*, 554 U.S. at p. 176.)  Indeed, in *Johnson*, we agreed that there will be defendants who, although competent to stand trial, are not competent to conduct trial proceedings by themselves. (*Johnson, supra*, 53 Cal.4th at p. 532.)

---

[21]   Although it is conceivable for a trial court to have anticipated what would later occur in *Edwards* and *Johnson* — and apply a different and higher standard of competence to a self-representation request than to the question of competence to stand trial (cf. *Mendoza, supra*, 62 Cal.4th at p. 894) — the record does not support the conclusion that the trial court did so in this case.

Here, based on the entire record before us, we cannot exclude the reasonable possibility that Hronis suffered from a "mental condition that falls in a gray area between *Dusky*'s minimal constitutional requirement that measures a defendant's ability to stand trial and a somewhat higher standard that measures mental fitness for another legal purpose." (*Edwards*, *supra*, 554 U.S. at p. 172.) Hronis's competency to stand trial was extensively litigated below with some evidence suggesting that Hronis's certainty he would be acquitted possibly impacted his understanding of the nuances of a penalty phase defense. In addition, Hronis plainly had some cognitive deficits. Although the court found that these cognitive deficits did not prevent him from consulting with counsel, it is a different matter entirely whether these deficits would prevent him from taking on the expanded role of acting as his own counsel. (*Id.* at p. 177 ["given the different capacities needed to proceed to trial without counsel, there is little reason to believe that *Dusky* alone is sufficient"].) The difficulties inherent in assessing an individual's mental condition add to this uncertainty, particularly when trying to evaluate an individual's ability to perform the varied tasks associated with self-representation. "Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways." (*Id.* at p. 175.) Nor did any of the psychological reports before the court address whether Hronis had a severe mental illness bearing on his competency to present his own defense without the help of counsel, since they utilized the pre-*Edwards* framework in *Dusky* and section 1367. Further, although the court was unpersuaded by Motion 820, it did order a court-appointed psychologist (Nakagawa) to evaluate Hronis before it

denied that motion. This decision reflects at least some openness to the idea that Hronis was substantially impaired; if *Edwards* and its progeny had already been decided, the court could have expressly considered whether Hronis was sufficiently impaired such that the court would not have allowed him to represent himself.

Our consideration of Hronis's competency to represent himself is informed by the individualized circumstances of this case, combined with the fact that Hronis sought to represent himself during the penalty phase of a capital case. "In focusing upon the capital context presented by the case before us, we are mindful of the United States Supreme Court's repeated admonition that ' "the penalty of death is qualitatively different from a sentence of imprisonment, however long," ' and that, as a result, ' "there is a corresponding difference *in the need for reliability in the determination that death is the appropriate punishment in a specific case.*" ' " (*People v. Horton* (1995) 11 Cal.4th 1068, 1134.)

Finally, we note that the trial court did not have the opportunity to determine the extent to which Hronis's mental capacity — versus his lack of technical skill or legal knowledge — was the reason Hronis offered no evidence at the penalty phase, filed no motions with the court, did not testify, and gave no closing argument. (See *Edwards*, *supra*, 554 U.S. at pp. 175–176, citing *McKaskle v. Wiggins* (1984) 465 U.S. 168, 174 [basic tasks of self-representation include organization of defense, making motions, arguing points of law, participating in voir dire, questioning witnesses, and addressing the court and jury].) And had mitigation evidence been presented to the jury, we cannot discount the possibility that the jury would have selected a penalty other than death.

For all these reasons, we conclude it is " 'reasonably possible' " the error here affected the penalty phase verdict. (*Brown, supra,* 46 Cal.3d at p. 448.) We therefore reverse the judgment of death as to Hronis.

### 2. *Instructional error claims*

Bertsch raises several claims of error relating to the trial court's instructions during the penalty phase. He failed to preserve several of these arguments by not lodging a specific, contemporaneous objection below. In any event, none of his claims has merit.

### a. *Admonition to Bertsch's jurors regarding penalty determination*

Bertsch contends the trial court erred when it admonished the jurors, after they returned their guilt phase verdicts, to keep an open mind regarding penalty but failed to repeat the guilt phase instruction not to form or express any opinion on this case until after the matter was submitted to them. Bertsch asserts this allowed the jurors to prematurely consider the question of penalty during the period between the guilt and penalty trials in violation of his constitutional rights to due process, a fair trial by jury, a reliable verdict, and protection against cruel and unusual punishment. We find no merit to this argument.

During the guilt phase trial, the court on several occasions admonished both juries not to "form or express any opinion on this case until the matter is finally submitted to you." After Bertsch's jury found him guilty of the charged offenses, the trial court informed the jury there would be a penalty phase hearing and reminded it that "the admonitions still apply." The court reiterated: "[Y]ou want to keep an open mind. The issue of penalty will be before you, but you don't want to start leaning or

closing off one option in favor of the other. You want to approach the penalty phase hearing with an open mind. An open mind." Bertsch's penalty trial commenced five days later.

Bertsch contends the trial court's admonitions allowed the jury to think about the penalty question and to form tentative opinions about it so long as they kept an "open mind."

Bertsch forfeited this claim by failing to object to the instruction or ask for an additional admonition of the jury. The claim also fails on the merits. During the guilt phase trial, the court properly admonished the jury not to form or express an opinion until the matter was submitted. Before the penalty trial commenced, the court reminded the jury that its prior admonitions still applied. Under analogous circumstances, we have concluded that a direction to remember a previous admonition not to form an opinion about the case, which was complete and correct when previously given, was sufficient. (*Lucas*, *supra*, 60 Cal.4th at p. 324; see also *Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1067 ["The trial court did not err in failing to instruct on which guilt phase instructions continued to apply at the penalty phase"].) The trial court's additional instructions to "keep an open mind" and to not "start leaning or closing off one [penalty] option in favor of the other" reinforced, rather than undermined, its previous admonition not to form an opinion on the matter. And, as in *Lucas*, there is no evidence in the record to suggest the jury improperly formed or expressed opinions on the issue of penalty prior to the penalty phase. (*Lucas*, at p. 324.) Accordingly, we discern no error.

b. *Lack of instruction prohibiting use of guilt phase findings in determining Bertsch's guilt of prior violent acts*

Bertsch asserts the trial court prejudicially erred by failing to instruct the jury sua sponte that it could not consider its guilt phase convictions in determining whether the prosecution had proven beyond a reasonable doubt that Bertsch committed assault with a deadly weapon on two prior occasions. We conclude there was no error.

Bertsch forfeited this claim by failing to ask for additional admonition of the jurors. (*Lucas*, *supra*, 60 Cal.4th at p. 314 ["[E]ven in the penalty phase trial of a capital case, 'a trial court is under no duty to instruct on the limited admissibility of evidence of past criminal conduct in the absence of a request' "].) His argument also fails on the merits. We have previously rejected as speculative the claim that the jury applied cross-admissibility instructions to the penalty phase in determining a defendant's guilt of prior acts of violence, even though no such instructions were given at the penalty phase. (*Ibid.*) Bertsch provides no cogent argument as to why we should not reach the same conclusion here.

c. *Lack of limiting instructions regarding propensity other-crimes evidence*

Bertsch maintains the trial court erred when it failed to repeat its guilt phase instruction that the jury was precluded from considering evidence of other crimes committed by Bertsch or witnesses' fear of Bertsch to prove Bertsch had a criminal propensity or bad character. Bertsch claims the omission of these instructions unconstitutionally undermined the presumption of innocence applicable to the other violent crimes presented as factors in aggravation.

Here, too, Bertsch forfeited this claim by failing to request additional instruction. (*People v. Maury* (2003) 30 Cal.4th 342, 443; *People v. Johnson* (1993) 6 Cal.4th 1, 49.) The claim also fails on the merits. The trial court's instruction regarding the burden of proof for aggravating factors clearly articulated that Bertsch was presumed innocent of prior acts unless the prosecution proved those acts beyond a reasonable doubt. Accordingly, the jury received adequate instruction. Moreover, the record does not indicate that the jurors were confused about the interplay between Bertsch's underlying convictions and the proof requirements for violent acts offered as factors in aggravation. Thus, we conclude the court did not err when it failed to instruct the jury that it was precluded from considering the guilt phase findings as propensity evidence.

d. *Witness credibility instruction*

In another forfeited claim, Bertsch argues the trial court prejudicially erred in not repeating certain instructions relating to witness credibility at the penalty phase. Specifically, Bertsch contends the court's admonition to disregard the guilt phase instructions and subsequent failure to reinstruct the jury with (1) an addendum to CALJIC No. 2.20, addressing how alcohol and drugs might affect witness credibility; (2) CALJIC No. 2.23.1, which states the jury could consider Jerry B.'s past misdemeanor criminal conduct in evaluating his credibility; and (3) CALJIC No. 2.21.2, which informs the jury it may reject the entire testimony of a witness found to have willfully testified falsely on a material point, skewed the jury's consideration of the alleged aggravating factors in the prosecution's favor. Bertsch's argument fails.

At the penalty phase, the court reinstructed the jury with CALJIC No. 2.20, which addresses what the jury may consider in assessing witness credibility, and CALJIC No. 2.13, which informs the jury that a witness's prior inconsistent statements may be considered in evaluating the witness's credibility and as evidence of the truth of the facts as stated by the witness on the prior occasion. The court also gave CALJIC No. 2.21.1, discrepancies in witness testimony, CALJIC No. 2.22, weighing conflicting testimony, and CALJIC No. 2.81, opinion testimony of lay witness. These instructions provided sufficient guidance to the jury on how to assess the credibility of witnesses. (*People v. Wader* (1993) 5 Cal.4th 610, 644–645.) The court had no sua sponte duty to give additional instruction on this point. (*Ibid.*; see *People v. Valdez* (2012) 55 Cal.4th 82, 139; *People v. Mendoza* (2011) 52 Cal.4th 1056, 1094.)

> e. *Lack of cautionary instructions regarding Bertsch's out-of-court statements*

Bertsch similarly contends the trial court erred by failing to reinstruct the penalty phase jury that his out-of-court statements and adoptive admissions should be viewed with caution. He claims that by not giving CALJIC Nos. 2.71, 2.71.5, and 2.71.7 at the penalty phase, the jury was allowed to reconsider guilt phase evidence of his statements and admissions without caution, thus undermining his penalty defense of lingering doubt as to guilt. We discern no error.

We have previously held that a trial court has no duty to give CALJIC Nos. 2.71, 2.71.5, or 2.71.7 on its own motion at the penalty phase. (*People v. Livaditis* (1992) 2 Cal.4th 759, 782–784; *People v. Diaz* (2015) 60 Cal.4th 1176, 1188–1195.) The record does not indicate that Bertsch requested these instructions at the penalty phase. Nor does he point to any out-

of-court statements or adoptive admissions introduced a second time at the penalty phase to merit such instructions. Accordingly, the trial court did not err in failing to instruct the jury sua sponte with CALJIC Nos. 2.71, 2.71.5, or 2.71.7.

> f. *Lack of instructions pertaining to eyewitness and expert scientific testimony*

Bertsch likewise argues the trial court erred when it failed to repeat certain guilt phase instructions regarding eyewitness identification and expert testimony, which undermined his theory of lingering doubt. We disagree.

At the guilt phase trial, the court instructed the jury with CALJIC Nos. 2.80 (expert testimony — qualifications of expert), 2.83 (resolution of conflicting expert testimony), and 2.92 (factors to consider in proving identity by eyewitness testimony). The court also instructed: "Scientific evidence has been introduced in this case. You are the sole judges of the reliability of that evidence and of the weight to be given to that evidence." At the penalty phase, the court reinstructed the jury with CALJIC No. 2.80, but did not give the other referenced instructions a second time.[22]

Again, Bertsch did not request the additional instructions be given, and the trial court was under no sua sponte duty to do so. (*People v. Alcala* (1992) 4 Cal.4th 742, 803.) Therefore, no error occurred.

_____

[22] The substance of CALJIC No. 2.80 at the penalty phase was the same, except for an omitted paragraph listing the various witnesses who testified as experts in the guilt phase.

g. *Trial court's comment that juror names would be sealed*

Bertsch argues the court prejudicially erred when, in front of the entire jury, it informed a juror who was dismissed due to an upcoming vacation that her name would be sealed in the court record. Bertsch claims the court's statement gave remaining jurors the impression that Bertsch was dangerous and might retaliate against them. He also asserts juror anonymity could diminish the jurors' sense of responsibility for their verdict. We find no error.

Bertsch forfeited this claim by failing to object or request further admonition. The claim also fails on the merits. Code of Civil Procedure section 237, subdivision (a)(2) requires a trial court to seal the record of personal juror identifying information, including the jurors' names, upon the recording of a jury's verdict in a criminal jury proceeding. After recording the guilt phase verdict, and consistent with prior discussions with counsel, the court excused one juror and told her that her information would be sealed and would not be released without notice and a hearing. The court's statement correctly conveyed applicable law.

Moreover, Bertsch's stated concern regarding the remaining jurors' reaction to the court's statement is pure speculation. Nothing in the record suggests the remaining jurors were confused regarding the reason for the court's admonition to the dismissed juror. The court stated on the record that it found good cause to excuse the juror "because of the family trip that has been long scheduled and that you are taking commencing on [August] 30th" and that the juror could now talk to anyone about the case. It then admonished the remaining jurors that the case was ongoing and that they could

not talk to anyone about the case. The court did not suggest the dismissed juror's name was sealed due to security concerns, nor is there any indication in the record that the remaining jurors inferred from the admonition that Bertsch was a security threat. Accordingly, there was no error, let alone reversible error.

h. *Response to jury's question regarding sentence modification options*

Bertsch maintains the court erred when, in response to the jury's question about sentencing options, the court repeated a portion of the jury instructions. We determine the court acted within its discretion in choosing to repeat the instruction.

During penalty phase deliberations, the jury asked, "Do we have the option of modifying the two sentences given us[?]" The trial court denied Bertsch's request to have the jury clarify its question and replied, "As you have been instructed, your task is to decide which of two possible penalties is to be imposed on the defendant: death or life without the possibility of parole. Your task is to choose between these two, and only these two, possible penalties."

Pursuant to section 1138, when the jury " 'desire[s] to be informed on any point of law arising in the case . . . the information required must be given.' However, '[w]here the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 97, quoting *People v. Beardslee* (1991) 53 Cal.3d 68, 97.) Here, the original instruction clearly conveyed to the jury that the only possible sentences were death or life without the possibility of parole. By

repeating this instruction, the court directly answered the question posed. Therefore, no abuse of discretion occurred.

### 3. *Cumulative Error*

Bertsch and Hronis claim any guilt phase errors, even if found harmless, should be deemed prejudicial as to the penalty phase because the state cannot prove beyond a reasonable doubt that the errors did not affect the penalty verdict. We found three harmless errors at the guilt phase relating to the admission of Presley's and Cotton's testimony as well as Myers's testimony on cross-examination regarding Buoncristiani's troubleshooting. We also assumed errors but found them harmless as to the selection of a jury. However, there is no indication that these errors prejudiced Bertsch and Hronis at the penalty phase.

Aside from the *Faretta* error as to Hronis only, for which we are reversing the judgment of death as to Hronis, we assumed only a single error during the penalty phase relating to the use of court attendants at the penalty phase. Thus, there is nothing to accumulate as to Bertsch. (*People v. Reed* (2018) 4 Cal.5th 989, 1018.)

### 4. *Challenges to California's death penalty scheme*

Bertsch and Hronis challenge the constitutionality of numerous features of California's capital sentencing scheme. We have consistently rejected such challenges, individually and cumulatively (*People v. Stevens* (2007) 41 Cal.4th 182, 211 (*Stevens*)), and we decline to reconsider our prior precedents regarding the following holdings:

" 'The death penalty scheme is not unconstitutional for failing to require . . . findings beyond a reasonable doubt as to the existence of aggravating factors other than section 190.3,

factors (b) and (c), that aggravating factors outweigh mitigating factors, or that death is the appropriate penalty.' [Citation.] The United States Supreme Court's decisions in *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington*[ (2004)] 542 U.S. 296, *Ring v. Arizona*[ (2002)] 536 U.S. 584, and *Apprendi v. New Jersey*[ (2000)] 530 U.S. 466 do not alter these conclusions." (*People v. Mataele* (2022) 13 Cal.5th 372, 435 (*Mataele*); *Ramirez*, *supra*, 13 Cal.5th at pp. 1160–1161.)

"The Constitution does not require that a jury make written findings regarding aggravating factors, or reach unanimity as to which aggravating evidence is true." (*Stevens*, *supra*, 41 Cal.4th at p. 212; see *Mataele*, *supra*, 13 Cal.5th at p. 435; *Homick*, *supra*, 55 Cal.4th at p. 903.)

"Section 190.2 adequately narrows the category of death-eligible defendants and is not impermissibly overbroad under the requirements of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. [Citations.] The various special circumstances are not unduly numerous or expansive." (*Winbush*, *supra*, 2 Cal.5th at p. 488; see *Schultz*, *supra*, 10 Cal.5th at p. 682; *Ramirez*, *supra*, 13 Cal.5th at p. 1160.)

" 'The absence of intercase proportionality review does not violate the Eighth and Fourteenth Amendments to the United States Constitution.' [Citation.] 'We do provide *intracase* proportionality review. Defendant does not specifically request such review, but given the crime . . . , it is inconceivable that it would aid him.' " (*Homick*, *supra*, 55 Cal.4th at p. 903; see *People v. Anderson* (2001) 25 Cal.4th 543, 602 (*Anderson*).)

"Use of adjectives such as 'extreme' and 'substantial' in section 190.3, factors (d) and (g), respectively, does not create a

constitutionally impermissible barrier to the jury's consideration of a defendant's mitigating evidence." (*People v. Johnson* (2016) 62 Cal.4th 600, 656.)

"Prosecutorial discretion to select those death-eligible cases in which the death penalty will actually be sought is not constitutionally impermissible." (*Anderson, supra*, 25 Cal.4th at p. 601; see also *Homick, supra*, 55 Cal.4th at p. 903; *People v. Box* (2000) 23 Cal.4th 1153, 1217.)

Section 190.3 factors in aggravation have not been applied so broadly as to result in arbitrary and contradictory results. (*People v. Gonzales* (2011) 51 Cal.4th 894, 957 (*Gonzales*); accord, *Tuilaepa v. California* (1994) 512 U.S. 967, 975–976 [rejecting facial challenge to § 190.3, factor (a)].)

" ' "[T]here is no requirement jurors be instructed there is a ' " 'presumption of life' " ' or that they should presume life imprisonment without the possibility of parole is the appropriate sentence." ' " (*People v. Tran* (2022) 13 Cal.5th 1169, 1236; see *Young, supra*, 34 Cal.4th at p. 1233.)

"Appellate review of death judgments is not impermissibly influenced by political considerations in violation of the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution." (*People v. Prince* (2007) 40 Cal.4th 1179, 1299; see *Gonzales, supra*, 51 Cal.4th at p. 958; *People v. Kipp* (2001) 26 Cal.4th 1100, 1140–1141.)

"CALJIC No. 8.85's use of the phrase 'whether or not,' is not an invitation to jurors who find 'a factor not proven' to then 'use that factor as a factor favoring imposition of the death penalty.' " (*People v. Cook* (2006) 39 Cal.4th 566, 618; see *People v. Krebs* (2019) 8 Cal.5th 265, 348; *People v. Miracle* (2018) 6 Cal.5th 318, 354.)

"The jury's consideration of unadjudicated criminal conduct in aggravation is constitutional, and jury unanimity regarding such conduct is not required." (*People v. Kelly* (2007) 42 Cal.4th 763, 800; see *People v. Brown, supra,* 33 Cal.4th at p. 402.)

"California's death penalty does not violate international law or international norms of decency." (*People v. Frederickson* (2020) 8 Cal.5th 963, 1027; see *Mataele, supra,* 13 Cal.5th at p. 436; *People v. Kelly, supra,* 42 Cal.4th at p. 801.)

"The capital sentencing scheme does not violate equal protection by denying certain procedural protections to capital defendants that are available to noncapital defendants." (*Scully, supra,* 11 Cal.5th at p. 612; see *People v. Molano* (2019) 7 Cal.5th 620, 678.)

We have previously rejected the argument that "a death sentence cannot be imposed unless the jury finds the defendant guilty 'beyond all possible doubt.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 314.) We have likewise rejected the claim that " 'evidence of guilt must be stronger in a capital case than in a noncapital case.' " (*Ibid.*, quoting *People v. Lewis* (2009) 46 Cal.4th 1255, 1290, fn. 23.)

### C. Appellate Delays

Bertsch argues that the five-year delay between his death sentence and the appointment of appellate counsel violated his federal constitutional rights to equal protection and due process of law. Hronis similarly contends the delays in appointment of counsel and filing of appellate briefs inflicted cruel and unusual punishment on him in violation of the federal Eighth and Fourteenth Amendments.

We have consistently rejected the claim that the delay in processing a capital appeal violates international norms or a defendant's constitutional rights to due process, equal protection, and freedom from cruel and unusual punishment. (*Winbush*, *supra*, 2 Cal.5th at p. 488; *People v. Wallace* (2008) 44 Cal.4th 1032, 1098 ["The delay inherent in death penalty appeals, including the delay in the appointment of appellate counsel, does not violate due process"].) "Further, . . . we have in the past declined to recognize the existence of a 'right to a speedy appeal' as an offshoot of the United States Constitution Sixth Amendment's right to a speedy trial." (*Wallace*, at p. 1098.) The " 'automatic appeal process following judgments of death is a constitutional safeguard, not a constitutional defect [citations], because it assures careful review of the defendant's conviction and sentence [citation].' " (*Winbush*, at p. 488.) "Moreover, while we remain sensitive to the evolution of Eighth Amendment doctrine, we recently found no factual basis for concluding that systemic delays render California's capital punishment scheme arbitrary and capricious." (*Ibid*.)

Bertsch's reliance on *Harris v. Champion* (10th Cir. 1994) 15 F.3d 1538 is misplaced. "We previously have distinguished that case, in which the federal court of appeals held that a two-year delay in disposing of noncapital criminal appeals is presumptively excessive, as '[not] address[ing] the unique demands of appellate representation in capital cases' " (*People v. Dunkle* (2005) 36 Cal.4th 861, 942, citing *People v. Holt* (1997) 15 Cal.4th 619, 709.) Bertsch provides no persuasive argument why we should not reach the same conclusion here.

In sum, Bertsch and Hronis have not shown that the delays inherent with the appointment of counsel and the capital appellate process violated their constitutional rights.

### D. Restitution Fines

At sentencing, the trial court imposed $10,000 restitution fines on Bertsch and Hronis. Subsequently, the Legislature imposed a 10-year limit on the enforcement and collection of these restitution fines. (§ 1465.9, subd. (d).) The statute provides: "Upon the expiration of 10 years after the date of imposition of a restitution fine pursuant to Section 1202.4, the balance, including any collection fees, shall be unenforceable and uncollectible and any portion of a judgment imposing those fines shall be vacated."

Because the restitution fines were levied on Bertsch and Hronis more than 10 years ago, any balance under those fines is uncollectable and unenforceable by operation of law. Any unpaid balance for both Bertsch and Hronis is hereby vacated.

### III. DISPOSITION

The judgment of conviction and the judgment of death as to Bertsch are affirmed. The balance, if any, of the restitution fine levied against Bertsch is vacated. The superior court is ordered to prepare an amended abstract of judgment reflecting the vacatur of the unpaid balance of the restitution fine and to provide a copy of that amended abstract to the Department of Corrections and Rehabilitation.

The judgment of conviction as to Hronis is affirmed, but the judgment of death is reversed. The balance, if any, of the restitution fine levied against Hronis under section 1202.4 is vacated. As to Hronis only, the matter is remanded to the trial court for further proceedings in accordance with this opinion.

At the conclusion of any further proceedings as to Hronis, the superior court is ordered to prepare an amended abstract of judgment reflecting the vacatur of the unpaid balance of the

section 1202.4 fine, as well as any other necessary changes, and to provide a copy of that amended abstract to the Department of Corrections and Rehabilitation

**GUERRERO, C. J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**EVANS, J.**
**VIRAMONTES, J.**[*]

---

[*]     Associate Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Bertsch and Hronis

_____

<u>Procedural Posture</u> (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S093944
**Date Filed:** April 20, 2026

_____

**Court:**  Superior
**County:**  Sacramento
**Judge:**  Lloyd G. Connelly

_____

**Counsel:**

Thomas Lundy and Alex Coolman, under appointments by the Supreme Court, for Defendant and Appellant John Bertsch.

Mark E. Culter, under appointment by the Supreme Court, for Defendant and Appellant Jeffrey Hronis.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, James William Bilderback II, Assistant Attorney General, Sean M. McCoy, Clara M. Levers, Kevin L. Quade and John W. Powell, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Alex Coolman
Attorney at Law
3268 Governor Drive #390
San Diego, CA 92122
(619) 831-7129

Mark E. Culter
Attorney at Law
P.O. Box 501
Lincoln, CA 95648
(530) 305-5575

John W. Powell
Deputy Attorney General
1300 I Street
Sacramento, CA 95814
(916) 210-7770